IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL CASE NO. |
| | 1:11-CR-255-TWT-RGV |
| ASHLEY HENDERSON | |

## ORDER FOR SERVICE OF FINAL REPORT AND RECOMMENDATION

Attached is the Report and Recommendation of the United States Magistrate Judge made in accordance with 28 U.S.C. § 636(b)(1) and Local Criminal Rule 59(2)(a)-(b). Let the same be filed and a copy, with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the Report and Recommendation within fourteen (14) days of receipt of this Order. Should objections be filed, they shall specify with particularity the alleged error(s) made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party. The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the District Court. Failure to object to this Report and Recommendation waives a party's right to review. Fed. R. Crim. P. 59(b)(2).

Pursuant to Title 18, U.S.C. § 3161(h)(1)(D) and (H), **the above-referenced fourteen (14) days allowed for filing objections is EXCLUDED from the computation of time under the Speedy Trial Act, whether or not objections are actually filed.** The Clerk is **DIRECTED** to submit the Report and Recommendation with objections, if any, to the District Court after expiration of the above time period.

**IT IS SO ORDERED**, this 16th day of April, 2012.

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL CASE NO. 1:11-CR-255-TWT-RGV |
| ASHLEY HENDERSON | |

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION

Defendant Ashley Henderson ("Henderson") is one of nine defendants charged in a fifteen-count indictment with unlawfully taking personal property by means of actual and threatened force, violence, and fear of injury in violation of 18 U.S.C. §§ 1951 and 2, using a firearm in relation to a crime of violence in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2, and conspiring to do so in violation of 18 U.S.C. § 1951. [Doc. 312]. Henderson filed a motion to suppress identification, [Doc. 189], on October 13, 2011, and a supplemental motion to suppress identification, [Doc. 234], on November 19, 2011. The government responded on November 23, 2011, [Doc. 253], and Henderson replied on November 30, 2011, [Doc. 264].[1] Following an

---

[1] The government also filed a surreply on December 2, 2011. See [Doc. 267]. However, "[n]either the Federal Rules nor the Court's Local Rules allow sur-reply briefs as a matter of right, and the Court normally does not permit sur-replies." USMoney Source, Inc . v. Am. Int'l Specialty Lines Ins. Co., No. 1:07-cv-0682-WSD, 2008 WL 160709, at *2 n.5 (N.D. Ga. Jan. 15, 2008), rev'd on other grounds, 288 F. App'x 558 (11th Cir. 2008) (per curiam) (unpublished) (citation omitted); see also

evidentiary hearing on January 12, 2012,[2] the undersigned **RECOMMENDS** that

Henderson's original and supplemental motions, [Docs. 189 & 234], be **DENIED.**

## I. FACTUAL BACKGROUND

On December 7, 2010, Monica Abdul-Rashid ("Abdul-Rashid"), who worked

as an ATM technician for Dunbar Armored, Inc. ("Dunbar"), an armored car

company, arrived at the Mall of Georgia to service an ATM machine. [Doc. 253-4 at

1-2; Doc. 304 at 9-10]. Abdul-Rashid exited the armored car with the money for the

ATM machine and walked straight into the mall, with another employee following

behind her. [Doc. 253-4 at 2; Doc. 304 at 11]. She walked to the ATM machine on the

second level, and while she was preparing to service the machine, a man walked up

on her right side, and she looked at him in his face. [Doc. 304 at 11, 13, 24-25]. The

---

Leatherwood v. Anna's Linens Co., 384 F. App'x 853, 857 (11th Cir. 2010) (per
curiam) (unpublished) (citation omitted). "Although the Court may in its discretion
permit the filing of a surreply, this discretion should be exercised in favor of
allowing a surreply only where a valid reason for such additional briefing exists,
such as where the movant raises new arguments in its reply brief." Fedrick v.
Mercedes-Benz USA, LLC, 366 F. Supp. 2d 1190, 1997 (N.D. Ga. 2005 ) (citations
omitted); see also St. James Entm't LLC v. Dash Crofts, Civil Action No.
1:09-CV-1975-RWS, 2010 WL 2802616, at *1 (N.D. Ga. July 13, 2010) ("Certainly, the
Court is disinclined to consider arguments raised in a surreply which could have
been raised in an earlier filing."). The government's surreply only addresses
Henderson's arguments regarding whether or not an evidentiary hearing was
required, which is now moot. See generally [Doc. 267]. Accordingly, the Court has
not considered the arguments raised in the government's surreply.

