IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

ASHLEY HENDERSON

CRIMINAL CASE NO.

1:11-cr-00255-TWT-RGV

## ORDER FOR SERVICE OF REPORT AND RECOMMENDATION

Attached is the Final Report, Recommendation, and Order of the United States Magistrate Judge made in accordance with 28 U.S.C. § 636(b)(1) and Local Criminal Rule 59(2)(a)-(b). Let the same be filed and a copy, with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the Report and Recommendation within fourteen (14) days of receipt of this Order. Should objections be filed, they shall specify with particularity the alleged error(s) made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party. The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the District Court. Failure to object to this Report and Recommendation waives a party's right to review. Fed. R. Crim. P. 59(b)(2).

Pursuant to Title 18, U.S.C. § 3161(h)(1)(D) and (H), **the above-referenced fourteen (14) days allowed for filing objections is EXCLUDED from the computation of time under the Speedy Trial Act, whether or not objections are actually filed.** The Clerk is **DIRECTED** to submit the Report and Recommendation with objections, if any, to the District Court after expiration of the above time period.

**IT IS SO ORDERED** and **DIRECTED**, this 6th day of September, 2012.

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

ASHLEY HENDERSON

CRIMINAL CASE NO.
1:11-cr-00255-TWT-RGV

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Defendant Ashley Henderson ("Henderson") is one of nine defendants charged in a fifteen-count indictment with (1) unlawfully obstructing, delaying, and interfering with interstate commerce by taking personal property in the custody and control of armored car couriers by means of actual and threatened force, violence, and fear of injury, and conspiring to do so, in violation of 18 U.S.C. §§ 1951 and 2; (2) carrying and using a firearm in relation to a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2; and (3) causing the death of a person through using a firearm in relation to a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A), 924(j)(1), and 2. See [Doc. 312]. Pending before the Court is Henderson's motion to suppress statements. [Doc. 188]. Following an evidentiary hearing on December 16, 2011,[1] Henderson filed a post-hearing brief, [Doc. 418], to which the government

_____

[1] See [Doc. 303] for a transcript of the evidentiary hearing. Citations to the evidentiary hearing transcript hereinafter will be referred to as "(Tr. at ___)." In

responded, [Doc. 425], and the pending motion is ready for ruling. For the following reasons, it is **RECOMMENDED** that Henderson's motion to suppress, [Doc. 188], be **DENIED**.

## I.  STATEMENT OF FACTS

On March 30, 2011, Henderson was arrested on state charges in connection with a series of armored car robberies that had occurred in Gwinnett and DeKalb Counties,[2] and he was transported to the Gwinnett County Police Department ("GCPD") where he was interviewed by state law enforcement officers.[3]  (Tr. at 8-9). Henderson first spoke to GCPD Sergeant John P. Wilbanks ("Sergeant Wilbanks")

---

addition, the parties submitted exhibits during the hearing, which will be referred to as "(Gov. Ex. ___)" for the government's exhibits and ("Def. Ex. ___") for Henderson's exhibits.

[2] At this point in time, "it hadn't entirely been decided" which jurisdictions were going to take which cases as there were law enforcement agents from Gwinnett County, Dekalb County, the City of Marietta, and the Federal Bureau of Investigation ("FBI") involved in the investigation.  (Tr. at 13, 56).

[3] The GCPD has interview rooms that are electronically monitored.  (Tr. at 12). There were a total of four interviews being conducted that day, and recordings of the interviews were made.  See (Gov. Ex. 1).  There is a central room where all of the interview rooms can be viewed simultaneously, and Daniel J. Porter ("Porter"), the District Attorney of the Gwinnett Judicial Circuit, was "spot checking each of the interviews" from the central room that day. (Tr. at 12).  As the primary felony prosecutor in Gwinnett County, Porter is the highest prosecuting official in Gwinnett County.  (Tr. at 8).

in the child interview room at the GCPD.[4]  (Tr. at 18).   Before Sergeant Wilbanks

entered the room, Henderson was allowed to go to the restroom and had something

to drink and was left "sitting in the [interview] room for a lengthy period of time."[5]

(Tr. at 18-19).  Upon entering the interview room, Sergeant Wilbanks proceeded to

read Henderson his <u>Miranda</u>[6] rights, and after Henderson indicated that he

understood those rights, Sergeant Wilbanks asked him if he wanted to talk, and

---

[4] The child interview room is "the one with a round table, more of a formal setting."  (Tr. at 18).  "The room is probably about eight or ten feet square [with] a round table in the middle and usually three chairs in the room."  (<u>Id.</u>).