[2] See [Doc. 304] for a transcript of the January 12, 2012, evidentiary hearing.

man then said, "What's up?" and Abdul-Rashid continued to look at him, wondering why he was talking to her. [Doc. 253-4 at 2; Doc. 304 at 11, 13, 24-25]. The man turned away from her and continued to walk toward the exit, but he then turned around to face Abdul-Rashid and put a gun in her face. [Doc. 253-4 at 2; Doc. 304 at 11-12, 25-26]. The man was "probably about a foot and six inches" away from her, and she focused on the barrel of the gun and was "terrified," but testified that she "will never forget his face." [Doc. 304 at 12, 14, 26-27]. Abdul-Rashid testified that the man was about six feet or a little taller, and "looked like he was kind of thick, not fat, but he had meat on him." [Id. at 15]. He was wearing a hat pulled down over his eyes and had on a big jacket that stopped at his waist. [Id. at 15-16]. The jacket was zipped or buttoned closed. [Id.]. The man told Abdul-Rashid to "give [him] the money." [Id. at 14]. Abdul-Rashid immediately ducked, saying, "No, no, no," and ran to a nearby perfume store where she called 911. [Doc. 253-4 at 2].

On the morning of March 30, 2011, Abdul-Rashid received a call informing her that someone from the Federal Bureau of Investigation ("FBI") was going to come to her home to show her a photographic lineup.[3] [Id. at 21-22, 35]. Later that day,

---

[3] Between the day of the robbery and March 30, 2011, Abdul-Rashid had no contact with law enforcement and was not shown any photos. [Doc. 304 at 17].

Corporal Dennis Hennelly ("Corporal Hennelly") and Corporal Shelly Millsap ("Corporal Millsap") of the Gwinnett County Police Department ("GCPD") met with Abdul-Rashid at her home to show her a photographic array.[4] See [Doc. 253-5; Doc. 304 at 17, 28-29, 54-55] see also [Doc. 253-2 (photographic array)]. Although neither corporal had formal training about photographic lineups, they worked with the criminal investigation division ("CID"), which routinely handles lineup identifications, and there is a section in the CID manual that explains photographic lineups. [Doc. 304 at 30-31, 55-56]. Corporals Hennelly and Millsap were not involved with the investigation of the armored car robberies because they worked in a separate homicide unit, and they did not review any police records regarding the incident prior to meeting with Abdul-Rashid, whom they met for the first time when they showed her the photographic lineup. [Id. at 31-32, 34, 39, 44, 55-57]. Neither Corporal Hennelly nor Corporal Millsap was in charge of putting the lineup together, nor do they know who created the lineup. [Id. at 31-32, 34, 56]. Neither corporal knew which photograph in the lineup was the alleged perpetrator when

---

[4] Abdul-Rashid could not recall whether the officers who arrived at her home were actually with the FBI or the GCPD. [Doc. 304 at 22]. Two officers were sent to present the lineup and no visual or audio recording was made of the witness' identification. [Id. at 33, 58].

they showed the lineup to the witness, nor did they know who specifically had been arrested with respect to the robbery. [Id. at 34, 39, 44, 56, 61].

Upon arriving at Abdul-Rashid's home, Corporal Hennelly told her that they were going to show her a lineup,[5] but he first gave her the photographic lineup affidavit to read.[6] [Doc. 304 at 17-18 & Def.'s Ex. 1 (photographic lineup affidavit)]. Abdul-Rashid read the affidavit, responded affirmatively when the corporal asked if she understood it, and then signed it. [Doc. 253-5; Doc. 304 at 18, 22-23, 36, 58-59 & Def.'s Ex. 1]. Corporal Hennelly then handed her the lineup with the photographs facing the ground,[7] and she turned around and walked away from the corporals while looking at the lineup.[8] [Doc. 304 at 19, 23-24, 36]. Henderson appeared in the second position of the six-photograph array, see [Doc. 253-5], but the corporals did

---

[5] The photographic lineup contained 6 black and white photographs and did not indicate the height of the individuals depicted. [Doc. 304 at 37-38].