[5] The video shows that Henderson was seated in the interview room starting at 9:28 a.m.  (Gov. Ex. 1 at 9:28:00-9:51:00).  Henderson sat relatively still in a chair and eventually put his head on the table.  (<u>Id.</u>).  At approximately 9:51 a.m., Henderson asked to go to the restroom and was immediately permitted to leave the interview room for that purpose.  (<u>Id.</u> at 9:51:00).  He returned approximately five minutes later and asked for a soft drink.  (<u>Id.</u> at 9:56:00).  Someone then brought Henderson a drink, and he sat alone again in the interview room for close to two hours.  <u>See</u> (<u>id.</u> at 10:02:15-11:57:15).  During that time, Henderson sat relatively still in a chair, leaned his head back against the wall, and appeared to nap.  (<u>Id.</u>).  Henderson also apparently heard a discussion in the adjacent room, put his ear to the wall, and appeared to be attempting to listen to that conversation.  (<u>Id.</u> at 11:57:00).  When an unidentified male checked on Henderson at approximately 11:57 a.m., Henderson asked to use the restroom.  (<u>Id.</u>).  He was permitted to do so, and returned to the interview room a few minutes later, where he put his legs up on a chair and appeared to try to fall asleep.  (<u>Id.</u> at 11:59:00).  A couple of minutes after that, Henderson again appeared to attempt to listen to a conversation in the adjacent room.  (<u>Id.</u> at 12:01:00).  Sergeant Wilbanks entered the room at approximately 12:11 p.m.  (<u>Id.</u> at 12:11:48).

[6] <u>See</u> <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

Henderson responded that he did.[7] (Tr. at 19); <u>see also</u> (Gov. Ex. 1 at 12:12:38-

12:13:13). Sergeant Wilbanks then talked to Henderson for about an hour, asking

"basic questions" and "getting him to open up a little bit." (Tr. at 20). He also asked

Henderson to explain the events that had taken place earlier that morning. (Gov. Ex.

1 at 12:14:05). Henderson was responsive to these questions, was alert and seemed

to be aware of what was going on and did not appear to be on drugs[8] or have any

physical injuries.[9] (Tr. at 20-21). Sergeant Wilbanks does not recall Henderson ever

asking him about the death penalty or complaining of being confused, and any

questions Henderson had about what he was being asked were clarified. (Tr. at 20,

23).

---

[7] Sergeant Wilbanks and Henderson were the only persons in the room at that time. (Tr. at 20). Sergeant Wilbanks was not armed, and he did not make any threats or promises to Henderson to induce him to waive his rights. (Tr. at 21-22).

[8] At one point during this initial interview, Sergeant Wilbanks specifically asked Henderson if he was high or "on something" and Henderson responded that he was not. <u>See</u> (Tr. at 21, 23); <u>see also</u> (Gov. Ex. 1 at 15:43:10 (Wilbanks asked Henderson if he is "on drugs now" and Henderson responded, "No hell no")).

[9] Specifically, Henderson was involved in a traffic accident earlier that day in connection with his arrest, but Sergeant Wilbanks did not recall Henderson making any complaints related to that accident. (Tr. at 21). However, Henderson did complain of having some form of diarrhea. (<u>Id.</u>); <u>see also</u> (Gov. Ex. 1 at 17:33:32). He asked to go to the bathroom periodically throughout the day and he was allowed to do so. (Tr. at 21).

Sergeant Cleophas Atwater ("Sergeant Atwater") of the GCPD joined Sergeant Wilbanks approximately fifteen minutes into Henderson's interview. (Tr. at 30); <u>see also</u> (Gov. Ex. 1 at 12:24:47). Sergeant Atwater testified that Henderson seemed anxious or nervous at times throughout the day, but he appeared to understand the questions he was asked and gave appropriate responses. (Tr. at 30-31). According to Sergeant Atwater, Henderson was cooperative and did not appear to be under the influence of alcohol or drugs.[10] (Tr. at 31). Around 1:12 p.m., Henderson asked for some water and to go to the bathroom.[11] (Tr. at 31); <u>see also</u> (Gov. Ex. 1 at 13:13:30). Henderson had to be accompanied by an officer when he left the interview room, so Sergeant Atwater escorted him to the restroom. (Tr. at 32). While they were in the restroom, Sergeant Atwater and Henderson had a conversation that was not recorded. (<u>Id.</u>).