[6] The photographic lineup affidavit stated that the lineup may not actually include the person who committed the crime and informed the witness that she did not have to identify anyone and that she had to make up her own mind if the perpetrator was present in the lineup. [Doc. 304 at 23].

[7] Corporal Hennelly testified that he does this so that he can observe the person's natural facial reaction when they flip the lineup over and first see the array. [Doc. 304 at 36]. He testified that it also prevents the witness from thinking that his hand is pointing at a certain person. [Id.].

[8] Corporal Hennelly testified that he did not remember Abdul-Rashid walking away. [Doc. 304 at 36]. He recalled that she was "very close" and facing him. [Id.].

not tell Abdul-Rashid that the suspect was in the lineup or even that any suspect had been arrested in connection with the robbery, and they said nothing to suggest who she should select, [Doc. 304 at 19, 24, 49, 61-62, 64]. Within seconds of viewing the array, Abdul-Rashid "quickly stated, 'Oh Lord it is number two.'" [Doc. 253-5; Doc. 304 at 20, 24, 49, 59, 64].[9] Although Abdul-Rashid asked the corporals if they "had [the suspect]," they ignored her question and told her that they could not talk to her about the case. [Doc. 304 at 20, 24, 39, 60, 62]. Abdul-Rashid then confirmed that she was positive that the person depicted in photograph two, Henderson, was the robber, and the officers had her circle the number of the photograph that she had chosen. [Doc. 253-5; Doc. 304 at 20-21, 24, 47-48, 64-65]. The officers then left her home, and she cannot remember being interviewed by anyone else.[10] [Doc. 304 at 21].

---

[9] Corporal Hennelly testified that Abdul-Rashid identified number two "as soon as she flipped [the lineup] over." [Doc. 304 at 36]. He stated that the witness appeared to be traumatized by what she was looking at because she "started shaking, paper was shaking in her hand, she had to sit down." [Id.]; see also [id. at 59 (Corporal Millsap testifying that the witness started shaking)]. However, Corporal Hennelly did not indicate that the witness appeared traumatized in the report he wrote about showing her the lineup. [Id. at 42-43].

[10] Corporals Hennelly and Millsap also showed this lineup to another witness, Brian Beaman ("Beaman") on March 30, 2011. [Doc. 204 at 49-52, 62-64]. The corporals used the same procedure, and Beaman did not select any photograph. [Id.].

## II. DISCUSSION

The Supreme Court has developed a two-part test to review an out-of-court identification. "First, we ask whether the original identification procedure was unduly suggestive." United States v. Brown, 441 F.3d 1330, 1350 (11th Cir. 2006); see also Manson v. Brathwaite, 432 U.S. 98, 106-07 (1977). If so "we then consider whether, under the totality of the circumstances, the identification was nonetheless reliable." Brown, 441 F.3d at 1350 (internal marks omitted) (quoting United States v. Diaz, 248 F.3d 1065, 1102 (11th Cir. 2001); see also United States v. Smith, 459 F.3d 1276, 1294 (11th Cir. 2006) (alteration and citation omitted) ("The court must first decide whether the procedure was impermissibly suggestive, and if it was suggestive the court must then determine whether the identification procedure created a substantial likelihood of misidentification."). Henderson bears the initial burden of proving that the identification procedure was unduly suggestive, and if he is successful, the burden then shifts to the government to prove that the identification was reliable in spite of the suggestive procedure. United States v. Wade, 388 U.S. 218, 240 n.31 (1967).

### 1.    *Unduly Suggestive*

In his motion to suppress the identification, Henderson asserts that "the photo array[] . . . contain[s] a combination of photographs that, in and of themselves are

unduly suggestive." [Doc. 234 at 3]. Henderson contends that the photographic array was unduly suggestive because (1) photographs one and three have "distinctly lighter backgrounds," (2) Henderson's photograph is "much more close up" than the other four photographs, (3) the persons depicted in photographs one, three, four, and five have "noticeable facial hair," contrary to the witness' recount of the robber with "low-cut facial hair," (4) "only [Henderson] and the person depicted in photograph [sic] appear to be stocky," and (5) Henderson's hair "seems to be the longest." [Id. at 9-10]. Henderson also alleges "upon information and belief, law enforcement, when displaying the photo arrays to witnesses employed suggestive tactics suggesting which photo the witness should select." [Id. at 3-6].[11] However, the Court finds that none of these alleged differences in the photographs or the procedures employed by Corporals Hennelly and Millsap render the photographic identification unduly suggestive.