---

[10] Sergeant Atwater testified that he remembered Henderson talking specifically about his drug use during the interview, mentioning that he had memory problems because of the amount of drugs he had used over time. (Tr. at 53-54). Sergeant Atwater recalled that Henderson told him that he had used drugs, but he was not sure whether Henderson specifically stated that he had used drugs that day or the night before the interview. (Tr. at 54).

[11] Later in his testimony, Sergeant Atwater clarified that after he and Sergeant Wilbanks left the room, Henderson also left the room to speak with someone whom Sergeant Atwater identified as Detective Andrew Whaley about a photograph that needed to be taken for a lineup. (Tr. at 38). After the photograph was taken, Henderson asked to use the restroom. (<u>Id.</u>). Sergeant Atwater and Henderson went to the restroom around 1:13 or 1:14 p.m. (<u>Id.</u>).

During this conversation, Henderson appeared to be "really nervous" and apprehensive. (Id.). When they entered the restroom, Henderson never walked over to the urinals, but instead stopped around the sinks "as if he want[ed] to say something." (Tr. at 51). He then turned to Sergeant Atwater and said something to the effect of "they are going to give me the death penalty" and mentioned that he wanted to try to work out some kind of deal. (Id.); see also (Tr. at 32). Sergeant Atwater did not recall the death penalty being mentioned before Henderson brought it up on the way to the bathroom. (Tr. at 50). Sergeant Atwater told Henderson that he would have to be truthful about his statements, as he had previously been going "round and round" in the interview room, being less than truthful about some of the facts the officers already knew. (Tr. at 32, 51). Sergeant Atwater testified that Henderson basically wanted to know what could be done for him, and Sergeant Atwater told him that if he wanted some kind of deal, he would have to tell the truth about the murders. (Id.). Henderson then responded that if he could work out a deal where the death penalty was off the table, he would tell everything. (Tr. at 32-33). Sergeant Atwater told Henderson that he would have to go speak to someone else who had authority to make those decisions before he could strike any deals, and made no promises about what he would be able to do, personally, with respect to Henderson's situation. (Tr. at 33). No one other than Sergeant Atwater

and Henderson were present for this conversation, which lasted about 30 seconds. (Id.).

Thereafter, Sergeant Atwater went directly[12] to Porter to tell him that Henderson had "brought up the subject of the death penalty and was willing to come forward if the death penalty was taken off the table."[13] (Tr. at 8-9, 34). Because the only homicide at issue occurred in DeKalb County, Porter did not have the authority to make that decision so he immediately called Don Geary ("Geary"), the Chief Assistant District Attorney of DeKalb County. (Tr. at 9, 12). Porter explained to Geary that Henderson was willing to give a statement if DeKalb County would take the death penalty off the table, and Geary indicated that he needed to contact his boss, the District Attorney for DeKalb County, Robert James ("James").[14] (Tr. at 9, 12-13). About 15 minutes later, Geary called Porter back and said that DeKalb County was willing to take the death penalty off the table for Henderson if he gave a truthful statement in regard to his and other persons' involvement in the armored

_____

[12] Sergeant Atwater could not recall if he put Henderson back into the interview room or if he had someone else escort him. (Tr. at 35).

[13] Although Porter was monitoring the video of the ongoing interviews, he was not aware that Henderson had asked for the death penalty to be taken off the table in exchange for his cooperation until he was approached by Sergeant Atwater. (Tr. at 12).

[14] James and Geary are the "number one and number two individuals in [the] DeKalb County Prosecutor's Office," respectively. (Tr. at 10).

car robberies.  (Tr. at 9, 14).  Porter did not talk to any federal authorities about the possibility of the death penalty in this case.[15]  (Tr. at 13).