---

[11] Henderson also contends that the identification was unduly suggestive because it was not administered as a "double blind" identification. [Doc. 234 at 8]. However, assertions that the use of a non-blind or double non-blind lineup procedure is inherently suggestive have been explicitly rejected by this and other courts. See United States v. Moulton, Criminal Action No. 1:10-cr-120-MHS, 2011 WL 902639, at *1 (N.D. Ga. Mar. 14, 2011); Young v. Symmes, Civil No. 06-4246 (JRT/JJG), 2008 WL 4748569, at *13 (D. Minn. Oct. 28 2008), adopted at *5 (citation omitted).

In evaluating the suggestiveness of a photographic array, courts consider the size of the array, the manner of its presentation by law enforcement officers, and the details of the photographs themselves. <u>See</u> <u>United States v. McNeill</u>, Criminal No. 06-373, 2007 WL 2234516, at *4 (W.D. Pa. Aug. 2, 2007) (<u>citing</u> <u>United States v. Wiseman</u>, 172 F.3d 1196, 1208-09 (10th Cir. 1999)); <u>United States v. Rosa</u>, 11 F.3d 315, 330 (2d Cir. 1993)). A defendant in a lineup does not have to be surrounded by others identical in appearance, and a lineup is not unduly suggestive merely because the defendant's photograph can be distinguished from others. <u>See</u> <u>Cikora v. Dugger</u>, 840 F.2d 893, 896-97 (11th Cir. 1988) (district court did not clearly err by admitting identification where only defendant's photograph in lineup had height markings in background and defendant was a different race than several other subjects); <u>Watson v. Harrison</u>, No. CV 06-3626-SJO (JCR), 2008 WL 2163940, at *7 (C.D. Cal. May 12, 2008). <u>But see</u> <u>O'Brien v. Wainwright</u>, 738 F.2d 1139, 1141 (11th Cir. 1984) (color photograph displayed with five other black-and-white mug shots "stuck out like a sore thumb").

The Eleventh Circuit and other courts have held that if the subjects in a lineup have "substantial similarity in facial features, complexion, facial hair, and general body type and appearance," the lineup is not unduly suggestive. <u>United States v. Smith</u>, 148 F. App'x 867, 874-75 (11th Cir. 2005) (per curiam) (unpublished) (internal

marks omitted); <u>United States v. Anderson</u>, 156 F. App'x 218, 220-21 (11th Cir. 2005) (per curiam) (unpublished); <u>see also</u> <u>United States v. Rose</u>, 362 F.3d 1059, 1066 (8th Cir. 2004) (photographic lineup not unduly suggestive although defendant's eyes may have appeared closed in his photograph and his hair was shorter than the rest, where basic physical features of others were consistent with description provided by witness and generally similar to defendant's features); <u>United States v. Burbridge</u>, 252 F.3d 775, 780 n.5 (5th Cir. 2001) (that defendant was the only one in photographic lineup with black t-shirt not impermissibly suggestive); <u>Harker v. Maryland</u>, 800 F.2d 437, 444 (4th Cir. 1986) (photo array not impermissibly suggestive where only one other individual wore clothing similar to defendant's clothing, as identification based more on facial features than clothing); <u>United States v. Johnson</u>, 56 F.3d 947, 954 (8th Cir. 1995) (photo spread comprised of African-American men with similar features to the African-American suspect was proper).