After Porter spoke with Geary, he accompanied Sergeant Atwater into the interview room where Henderson was seated.  (Tr. at 10); see also (Gov. Ex. 1 at 13:57:00).  Two other DeKalb County detectives were also present in the interview room,[16] and all three were introduced to Henderson.  (Tr. at 10); see also (Gov. Ex. 1 at 13:57:00).  Henderson immediately said that he needed to talk to Sergeant Atwater again for a few minutes.  (Gov. Ex. 1 at 13:57:40).  Porter then made a comment to the effect of "hurry up, we are not going to dance around about this all day," and he and the other two detectives then left the interview room.  (Tr. at 10); see also (Gov. Ex. 1 at 13:57:00).  Henderson and Sergeant Atwater then engaged in the following discussion:

Henderson: This ain't federal is it? All this shit State ain't it?

Sergeant Atwater: Right now, yeah, this is State.  This is all State.

Henderson: It ain't no - - it ain't no federal?

_____

[15] Porter testified that "it didn't even occur to [him]" to talk to the federal prosecutors or FBI agents about the death penalty.  (Tr. at 13-14).

[16] Porter could not recall the names of the other two detectives.  (Tr. at 10). Sergeant Atwater testified that one of the individuals was "Sergeant King," but he could not remember the name of the other DeKalb County detective who was present.  (Tr. at 34).

Sergeant Atwater: Now, the feds are involved okay?

Henderson: Uh huh.

Sergeant Atwater: Because it's armored car stuff.

Henderson: Uh huh.

Sergeant Atwater: But the bottom line is, these people right here? You talking about State. When I say DeKalb County, you're talking about State.

Henderson: Uh huh.  So what I'm saying

Sergeant Atwater:  Yeah so the death penalty –

Henderson: So what I'm saying is who I'm gonna go in front of, the State or –

Sergeant Atwter: The State. Yeah.

Henderson: So I'm going to do my time with the State?

Atwater: Yeah, just talking about State.

Henderson: The Feds ain't got nothing to do with it?

Sergeant Atwater: Right now, the Feds ain't got nothing to do with it. This is the State right now.

(Gov. Ex. 1 at 13:58:00 to 13:58:51); see also (Tr. at 40, 52).  Henderson then expressed

concerns about not having enough information to tell the detectives.  (Tr. at 36).

Specifically, he was concerned that even though he may be able to tell Porter and the

other detectives where other people who were involved with the crimes were, he did

not know some of their last names, and he was worried that the detectives would think that he was not being truthful. (Id.). Sergeant Atwater reiterated that all Henderson had to do was tell the truth and explain exactly what he knows from beginning to end. (Id.). Henderson asked Sergeant Atwater to stay with him in the interview room while he spoke to Porter and the other detectives. (Tr. at 37).

Following that conversation, Porter and the two other detectives were brought back into the interview room. (Tr. at 10, 36); see also (Gov. Ex. 1 at 14:02:00). Porter then "conveyed the essence of the offer" to Henderson, telling him that he had been in contact with DeKalb County officials and that he was authorized to tell Henderson that DeKalb County was willing to remove the possibility of the death penalty in the killing of the armored car guard in return for a truthful statement that outlined his involvement in this or any other crimes or gave information about anyone else who was involved in the crime.[17] (Tr. at 10-11, 14-15). Although Henderson also asked him if he could make agreements with respect to a life sentence, Porter told him that he was not authorized to discuss that, and indicated that even if it was his case, he would not make such an agreement because he did

---

[17] Porter also testified that he reviewed the portion of the video of the interrogation that he was involved in, and that the video and audio recording of the interviews occurring that day accurately reflected what occurred and that there were no conversations or communications that took place and were not recorded. (Tr. at 11, 16); see also (Gov. Ex. 1).

not know what information Henderson had yet. (Tr. at 15). Henderson objected that "if you give me a life sentence, you might as well kill me" and Porter reiterated that he was only authorized to give him the deal with respect to the death penalty. (Id.). Porter then left the interview room and had no further discussions with Geary, Gwinnett County police, or federal agents regarding the offer he conveyed to Henderson. (Id.). After Porter left the room, Sergeant Atwater stayed an additional ten minutes, at most, during which Henderson mentioned that he was concerned that co-defendant Quentin Booker ("Booker") had heard his interview because he could hear some of the conversation Booker was having through the walls of the interview room and he was worried that the sound was traveling both ways. (Tr. at 41). Henderson then began speaking with the DeKalb County detectives about specific situations that occurred in DeKalb County, so Sergeant Atwater left the interview. (Tr. at 37).