The fact that two of the photos have lighter backgrounds does not render the photographic array unduly suggestive. This difference in backgrounds does not impermissibly distinguish Henderson's photograph which is one of four photos with allegedly darker backgrounds. Here, the background in at least three other pictures are similar in shade to Henderson's photograph, and "none are so [different] as to make [Henderson's] picture more conspicuous than the others." <u>United States v.</u>

<u>Smith</u>, 546 F.2d 1275, 1280 (5th Cir. 1976[12]) (holding that an array in which the defendant's photograph was lighter than the other five photographs was not unduly suggestive); <u>see also</u> [Doc. 253-2]. Moreover, although Henderson contends his photo "is much more close up" than the others, a review of the photographic array shows that each photo depicts the same proportions of each person (head and neck) and the photograph of Henderson does not show any more or any less of him than is depicted in the other photographs. <u>See</u> [Doc. 253-2]. Because "[a] lineup is not unduly suggestive merely because the defendant's photograph can be distinguished from the others," <u>Smith</u> 148 F. App'x at 874, and Henderson has not suggested that these differences somehow indicate he was the robber, <u>see</u> <u>United States v. Sanders</u>, 275 F. App'x 121, 124 (3d Cir. 2008) (unpublished) (finding an array in which the defendant was the only person not wearing a shirt not unduly suggestive because "we are not prepared to say that there is any logical connection between being bare-chested and being guilty"), these alleged differences do not render the out-of-court identification unconstitutionally suggestive.

Henderson's remaining assertions are related to the fact that his photograph more closely matches the witness' description of the perpetrator than the photos of

---

[12] Decisions of the Fifth Circuit rendered before October 1, 1981, are binding precedent in the Eleventh Circuit. <u>Bonner v. City of Prichard, Ala.</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

the other witnesses. Specially, he asserts that his hair is the longest, that only he and one other man appear "stocky" and that only he and one other man have "low cut facial hair," and that the lineup is thus suggestive because his picture more closely matches the description given by the witness than the others. See [Doc. 234 at 9-10]. However, with respect to facial hair, a review of the photographs shows that they all depict persons with similar facial hair, and thus any differences are not unduly suggestive. See Cikora, 840 F.2d at 897 (providing that a photographic array was not unduly suggestive where "[a]ll the men depicted had some facial hair" even though the defendant's "moustache in the picture was sparse"); see also [Doc. 253-2]. Furthermore, a review of the photographs shows that Henderson appears to have hair the same length as the men in photographs three and four.[13] See [Doc. 253-2]. Finally, as the photographs all depict only the head and neck of the suspects, it is impossible to say whether Henderson is "stockier" than any of the other men in the array. See [id.].

Contrary to Henderson's assertions, the evidence shows that the photographic lineup was not presented in a suggestive manner to the witness. See [Doc. 234 at 3-

---

[13] Furthermore, as the government notes, the admonition form given to the witness before she saw the photographic array specified that "hair styles, beards and moustaches are easily changed," adequately protecting against undue suggestiveness based on the minor differences in facial hair or hair length among the photographs. See [Doc. 253-1 at 1].

6].  Neither officer was involved in the underlying investigation or the creation of the photo array, nor did they have any knowledge about any particular arrest or even which photo depicted the suspect.  See [Doc. 304 at 31-32, 34, 39, 44, 55-57, 61]. Corporal Hennelly handed the lineup to the witness face down, a procedure he uses in order to avoid making any suggestions to the witness by how his hand is positioned on the array.  [Id. at 36].  Neither officer said anything to suggest that the photographic array necessarily contained the photograph of the robber, indicated that an arrest had been made, or did anything to suggest which photograph the witness should select.  [Id. at 19, 24, 49, 61-62, 64].  After the witness made her selection, the officers did nothing to confirm or deny whether she had selected correctly, and informed her that they could not talk to her about the case.  [Id. at 20, 24, 39, 60, 62].  Furthermore, the officers used the same exact procedure with a second witness later that day, and that witness did not select any photograph. See [id. at 49-52, 63-64], indicating that the procedure used did not inherently pressure the witness into selecting Henderson's photograph.

In sum, the Court finds that the photographic array, consisting of six black and white photographs of African-American males, is not unduly suggestive because Henderson's photograph is sufficiently similar to the others in size, details, and manner of presentation to render it inconspicuous.  The photographs each

depict African-American males similar in age and with similar haircuts and facial

hair. [Doc. 253-2]. Likewise, each photograph is a facial shot, not a side view, each

depicts the same profile consisting of the shoulders, neck, and face, and each subject

is dressed in civilian clothes, not in prison garb. [Id.]. The photographs are all the

same size, and the subjects themselves occupy approximately the same amount of

space in each photograph. [Id.]. Neither officer presenting the lineup was aware

that Henderson's photo was in the second position, and neither made any sort of

statement or gesture to suggest to the witness which photograph to select. See [Doc.