## II. DISCUSSION

Henderson moves to suppress statements he made while in custody because he contends that they were not voluntary under the totality of the circumstances and were thus obtained in violation of his rights under the Fifth Amendment of the Constitution. See generally [Doc. 418]. Specifically, Henderson contends that the promise of leniency, i.e., not seeking the death penalty, rendered his confession

involuntary, see [id. at 9-14], and that his statements also were involuntary because the officers reasonably should have known that he was under the influence of cocaine at the time he made them, see [id. at 15-16].

The government argues that the fact that Henderson chose on his own initiative to enter into an agreement that he would provide a truthful statement to state authorities in exchange for their agreement not to seek the death penalty does not render his statement involuntary, and that, in any event, Henderson breached any such agreement by continuing to make evasive and false statements to law enforcement. [Doc. 425 at 8-23]. Furthermore, the government contends that Henderson's statement was not involuntarily made based on alleged drug use because none of the evidence cited by Henderson demonstrates that he was under the influence of cocaine at the time of the interview, and Henderson directly denied being high during the interview. [Id. at 23-28]. The Court will address the merits of each of these arguments.

A.    **Applicable Law**

Whether a statement was voluntarily given must be examined in light of the totality of the circumstances. United States v. Shepherd, Criminal Case No. 1:11–cr–00058–ODE–RGV–1, 2011 WL 4443440, at *7 (N.D. Ga. Aug. 23, 2011), adopted by 2011 WL 4443435, at *1 (N.D. Ga. Sept. 21, 2011) (citing Schneckloth v.

<u>Bustamonte</u>, 412 U.S. 218, 226 (1973); <u>Hubbard v. Haley</u>, 317 F.3d 1245, 1252 (11th Cir. 2003)). "This totality of circumstances test directs the Court ultimately to determine whether a defendant's statement was the product of 'an essentially free and unconstrained choice.'" <u>United States v. Villaverde-Leyva</u>, Criminal Action File No. 1:10-CR-035-RWS/AJB, 2010 WL 5579825, at *11 (N.D. Ga. Dec. 9, 2010), adopted by 2011 WL 121932, at *1 (N.D. Ga. Jan. 14, 2011) (citation omitted). "Among the factors the Court must consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police." <u>Id.</u> (citations omitted).

The focus of the voluntariness inquiry is whether the defendant was coerced by the government into making the statement: "[T]he relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986); <u>see also</u> <u>United States v. Cordova</u>, 829 F. Supp. 2d 1342, 1353 (N.D. Ga. 2011), adopted at 1345. "Those cases where courts have found confessions to be involuntary 'have contained a substantial element of coercive police conduct.'" <u>United States v. Patterson</u>, Criminal No. 1:06-CR-500-1-TWT, 2007 WL 2331080, at *4 (N.D. Ga. Aug. 10, 2007), adopted at *1 (<u>quoting</u> <u>Colorado v. Connelly</u>, 479 U.S. 157, 164 (1986)). "Sufficiently coercive conduct normally involves

subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession." <u>United States v. Jones</u>, 32 F.3d 1512, 1517 (11th Cir. 1994) (per curiam) (citation and internal marks omitted).

**B.     Analysis**

**1.     *Henderson's Alleged Drug Use***

"The mere fact that the defendant had taken drugs prior to giving the statement does not render it inadmissible.  The evidence must show the defendant was so affected as to make his statement, after appropriate warnings, unreliable or involuntary." <u>United States v. Taylor</u> 508 F.2d 761, 763 (5th Cir. 1975[18]) (citations omitted); <u>see also</u> <u>United States v. Gaddy</u>, 532 F.3d 783, 788 (8th Cir. 2008) (stating that while alcohol and drug use are relevant to the voluntariness analysis, they do not automatically render the confession involuntary as the test is whether the impairments cause defendant's will to be overborne).  Because Henderson contends that his statements were coerced, the government bears the burden of proving by a preponderance of the evidence that his statements were in fact voluntarily given. <u>See</u> <u>Connelly</u>, 479 U.S. at 168.