304 at 19-20, 24, 31-34, 36, 39, 44, 49, 55-57, 60-62]. Thus, the views or angles

presented of each subject, the details of the subjects' physical features, the fact that

they all wore civilian clothes, the size of the photographs, the fact that each was a

black and white photo, and the manner in which the lineup was presented to the

witness all weigh toward a finding that the array was not unduly suggestive. See

Smith, 148 F. App'x at 874-875; Anderson, 156 F. App'x at 220-21; Johnson, 56 F.3d

at 954; United States v. Sanchez, 24 F.3d 1259, 1263 (10th Cir. 1994) (finding that a

six-person lineup in which the defendant was the only one with his eyes closed was

not unduly suggestive); Cikora, 840 F.2d at 896-97 (holding lineup not impermissibly

suggestive where defendant's photograph had height markings in the background,

and the defendant was a different race than several other persons photographed);

Watson, 2008 WL 2163940, at *7 (holding lineup not impermissibly suggestive where all individuals in six-person lineup were of similar age and complexion, with extremely short hair even though petitioner was only one who was bald and had a lip piercing). Accordingly, Henderson's motions to suppress identification, [Docs. 189 & 234], are due to be **DENIED**.

2. *Reliability*

Because the photographic array was not unconstitutionally suggestive, the inquiry ends there. Williams v. Weldm, 826 F.2d 1018, 1021 (11th Cir. 1987) ("We must first decide whether the original identification procedure was unduly suggestive. If not, that ends the inquiry."); see also Perry v. New Hampshire, 132 S. Ct. 716, 730 (2012) ("[T]he Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement."). However, even if the array were found to be unduly suggestive, the evidence in the record indicates that Abdul-Rashid's identification of Henderson was reliable, and therefore, it is not subject to suppression.

The test for determining the reliability of identification testimony is whether, when viewed in light of the totality of the circumstances, it possesses sufficient

indicia of reliability.[14]  Manson, 432 U.S. at 114.  The factors considered in the

"totality of the circumstances" analysis include: the opportunity to view the

perpetrator at the time of the crime; the witness' degree of attention; the accuracy of

the witness' prior description of the perpetrator; the level of certainty demonstrated

by the witness at the confrontation; and the length of time between the crime and the

confrontation.[15]  Neil v. Biggers, 409 U.S. 188, 199-200 (1972); Manson, 432 U.S. at

_____

[14] Henderson asserts that the admission of the identification into evidence
should be subject to a heightened reliability standard since this case may involve the
death penalty.  See [Doc. 234 at 11-12; Doc. 264 at 1-2].  While Henderson is correct
that the Supreme Court has stated that "[i]n capital proceedings generally, this Court
has demanded that factfinding procedures aspire to a heightened standard of
reliability," Ford v. Wainwright, 477 U.S. 399, 411 (1986) (citation omitted), a review
of the cases cited by the Supreme Court, Henderson, and the government reveals
that the Supreme Court applies this heightened reliability standard "in the
determination [of] whether the death penalty is appropriate in a particular case,"
Sumner v. Shuman, 483 U.S. 66, 72 (1987) (citations omitted), not in pretrial
evidentiary rulings of cases where the death penalty is being sought, see, e.g., Monge
v. California, 524 U.S. 721, 722 (1998) (capital trial's sentencing phase); Ford, 477 U.S.
at 411 (habeas appeal for clemency on basis of mental defect); Spaziano v. Florida,
468 U.S. 447, 456 (1984) (jury instructions); Gardner v. Florida, 430 U.S. 349, 358
(1977) (capital trial's sentencing phase); Woodson v. North Carolina, 428 U.S. 280,
305 (1976) (capital trial's sentencing phase); Peek v. Kemp, 784 F.2d 1479, 1493-94
(11th Cir. 1986) (en banc) (jury instructions).  Consequently, the Court agrees with
the government that  the "heightened reliability" standard applies "to the ultimate
imposition of the death penalty," [Doc. 253 at 9-10], and not to identification
procedures, and the Court will evaluate the reliability of the identification procedure
under the usual standard.