---

[18] Decisions of the Fifth Circuit rendered before October 1, 1981, are binding upon panels of the Eleventh Circuit.  <u>Bonner v. City of Prichard, Ala.</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

The evidence of record does not support Henderson's contention that his behavior during the interview demonstrated recent drug use. <u>See</u> [Doc. 418 at 15-16]. According to the National Institute on Drug Abuse's Research Report Series on cocaine, the use of cocaine:

> usually makes the user feel euphoric, energetic, talkative, and mentally alert . . . . It can also temporarily decrease the need for food and sleep. The short-term physiological effects of cocaine include constricted blood vessels; dilated pupils; and increased body temperature, heart rate, and blood pressure. Large amounts of cocaine may intensify the user's high but can also lead to bizarre, erratic, and violent behavior. Some cocaine users report feelings of restlessness, irritability, anxiety, panic, and paranoia. Users may also experience tremors, vertigo, and muscle twitches.

[Doc. 425-1 at 3-4]. Henderson did not demonstrate these behaviors. He did not appear euphoric or energetic, but instead sat still when he was left alone in the interview room, often appearing to fall asleep. <u>See, e.g.,</u> (Gov. Ex. 1 at 9:28:00-9:49:00, 10:05:00-11:56:00). He did not engage in bizarre, erratic, or violent behavior and immediately ate the meal which was provided to him by authorities. (<u>Id.</u> at 13:41:10-13:52:55). Based on the Court's review of the recorded interview and the testimony of the interviewing officers, Henderson did not appear impaired during the interview, offered coherent answers, and understood the questions being asked of him. <u>See</u> (Tr. at 20-21).

Although Henderson points out that he spat into a bottle for a time during the interview and frequently used the restroom, behaviors he contends are associated with cocaine use, neither of these behaviors provide persuasive evidentiary support for Henderson's contention that he was "so affected as to make this statement, after appropriate warnings, unreliable or involuntary." Taylor, 508 F.2d at 763. With respect to the spitting, the behavior did not begin until hours after Henderson was arrested and placed in the interview room and lasted for only a short portion of the interview. See (Gov. Ex. 1 at 12:36:00). Since cocaine's effects "appear almost immediately after a single dose and disappear within a few minutes to an hour," see [Doc. 425 at 26 (citing [Doc. 425-1 at 3-4])], this time line does not support Henderson's position that the spitting was the result of drug use. Similarly, although Henderson points out that he went to the bathroom several times, he was also in the interview room for a lengthy period of time during which he was eating and drinking, which would normally cause someone to need to use the restroom. Moreover, using the restroom frequently is consistent with Henderson's complaint that he was suffering from diarrhea. See (Gov. Ex. 1 at 17:33:32). Accordingly, none of the evidence before the Court suggests that Henderson's restroom use or spitting was connected in any way to drug use.

Finally, although the record reflects that Henderson candidly admitted he had a drug problem, see (id. at 20:07:03), and Henderson contends that statements made during the interview indicate that he was on drugs, see also (id. at 15:29:39), none of Henderson's statements, when taken in context, indicate that he was high at the time of the interview. In fact, given that the high associated with cocaine dissipates within an hour, see [Doc. 425-1 at 3], it would have been nearly impossible for Henderson, who was in custody for a couple of hours before his interview even began, to be under the influence of drugs when he made the statements at issue. Indeed, when directly asked by Sergeant Wilbanks if he was high, Henderson emphatically responded, "No hell no." (Gov. Ex. 1 at 15:43:10). Accordingly, the evidence does not show that Henderson's statement was rendered involuntary by drug use, and his motion to suppress statements on this basis is due to be denied. See United States v. Harris, No. 4:11-cr-18-HLM-WEJ, 2011 WL 5514003, at *7 (N.D. Ga. Oct. 21, 2011), adopted by 2011 WL 5514058, at *7-8 (N.D. Ga. Nov. 10, 2011) (finding that statement was voluntary even when defendant appeared to be under the influence of drugs because there was no evidence that the defendant lacked sufficient mental capacity to understand and waive his rights).