[15] In his motion to suppress, Henderson presents statistics regarding the
alleged fallibility of eyewitness evidence, asserting that eyewitness identification is
uniquely unreliable, see [Doc. 234 at 3-6], however, ""the potential unreliability of
a type of evidence does not alone render its introduction at the defendant's trial

114; <u>Blanco v. Singletary</u>, 943 F.2d 1477, 1508 (11th Cir. 1991); <u>United States v. Rodger</u>, No. CR 109-040, 2010 WL 2643268, at *17 (S.D. Ga. Apr. 16, 2010), adopted by 2010 WL 2643267, at *4 (S.D. Ga. June 30, 2010).

"The record here reflects that [Abdul-Rashid] was paying close attention at the time of the crime and had an adequate opportunity to view [Henderson] at close range," <u>United States v. Moulton</u>, Criminal Case No. 1:10-CR-00120-MHS-RGV, 2010 WL 6084115, at *11 (N.D. Ga. Nov. 22, 2010), adopted by 2011 WL 902639, at *1 (N.D. Ga. Mar. 14, 2011), both when he "walk[ed] up beside [her] and asked, "What's up?" and when he turned around to face her and put a gun in her face, <u>see</u> [Doc. 253-4 at 2; Doc. 304 at 11-14, 24-27 (witness testifying that she looked at the robber's face and that she "kept looking at him")]. Moreover, the specific description of both the robber and the weapon he used provided by Abdul-Rashid is evidence that her degree of attention was high. <u>See</u> [Doc. 253-4 at 2 (relating witness' description of the robber as an African-American male with a stocky build in his late twenties or early thirties who had "real low cut facial hair" and "real low cut hair" and

_____

fundamentally unfair," <u>Perry</u>, 132 S. Ct. at 728 (citations omitted), and thus the potential fallibility of eyewitness identification generally is not relevant to assessing indicia of reliability with respect to this particular identification, and will not be used by this Court to exclude such evidence from the consideration of the jury, <u>see</u> <u>id.</u> ( "The fallibility of eyewitness evidence does not, without the taint of improper state conduct, warrant a due process rule requiring a trial court to screen the evidence for reliability before allowing the jury to assess its creditworthiness.").

specifying that he was wearing a black or dark blue "big, short coat," with gray trim and describing the gun as a black semi-automatic gun with a big barrel and silver lines on the side); Doc. 304 at 15-16].  As this description reasonably matches Henderson, "the accuracy of the prior description of the criminal" factor also weighs in favor of reliability.  See United States v. Dixon, 401 F. App'x 491, 494 (11th Cir. 2010) (per curiam) (unpublished) (providing that the third Biggers factor weighed in favor of reliability in light of the witness's "reasonably accurate description of [the defendant] following the crime").

Additionally, the police report and testimony at the evidentiary hearing indicate that at the time the witness made the identification, she demonstrated a high level of certainty.  See [Doc. 253-5 (reporting that the witness "quickly" said "oh Lord it is number two" and then stated that she was "positive" that the person depicted in photograph two [Henderson] was the robber); Doc. 304 at 20-21, 24, 47-49, 59, 64-65].  Finally, the time between the crime and the identification, less than 4 months, is "not so long as to lead to the conclusion that the identification was unreliable."  United States v. Douglas 489 F.3d 1117, 1127 (11th Cir. 2007) (per curiam) (finding that more than eight months between the crime and an in-court identification did not render that identification unreliable).  Therefore, even if Henderson had presented evidence that the procedure used was unduly suggestive,

his motion would still be due to be denied because the evidence of record indicates that Abdul-Rashid's identification was nevertheless reliable.  See Manson, 423 U.S. at 116 (explaining that short of a "very substantial likelihood of irreparable misidentification . . . [out-of-court photographic identifications are] for the jury to weigh"); Simmons v. United States, 390 U.S. 377, 384 (1968) (stating that suppression of an out-of-court photographic identification is proper where, after consideration of the Biggers factors, the "procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification").

### III.  CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that Henderson's original and supplemental motions to suppress identification, [Docs. 189 & 234], be **DENIED**.[16]

**IT IS SO RECOMMENDED**, this 16th day of April, 2012.

_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

---

[16] Because Henderson and other co-defendants still have pending motions before this Court, this case is not ready to be certified for trial.