## 2.     *The Promise not to Seek the Death Penalty*

Although "the making of a promise that induces a confession" can render a statement involuntary, Jones, 32 F.3d at 1517 (citation and internal marks omitted), a statement is not *per se* involuntary simply because it is provided "in exchange for a promise of benefits from the government" because the voluntariness inquiry must be considered within the context of the totality of the surrounding circumstances, Taylor v. Singletary, 148 F.3d 1276, 1281 (11th Cir. 1998) (citing Bordenkircher v. Hayes, 434 U.S. 357, 363-65 (1978)).     When considering the totality of the circumstances and promises or agreements made for confessions, "a significant aspect of [the] inquiry [] involves the effect of deception in obtaining a confession." United States v. Lall, 607 F.3d 1277, 1281, 1285 (11th Cir. 2010).  Thus, honest, non-illusory promises of leniency from authorized officials in exchange for information do not amount to coercion which renders a statement involuntary.   See United States v. Little, 9 F.3d 110, 1993 WL 453396, at *8-9 (6th Cir. Nov. 4, 1993) (per curiam) (unpublished) (citation omitted) (finding confession voluntary where promise that the death penalty would be taken off the table was not illusory because agents had talked to the appropriate prosecuting authority and were not "leading the defendant to believe that he . . . will receive lenient treatment when this is quite unlikely"); see also Jones, 32 F.3d at 1517 (citation omitted) ("[D]iscussions of

realistic penalties for cooperative and non-cooperative defendants, are normally insufficient to preclude free choice.").

However, cooperation agreements can be coercive where deceptive or misleading promises amounting to misrepresentations of the law are used to secure statements. See Lall, 607 F.3d at 1281, 1287 (finding confession involuntary where the "only plausible interpretation of [the police officer's] representations [that anything the defendant said was "off the cuff"] was that the information [the defendant] provided would not be used against him by [the officer] or anyone else," and "it [was] inconceivable that [defendant] . . . understood at the time that [the] promise . . . did not preclude the use of the confession in a federal prosecution"); see also United States v. Walton, 10 F.3d 1024, 1030 (3d Cir. 1993); Streetman v. Lynaugh, 812 F.2d 950, 957 (5th Cir. 1987). In other words, "if the government feeds the defendant false information that seriously distorts his choice . . . then the [statement] must go out." United States v. Rutledge, 900 F.2d 1127, 1129 (7th Cir. 1990).

Considering the totality of the circumstances in this case, the evidence of record does not establish that Henderson was intimidated, coerced or deceived into making statements to law enforcement. Instead, the evidence shows that, after being advised of his Miranda rights and waiving those rights, Henderson spoke with law

enforcement agents for about an hour, and he then initiated negotiations that resulted in an agreement that he would provide truthful statements to law enforcement agents in return for DeKalb County not seeking the death penalty against him. See (Gov. Ex. 1 at 12:12:38 to 13:13:30); see also (Tr. at 32-33, 50-51). It was Henderson, not law enforcement agents, who first raised the prospect that he may face the death penalty for the murder of an armored car courier in DeKalb County, and it was Henderson who proposed to tell the truth if he could work out a deal regarding the death penalty. See (Tr. at 32-33, 50-51). Thus, this is not a case in which law enforcement agents threatened a suspect with the death penalty to intimidate or coerce him to speak with them. Nor is it a case in which law enforcement officers made an illusory promise of leniency, material misrepresentations, or false promises. Rather, it is a case in which Henderson negotiated the terms under which he would provide truthful statements to law enforcement, and to date, the agreement he negotiated has been honored, although the government contends that Henderson breached his end of the bargain.

Henderson contends that the promise not to seek the death penalty against him is the equivalent of the deceptive promise not to prosecute made to the defendant in Lall. [Doc. 418 at 11]. Henderson asserts that "[n]ot only did the government promise leniency by supposedly taking the death penalty off the table

in exchange for [his] statement, but it then reneged on its promise, and is now seeking death." [Id.]. However, Henderson's reliance on Lall is misplaced.

In Lall, the Eleventh Circuit ruled that the defendant's confession was involuntary because the detective who interviewed him repeatedly promised that he would not use the defendant's statements to prosecute him. 607 F.3d at 1287. Unlike in Lall, Henderson has not shown that anyone made a deceptive promise to him. When Henderson raised the prospect of negotiating a deal with Sergeant Atwater, he went directly to the prosecuting authority of Gwinnett County, District Attorney Porter, and conveyed Henderson's proposal. (Tr. at 8-9, 12-13, 34). Because the homicide at issue occurred in DeKalb County, Porter contacted Geary, the Chief Assistant District Attorney of DeKalb County. (Tr. at 9, 12). Porter then personally met with Henderson and relayed to him that DeKalb County was willing to forego seeking the death penalty if Henderson provided truthful statements about his conduct and that of others involved in the crimes. (Tr. at 10-11, 14-15); see also (Gov. Ex. 1 at 14:02:00). When Henderson tried to negotiate other terms regarding life imprisonment, Porter stated that he was only authorized to convey the deal regarding the death penalty from DeKalb County. (Tr. at 15).

Henderson has not shown that this was a false or deceptive promise as there is no indication in the record before the Court that DeKalb County has "reneged on

its promise" and is now seeking the death penalty against Henderson.[19]  Although the government contends that Henderson breached the agreement by making false and evasive statements to the interviewing agents, it appears that DeKalb County has still honored its agreement with Henderson to date.  Nor can Henderson presently claim that the promise of leniency was illusory because he remains subject to potentially facing the death penalty in federal court since, as the government points out, it has not filed any notice that it intends to seek the death penalty against Henderson.[20]  Thus, any argument that Henderson may have that the promise not to seek the death penalty made by state authorities was deceptive or illusory is premature, at best, at this time.[21]

_____

[19] The Court has been informed that Henderson was indicted in the Superior Court of DeKalb County on April 19, 2012, for the murder of two individuals, among other charges, but there is no indication in the record that DeKalb County is seeking the death penalty against Henderson.  See [Doc. 458 at 3].

[20] The Court is aware that the United States is considering whether to seek the death penalty against Henderson, see [Doc. 465], but unless and until it files notice of its intention to seek the death penalty against him, Henderson cannot correctly claim that the government "reneged on its promise, and is now seeking death," [Doc. 418 at 11].

[21] Henderson's argument that Sergeant Atwater's statement that "Right now the feds ain't got nothing to do with it.  This is the State," was deceptive ignores the context of the comment and Sergeant's Atwater's earlier statement in the same conversation informing Henderson that federal authorities were involved in the investigation.  See (Gov. Ex. 1 at 13:58:00 to 13:58:51).  This exchange between Henderson and Sergeant Atwater occurred just after Porter and two DeKalb County detectives had entered the interview room to convey the offer from DeKalb County's

Accordingly, Henderson continues to have the benefit of the bargain he struck with the state authorities, and there is no proof that his statements were obtained by false, misleading, or deceptive promises, so the statements he made in response to the state officials' promise to not seek the death penalty were therefore not involuntary under the Fifth Amendment, and it is **RECOMMENDED** that his motion to suppress statements, [Doc. 188], be **DENIED**. See United States v. Davis, 233 F. App'x 292, 294 (4th Cir. 2007) (per curiam) (unpublished) (citation omitted) (finding that the fact that the defendant's statement to police was made under grant of state use immunity did not render it involuntary for purposes of federal prosecution); United States v. Long, 852 F.2d 975, 976-78 (7th Cir. 1988) (finding that defendant's statements which were made to state authorities in exchange for the

---

district attorney. Henderson asked to speak with Sergeant Atwater so Porter and the detectives left the interview room. Henderson then asked if there was any federal involvement, and Sergeant Atwater truthfully told him that federal authorities were involved but that "these people" were with the state, and he mentioned DeKalb County, in particular. (Id.). So, Henderson was informed that federal authorities were involved in the case but were not party to the meeting he was about to have with Porter and the DeKalb County detectives. Thus, the statement that Henderson contends was deceptive actually correctly informed him that he was just dealing with state authorities at that time, not federal authorities. Porter subsequently explained that he was conveying an offer on behalf of DeKalb County, and Henderson did not ask Porter or Sergeant Atwater any further questions about the involvement of federal authorities or seek to strike any deal with federal authorities at that time.

promise of a reduced state sentence were not involuntary when later used in a

federal prosecution because there was no "misstatement, trickery, or deception").

### III. CONCLUSION

For the foregoing reasons and cited authority, it is hereby **RECOMMENDED**

that Henderson's motion to suppress statements, [Doc. 188], be **DENIED**.

**IT IS SO RECOMMENDED**, this 6th day of September, 2012.

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE