IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL CASE NO. |
| | 1:11-cr-00255-TWT-RGV |
| STACEY DOOLEY and ASHLEY HENDERSON | |

## <u>ORDER FOR SERVICE OF REPORT, RECOMMENDATION, AND ORDER</u>

Attached is the Report, Recommendation, and Order of the United States Magistrate Judge made in accordance with 28 U.S.C. § 636(b)(1) and Local Criminal Rule 59(2)(a)-(b). Let the same be filed and a copy, with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the Report and Recommendation within fourteen (14) days of receipt of this Order. Should objections be filed, they shall specify with particularity the alleged error(s) made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party. The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the District Court. Failure to object to this Report and Recommendation waives a party's right to review. Fed. R. Crim. P. 59(b)(2).

Pursuant to Title 18, U.S.C. § 3161(h)(1)(D) and (H), **the above-referenced fourteen (14) days allowed for filing objections is EXCLUDED from the computation of time under the Speedy Trial Act, whether or not objections are actually filed.** The Clerk is **DIRECTED** to submit the Report and Recommendation with objections, if any, to the District Court after expiration of the above time period.

**IT IS SO ORDERED** and **DIRECTED**, this 29th day of January, 2013.

_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL CASE NO. 1:11-cr-00255-TWT-RGV |
| STACEY DOOLEY and ASHLEY HENDERSON | |

## MAGISTRATE JUDGE'S REPORT, RECOMMENDATION, AND ORDER

Defendants Stacey Dooley ("Dooley") and Ashley Henderson ("Henderson"), collectively referred to herein as "defendants," are charged along with seven other co-defendants in a fifteen-count indictment. [Doc. 312]. Dooley and Henderson are charged with (1) unlawfully obstructing, delaying, and interfering with interstate commerce by taking personal property in the custody and control of armored car couriers by means of actual and threatened force, violence, and fear of injury, and conspiring to do so, in violation of 18 U.S.C. §§ 1951 and 2; (2) carrying and using a firearm in relation to a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2; and (3) causing the death of a person through using a firearm in relation to

a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A), 924(j)(1), and 2. <u>See</u> [<u>id.</u>].[1]

On October 13, 2011, Henderson filed a motion to suppress any evidence obtained as a result of Global Positioning System ("GPS") monitoring of vehicles. [Doc. 193]. Similarly, on October 14, 2011, Dooley filed a motion to suppress evidence and fruits obtained from warrantless GPS tracking. [Doc. 201]. In his motion, Dooley asserted that warrantless installation, use, and monitoring of a GPS tracker attached to a red Chevrolet Impala (the "Impala") "that was driven by . . . Dooley" violated the Fourth Amendment. [<u>Id.</u> at 2]. In support of this assertion, Dooley relied primarily on <u>United States v. Maynard</u>, 615 F.3d 544 (D.C. Cir. 2010), and he noted that the Supreme Court had accepted certiorari in the case, styled as <u>United States v. Jones</u>, 131 S.Ct. 3064 (June 27, 2011). [<u>Id.</u> at 3-4]. Accordingly, at the pretrial conference on October 19, 2011, the Court took defendants' motions under advisement, but deferred briefing and ruling on the matter until the Supreme Court ruled in <u>Jones</u>. [Doc. 219].

Following the Supreme Court's ruling in <u>Jones</u>, Dooley filed an additional motion to suppress all evidence derived from illegally installed GPS trackers and

─────────────

[1] The cited document and page numbers refer to the document and page numbers shown on the Adobe file reader linked to this Court's electronic filing database (CM/ECF).

from all real-time location data derived from his telephones.[2]  [Doc. 398].  In this

motion, now citing United States v. Jones, 132 S.Ct. 945 (2012), Dooley again asserted

that the warrantless installation, use, and monitoring of a GPS tracker on the Impala[3]

violated the Fourth Amendment.  [Id. at 6-8].  In addition, he asserted that the

government had violated his Fourth Amendment rights by procuring unauthorized

real-time cell phone location data, arguing that neither the pen register trap and

trace orders, nor the wiretap orders issued in the case legally authorized the

interception of such data.  [Id. at 8-15].  The government then filed separate

responses to Dooley's contentions regarding warrantless installation of the GPS

tracker, [Doc. 424], real-time cell phone location data under the pen register trap and

trace orders, [Doc. 433], and to Dooley's contentions regarding real-time cell phone

location data under the wiretap orders, [Doc. 434].  Dooley filed reply briefs

regarding the warrantless installation of the GPS tracker, [Doc. 459], and real-time

cell phone location data, [Doc. 460].

---

[2] Henderson did not filed a post-Jones brief.

[3] In addition to tracking the Impala, the government also installed and monitored a GPS tracker on a Buick Park Avenue without a warrant.  See [Doc. 424 at 3]; (Tr. at 48-49, 85-87).  However, the Buick Park Avenue never moved from its location during the time of monitoring and the government does not intend to offer any evidence from this GPS tracker, see [Doc. 424 at 3 n.1], so it will not be discussed further herein.

On September 11, 2012, the Court held an evidentiary hearing on the issue of defendants' standing with respect to the warrantless installation of the GPS tracker on the Impala.[4] [Doc. 498]. Following this hearing, defendants filed briefs regarding this standing issue.[5] [Doc. 528 (Dooley's standing brief); Doc. 531 (Henderson's standing brief)]. The government then filed a comprehensive response, [Doc. 543], and in addition to addressing the standing question, presented arguments regarding the suppression of evidence as a result of the warrantless installation of the GPS tracker. The defendants then filed post-hearing reply briefs addressing not only standing issues, but also the substantive arguments raised in the government's response, [Doc. 554 (Henderson's reply); Doc. 557 (Dooley's reply)], to which the government has filed a surreply, [Doc. 559-1].[6]

---

[4] See Doc. 505 for the transcript of the hearing, hereinafter referred to as ("Tr. at ___"). In addition, the government submitted exhibits which will be referred to as "(Gov. Ex. __)."

[5] In addition, at the request of the Court, Dooley filed a supplemental brief regarding his standing to challenge the sufficiency of the wiretap orders, [Doc. 544], to which the government has responded, [Doc. 555]; see also [Doc. 341 at 7-27 (arguments regarding standing in government's initial response to the motions to suppress evidence from the wiretap orders)].

[6] On December 11, 2012, the government filed a motion for leave to file a sur-reply to defendants' reply briefs related to the GPS tracker. [Doc. 559]. Although "[n]either the Federal Rules nor the Court's Local Rules allow sur-reply briefs as a matter of right, and the Court normally does not permit sur-replies," USMoney Source, Inc . v. Am. Int'l Specialty Lines Ins. Co., No. 1:07-cv-0682-WSD, 2008 WL 160709, at *2 n.5 (N.D. Ga. Jan. 15, 2008), rev'd on other grounds, 288 F. App'x 558

For the following reasons, it is **RECOMMENDED** that Henderson's motion to suppress any evidence obtained as a result of the GPS monitoring of vehicles, [Doc. 193], Dooley's motion to suppress evidence and fruits obtained from warrantless GPS tracking, [Doc. 201], and Dooley's motion to suppress all evidence derived from illegally installed GPS trackers and from all real-time location data derived from his telephones, [Doc. 398], be **DENIED**.

---

(11th Cir. 2008) (per curiam) (unpublished) (citation omitted); see also Leatherwood v. Anna's Linens Co., 384 F. App'x 853, 857 (11th Cir. 2010) (per curiam) (unpublished) (citation omitted), "the Court may in its discretion permit the filing of a surreply . . . where a valid reason for such additional briefing exists, such as where the movant raises new arguments in its reply brief," Fedrick v. Mercedes-Benz USA, LLC, 366 F. Supp. 2d 1190, 1197 (N.D. Ga. 2005 ) (citations omitted); see also St. James Entm't LLC v. Dash Crofts, Civil Action No. 1:09-CV-1975-RWS, 2010 WL 2802616, at *1 (N.D. Ga. July 13, 2010) ("Certainly, the Court is disinclined to consider arguments raised in a surreply which could have been raised in an earlier filing."). Here, the government seeks leave to file a surreply to address arguments raised by the defendants for the first time in reply briefing; namely, evidence presented by Henderson regarding his presence in the Impala and resulting standing to challenge the monitoring of the GPS tracker and the government's failure to produce evidence regarding the subjective good faith of the officer installing the GPS tracker on the Impala. See [Doc. 559]; see also [Doc. 557]. Accordingly, the government's motion for leave to file a surreply is **GRANTED**, and the clerk is **DIRECTED** to enter the government's surreply, [Doc. 559-1], on the docket.

## I. FACTUAL BACKGROUND

### A.    Ownership of the Impala

At the evidentiary hearing on September 11, 2012, the Court heard testimony from Yvonne Jones ("Yvonne"), Desiree Jones' ("Jones") mother.[7]  (Tr. at 8-18). Yvonne testified that she knew Dooley because Jones had introduced him to her as her boyfriend.  (Tr. at 9).  Both Dooley and Jones lived with her for almost a year and a half, until Dooley and Jones, along with their two children,[8] moved to a house "less than a mile down the road" at 5015 Michael Jay Street, Snellville, Georgia.  (Tr. at 10-12).  Yvonne further testified that she later found out Henderson was also living at 5015 Michael Jay Street.  (Tr. at 13).  She stated that she saw his clothes in the house, and that Henderson was there on a regular basis when she visited at the house.[9] (Tr. at 13-14).[10]

---

[7] Jones is a co-defendant in this case.  See [Doc. 312]; (Tr. at 9).

[8] One of these children was Dooley's biological child, and one was not.  (Tr. at 11).

[9] Yvonne testified that she spent time at the house because her grandchildren were there.  (Tr. at 19).  She stated that she would sometimes visit once or twice a week, but some weeks not at all.  (Id.).

[10] Officer Benjamin Finney with the Gwinnett County Police Department ("GCPD") also testified that when officers searched 5015 Michael Jay Street, they discovered Henderson's birth certificate and social security card, (Tr. at 29, 34-35), as well as receipts for purchases made in Henderson's name, (Tr. at 34).

At some point, Dooley came to Yvonne and asked for her help in purchasing a vehicle. (Tr. at 14-15). He told her that because neither he nor Jones had a Georgia driver's license, they could not purchase a vehicle on their own. (Tr. at 14). Therefore, he asked Yvonne to sign for the vehicle, which she could then transfer over to Jones once Jones got her "license straightened out." (Tr. at 14-15). Yvonne agreed, but did not want to make any payments for the vehicle, so they met at a small independent car dealership where Dooley provided the money for the purchase of the Impala, which was purchased in Yvonne's name.[11] (Tr. at 15-16, 20). Yvonne never drove the vehicle, and she testified that Dooley drove it "at least 99 percent of the time," (Tr. at 16-17), although she had some recollection of Henderson driving the vehicle on occasion, (Tr. at 18 (stating that "it was rare, but [she knew] that he did")). Yvonne also testified that Dooley always parked the Impala in the driveway of 5015 Michael Jay Street, and never on the street. (Tr. at 16).

B.    **The Investigation Prior to Installation of the Impala's GPS Tracker**

1.    *Evidence from Interviews and Phone Records*

Beginning in the fall of 2010, the Federal Bureau of Investigation ("FBI"), in conjunction with state and local law enforcement, investigated a series of armored car robberies, one of which occurred in October of 2010, two of which occurred in

---

[11] No more than one month after the purchase was made, the car was transferred to Jones' name. (Tr. at 21-22).

November of 2010, one of which occurred on December 7, 2010, and one of which occurred on January 21, 2011. (Tr. at 65-66).

Early in the investigation, law enforcement was focused on four names that had come to their attention. (Tr. at 66). The first was Christopher Bennett ("Bennett"), who name arose after his fingerprints were recovered from a stolen vehicle used in the December 7, 2010, robbery. (Id.). Bennett was reported missing on December 29, 2010, and his body was later found at the end of January of 2011. (Id.). In conducting the investigation of Bennett's involvement with the robberies, and later, his murder, law enforcement interviewed several of his family members and friends. (Tr. at 66-67). These family members and friends were familiar with Bennett's involvement in at least one of the armored car robberies, and they identified three other names linked to the robberies: "Big Quint," "Chicken," and "Teddy." (Tr. at 67). Subsequently, law enforcement was able to identify Quentin Booker ("Booker"), a co-defendant in this case, as "Big Quint." (Id.); see also [Doc. 341-1 (affidavit supporting wiretap warrant) at 35, 37-39 (describing interviews where individuals who knew "Big Quint" identified Booker out of a photo lineup)].

Bennett's family members also told law enforcement that just before his disappearance, Bennett was supposed to meet up with an individual known as "Chicken," so that he could allegedly purchase narcotics, and they provided law

enforcement with "Chicken's" phone number (404-461-8025). (Tr. at 67, 69). Investigators suspected that the last phone number to be in contact with Bennett's telephone (404-333-5110), which had been identified by the Atlanta Police Department's missing person's investigation, must belong to "Chicken." (Tr. at 68). Accordingly, law enforcement obtained a court order for subscriber information and cell site location information from these two numbers. (Tr. at 69); see also [Doc. 285-1 (Trap and Trace Order for 5110 number); Doc. 285-2 (Trap and Trace Order for 8025 number)]. These records showed that the two phone numbers were in the vicinity of some of the robbery locations at the times of the robberies. (Tr. at 69). Specifically, the first phone number, ending in 5110, was in the area of the December 7, 2010, robbery, as well as the November 29, 2010 robbery, and the second phone number, ending in 8025, was in the area of the November 29, 2010, robbery, as well as the January 21, 2011 robbery. (Tr. at 69-70). Therefore "[i]t was apparent that the user of those two telephones was potentially involved in those robberies." (Tr. at 70).

Further analysis of the phone records associated with these two numbers led law enforcement to identify a third telephone number (404-217-8277) that was being called around the times of the robberies. (Tr. at 70). This number was registered to Booker. (Id.). Law enforcement obtained a court order for the subscriber

information and cell cite location information associated with the phone number ending in 8277, and found that this phone was in the vicinity of each of the five robberies at the time the robberies occurred.  (Id.); see also [Doc. 285-2 (Trap and Trace Order for 8277 number).  Law enforcement then pulled subscriber information for the various phone numbers in contact with Booker at the 8277 number between September of 2010 and January of 2011.  (Tr. at 82).

Looking at the phone records amassed in the investigation thus far, three additional phone numbers stood out because of the contact they had with other telephone numbers already identified in the case.  See (Tr. at 82-83).  In addition, each had a tie to 5015 Michael Jay Street in Snellville, Georgia.  (Tr. at 82).  Two of these phone numbers,[12] which had contact with all three of the other identified telephone numbers, were subscribed to an individual named Donyale Dooley, who lived at 5015 Michael Jay Street.[13]  (Tr. at 82-83).  The third phone number[14] was a landline at 5015 Michael Jay Street that was registered to Jones, and had "numerous

---

[12]These phone numbers were 678-895-3369 and 678-994-7676  (Tr. at 82-83). In addition to having contact with all three previously identified phone numbers, the phone number ending in 7676 had 265 contacts with Booker's phone during the several months of records obtained by law enforcement.  (Tr. at 83).

[13] It was later determined that Dooley used his brother's name, Donyale Dooley, as an alias to establish cell phone service. [Doc. 341-4 at 8 n.1; Doc. 544-1].

[14] This phone number was 678-395-5110.  (Tr. at 83).

contacts"[15] with Booker's phone, many of which occurred after at least one of the robberies. (Tr. at 83).

Because two of these phones were registered to Donyale Dooley, law enforcement followed up on that name, and discovered that he "appeared to be a legitimate person." (Tr. at 83). Law enforcement discovered that Donyale Dooley had a criminal history in North Carolina and a prior residence in North Carolina. (Tr. at 84). Since the individuals they had spoken to about "Chicken" indicated that he was from North Carolina, investigators came to believe that "Chicken" was residing at 5015 Michael Jay Street. (Id.).

### 2. *Evidence from Visual Surveillance*

On March 7, 2011, the FBI conducted visual surveillance of Booker as he left his residence in Douglasville, Georgia, driving a Buick LeSabre ("Booker's vehicle"). (Tr. at 70). Authorities followed Booker as he went to a few locations in Douglasville, Georgia, and then traveled to Stone Mountain, Georgia, near the border of Gwinnett and DeKalb Counties. (Tr. at 71). While in Stone Mountain, Booker appeared to follow a Loomis armored truck. (Tr. at 71-73); see also [Doc. 341-1 at 40-41 (describing visual surveillance of Booker as he followed a Loomis

---

[15] Specifically, FBI Special Agent Paul Szabo ("Agent Szabo") testified that the phone ending in 5110 had contacted Booker's phone 645 times during the several months of records obtained by law enforcement. (Tr. at 83).

truck and noting that he was "engaging in evasive driving techniques, referred to by law enforcement officials as heat checks.")]. While surveilling Booker as he followed the armored truck in Stone Mountain, authorities noticed a black Buick Park Avenue (the "Buick") was also following behind the armored truck.[16] (Tr. at 72). Two people were in the Buick, and the driver was a black male. (Tr. at 74).

While under surveillance, Booker's vehicle and the Buick followed the Loomis truck as it traveled to a Wells Fargo Bank off of Highway 78. (Tr. at 73). While the armored truck serviced the ATM, surveillance observed Booker's vehicle driving in the vicinity and eventually parking directly across the street, and the Buick parked in a parking lot adjacent to the bank and directly behind the ATM drive-thru. (Tr. at 74). The Loomis armored truck eventually left, and Booker's vehicle and the Buick followed it to another Wells Fargo Bank in downtown Snellville, Georgia. (Tr. at 75-76). Surveillance observed as both vehicles drove through the parking lot behind the bank while the Loomis truck serviced the ATM there. (Tr. at 76). The vehicles then drove off in separate directions. (Tr. at 77).

Two days later, on March 9, 2011, law enforcement received a report of a suspicious incident from an employee at the Bank of America on Medlock Bridge

---

[16] Agent Szabo described the Buick as having standard wheels and dark tint, a paper "drive-out" tag on the rear, and the left side of the hood was noticeably ajar, as if damaged. (Tr. at 74).

Road in Johns Creek, Georgia. (Tr. at 77-78). According to the employee, she arrived at work early and while she waited for the bank to open, a Dunbar armored truck serviced the ATM at the drive-thru. (Tr. at 78). The employee observed a black vehicle pull up and park directly beside her "as if watching the armored car" while it serviced the ATM. (Id.). While the employee described the black vehicle as a "limousine-type vehicle," Agent Szabo understood that description as referring to a sedan-type vehicle and specifically a Buick Park Avenue (as opposed to a Lincoln Town Car), based on her description of the black vehicle's tail lights. (Tr. at 79-80). The employee described the hood of the black vehicle as being noticeably ajar, matching the description of the vehicle that agents had seen two days earlier following the Loomis armored truck. (Tr. at 78).

On March 15, 2011, a robbery of a Garda armored truck occurred at the Kroger on LaVista Road in DeKalb County, during which the Garda courier was shot from behind multiple times and killed. (Tr. at 80). Witnesses reported that the robbers fled in a light blue Mercury Grand Marquis, later determined to have been stolen. (Id.). The robbers abandoned that vehicle a few blocks away, and witnesses at that location reported seeing an individual carrying a firearm get into a red four-door sedan similar to a Toyota Camry or Nissan.[17] (Tr. at 81, 97-98). Agent Szabo testified

---

[17] Specifically, both witnesses reported seeing a red sedan, but it appears that only one of the two posited that it could be a Toyota or a Nissan. (Tr. at 97, 105).

about the use of two vehicles in a robbery, describing the red four-door vehicle as a "secondary getaway vehicle:"

> The stolen getaway vehicle was used to get away from the scene. Obviously that's viewed by witnesses, so typical[ly] in robbery cases, that vehicle gets dumped and they switch to another vehicle to facilitate their getaway. Often, that second vehicle is not a stolen vehicle; it's owned by a suspect, a girlfriend, a relative, but it's a vehicle usually legitimately owned or rented by somebody associated with the robbery suspects.

(Tr. at 87).

On March 17, 2011, law enforcement conducted surveillance of the residence at 5015 Michael Jay Street, and observed parked in the driveway a black Buick Park Avenue, with the hood noticeably ajar, matching the description of the Buick agents had seen following the Loomis truck on March 7, 2011, and that the bank employee reported seeing on March 9, 2011. (Tr. at 85). The agent who observed the vehicle took a photograph of it and sent it to Agent Szabo, who had been part of the law enforcement team tailing Booker's vehicle and the Buick while they followed the Loomis truck. (Tr. at 85-86). Agent Szabo testified that the vehicle in the photograph "appeared to be the same" as the Buick he had previously observed. (Tr. at 85).

---

Agent Szabo also testified that a 2008 red Chevy Impala, like the Impala at issue in this case, is similar in appearance to a 2008 Toyota Camry. (Tr. at 102, 104).

## C.     Installation of the Impala's GPS Tracker

Continued visual surveillance at 5015 Michael Jay Street revealed that the Impala, a red, four-door sedan like the second get-away vehicle from the March 15, 2011, robbery, was parked in the driveway of that residence.[18]  (Tr. at 88-89).  On March 22, 2011, sometime between 3:00 a.m. and 5:00 a.m., GCPD Detective Michael Duncan ("Detective Duncan") installed a GPS tracker underneath the rear bumper of the Impala while it was parked in the driveway of 5015 Michael Jay Street.  (Tr. at 50, 52, 88).  The Impala was backed into the driveway with the rear bumper almost touching the garage door, which remained closed.  (Tr. at 51).  At that time, the residence at 5015 Michael Jay Street had no carport or any similar type of enclosure extending from the residence over the Impala, and the Impala was not covered in any way.  (Tr. at 52).  When Detective Duncan installed the GPS tracker on the Impala, the Buick was also parked in the driveway.  (Tr. at 52-53).  Detective Duncan did not enter the garage or the residence that evening.  (Tr. at 62); see also (Gov. Exs. 1-4).

---

[18] This Impala was subsequently determined to be registered to Jones.  (Tr. at 89).

## II. DISCUSSION

### A.      Evidence Derived From GPS Tracker

The Fourth Amendment to the United States Constitution provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. CONST. amend. IV. In Jones, 132 S.Ct. at 945, the Supreme Court clarified its Fourth Amendment jurisprudence by explaining that both the common-law trespassory test and the reasonable expectation of privacy test articulated in Katz v. United States, 389 U.S. 347, 351 (1967) (Harlan, J., concurring), are valid methods to determine if a Fourth Amendment violation has occurred.  See Jones, 132 S.Ct. at 952 (emphasis and citation omitted) (noting that the Katz reasonable expectations of privacy test was "added to, not substitute for, the common-law trespassory test").[19]  Accordingly, a

_____

[19] To the extent the government asserts that this statement indicates a defendant must show *both* a common law trespass and a reasonable expectation of privacy in the subsequent tracking to establish a Fourth Amendment violation, see [Doc. 543 at 20, 22-23; Doc. 559-1 at 3-4 (noting that the government's argument was based only upon the non-binding concurrence)], the Court declines to adopt this approach.  The language of the majority opinion in Jones makes clear that "*Katz* did not erode the principle 'that, when the Government *does* engage in a physical intrusion of a constitutionally protected area in order to obtain information, that intrusion may constitute a violation of the Fourth Amendment.'"  Jones, 132 S.Ct. at 951 (citation omitted); see also id. (footnoted omitted) ("Katz did not narrow the Fourth Amendment's scope.").  Accordingly, the holding in Jones does not, as the government asserts, add another necessary condition that must be satisfied in order for a violation to occur, see id. at 948 (". . . Jones's Fourth Amendment rights do not rise or fall with the *Katz* formulation."), but instead merely reaffirms an additional,

defendant may show that a Fourth Amendment violation occurred either by showing that the "[g]overnment physically occupied private property for the purpose of obtaining information," id. at 949, 951 n.5, or, even absent a trespass, by showing that his reasonable expectations of privacy were violated, see id. at 952. In the specific context of a GPS tracking device, this formulation of Fourth Amendment jurisprudence makes clear that a violation occurs where the government physically intrudes on a constitutionally protected area to place the tracking device for subsequent monitoring, id. at 951, or if no such trespass occurs, when the subsequent monitoring of that tracking device interferes with a person's reasonable expectations of privacy, see id. at 951-54.

1.   *Installation of the Tracking Device*

a.   <u>Henderson's Challenge Against the Installation</u>

In order for Henderson to successfully mount a Fourth Amendment challenge to the installation of the tracking device based on trespass theory, he must establish that the government intruded upon a constitutionally protected area when it placed the GPS tracker on the Impala.  See id. at 951.  As previously stated, the Fourth Amendment protects "the right of people to be secure in their persons, houses, papers, and effects," U.S. CONST. amend. IV, and, the home is "[w]ithout question

_____

independent way that a defendant may establish his Fourth Amendment rights have been violated.

. . . accorded the full range of Fourth Amendment protections," <u>Lewis v. United States</u>, 385 U.S. 206, 211 (1966) (citations omitted); <u>see also</u> <u>United States v. Weston</u>, 443 F.3d 661, 666 (8th Cir. 2006) (citation omitted) ("The Fourth Amendment's protection extends to the curtilage surrounding a home."). Moreover, "[i]t is beyond dispute that a vehicle is an 'effect' as that term is used in the [Fourth] Amendment." <u>Jones</u>, 132 S.Ct. at 949 (<u>citing</u> <u>United States v. Chadwick</u>, 433 U.S. 1, 12 (1977), <u>overruled in part on other grounds</u> by <u>California v. Acevedo</u>, 500 U.S. 565 (1991)). Since the evidence shows that Detective Duncan entered the driveway at 5015 Michael Jay Street to install the GPS tracker on the undercarriage of the Impala, Henderson may pursue his claim if he can show a trespass by establishing that he had a constitutionally protected interest in either the driveway of 5015 Michael Jay Street or the Impala onto which the GPS tracker was actually attached.

Henderson asserts that the installation of the tracker on the Impala infringed upon his constitutionally protected rights because he was living[20] at 5015 Michael Jay Street, and the Impala parked in the driveway, which he sometimes drove, was

---

[20] Given the evidence presented by Henderson, <u>see</u> [Doc. 531 at 2-3 (recounting testimony that Henderson was often at the residence, that his clothing was at the residence, and that Jones who was living at 5015 Michael Jay Street with Dooley, said Henderson lived there; noting that law enforcement found Henderson's birth certificate, his social security card, and receipts in his name when they searched the residence; and stating that Henderson gave his address upon arrest as 5015 Michael Jay Street)]; (Tr. at 8-18, 20), the Court finds that he has sufficiently established that 5015 Michael Jay Street was his residence.

within the curtilage of that residence when the tracker was installed. [Doc. 531 at 2-6]. Although Henderson acknowledges that many courts have held a driveway that is not enclosed does not constitute curtilage of a residence, he "believes he had a reasonable expectation of privacy in the driveway of this particular residence, a home with attached garage and a driveway that was barely long enough to park two vehicles bumper to bumper," and in any event, he asserts that "the area in question" is really the "underside of [the Impala] (a vehicle he sometimes drove)." [Id. at 5-6 n.4].

Black's Law Dictionary defines curtilage as "[t]he land or yard adjoining a house, usually within an enclosure." Black's Law Dictionary (9th ed. 2009). The extent of the curtilage "is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." United States v. Dunn, 480 U.S. 294, 300 (1987) (citation omitted). The Supreme Court has identified four factors relevant to determining the boundaries of the curtilage: (1) the proximity of the area claimed to be in the curtilage to the home; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the uses to which the area is put; and (4) the steps taken by the resident to protect the area from observation by people passing by. Id. at 301.

Considering these factors, the undersigned finds that Henderson has not demonstrated a reasonable expectation of privacy in the driveway because it is not part of the curtilage of the 5015 Michael Jay Street residence. Although the first factor weighs in Henderson's favor, as the area of the driveway on which the car was parked was right next to the garage door of the house, (Tr. at 51), the other three factors do not weigh in favor of finding the driveway to be within the curtilage. No enclosure or carport covered the driveway; instead, it was completely open to the public. (Tr. at 52). The driveway was being used to store vehicles, <u>see</u> (Tr. at 16, 52-53), and there is no evidence in the record that defendants used it for any other more private purpose, <u>cf.</u> <u>United States v. Soliz</u>, 129 F.3d 499, 502-03 (9th Cir. 1997), <u>overruled on other grounds by</u> <u>United States v. Johnson</u>, 256 F.3d 895 (9th Cir. 2001) (per curiam) (noting that parking cars is not a "private activit[y] connected with the sanctity of the home" and is instead a "mundane, open and notorious activity"). Finally, there is no evidence that any of the residents of 5015 Michael Jay Street, including Henderson, took any steps to protect the driveway from observation of people passing by; there was no gate or fence, no "No Trespassing" signs, nor any other features that would prevent a person standing in the public street from seeing the entirety of the driveway.[21] <u>See generally</u> (Tr. at 51-52). Accordingly, even if

---

[21] Indeed, as Henderson notes, the "driveway . . . was barely long enough to park two vehicles bumper to bumper," indicating that it was quite close to the public

Henderson had an expectation of privacy in the residence located at 5015 Michael Jay Street, he had no expectation of privacy in the driveway as it was not part of the residence's curtilage and law enforcement therefore did not enter into a constitutionally protected area by crossing the driveway to attach the GPS tracker to the Impala.[22]  See United States v. Alvin, No. CR208-25, 2009 WL 722267, at *3 (S.D. Ga. Mar. 18, 2009), adopted at *1; see also United States v. Galaviz, 645 F.3d 347, 355-56 (6th Cir. 2011) (citations omitted) (noting that even if proximity to the house was close enough to possibly constitute curtilage, a "short driveway" "at least two car lengths long" was not curtilage where it "was not enclosed by a fence or other barrier" and "no apparent steps were taken by the residents of the house to

_____

road.  See [Doc. 531 at 5 n.4].

[22] Henderson appears to contend that the fact that the tracker was attached to the Impala in a place not readily visible to the public, i.e. the undercarriage of its rear section, which was immediately adjacent to the garage door, renders the driveway within the curtilage of 5015 Michael Jay Street.  See [Doc. 531 at 5-6 & n.4; Doc. 554 at 5-6].  However, curtilage is "the *land or yard* adjoining a house"  Black's Law Dictionary (9th ed. 2009) (emphasis added), and thus, the movable vehicle parked on the driveway is not, in and of itself, curtilage to which the Fourth Amendment's protection could be extended.  Instead, the positioning of the vehicle on the driveway is relevant as to whether Henderson had a reasonable expectation of privacy in the driveway because it informs the Court's interpretation of the Dunn factors, showing that law enforcement came within close proximity to the residence when it placed the tracker on the vehicle and demonstrating "the nature of the uses to which the area is put."  See Dunn, 480 U.S. at 301.  However, as previously discussed, considering the totality of the circumstances these factors do not support a finding that the driveway where the car was parked is constitutionally protected curtilage.

protect the driveway from the sidewalk or street"); <u>United States v. Ventling</u>, 678 F.2d 63, 66 (8th Cir. 1982) (per curiam) (holding that a driveway is not "protected curtilage" because "a driveway and portion of the yard immediately adjacent to the front door of the residence can hardly be considered out of public view"); <u>cf. United States v. Quintana</u>, 594 F. Supp. 2d 1291, 1301-02 (M.D. Fla. 2009), adopted at 1294 (finding a paved driveway near the front of a residence to be curtilage where law enforcement accessed the driveway by jumping over a fence and unlocking an electronic driveway gate).

Moreover, Henderson has not shown that he had a constitutionally protected interest in the Impala itself. Indeed, with respect to the Impala, Henderson merely asserts that he "sometimes drove" the vehicle. <u>See</u> [Doc. 531 at 6 n.4; Doc. 553 at 554 (<u>citing</u> (Tr. at 17-18, 22))]; <u>see also</u> (Tr. at 18 (Yvonne testifying that Henderson rarely drove the Impala)). Henderson has not established that he had any possessory interest in the vehicle, and a non-owner, like Henderson, who drives the vehicle only after a GPS tracker is installed, cannot establish a Fourth Amendment violation on the basis of the trespass theory.[23] <u>See Jones</u>, 132 S.Ct. at 951-52 (distinguishing

_____

[23]   Henderson looks to the <u>Jones</u> case as support for his position that as an occasional driver of the vehicle, he has standing to challenge the installation of the GPS tracker. <u>See</u> [Doc. 554 at 3]; <u>see also Jones</u>, 132 S.Ct. at 949 n.2 (noting that standing may exist to challenge an alleged Fourth Amendment violation where an individual is the "exclusive" user of a vehicle and, as a result, assumes the property rights of a bailee). However, the <u>Jones</u> Court also stated that because the

United States v. Knotts, 460 U.S. 276 (1983), and United States v. Karo, 468 U.S. 705

(1984), on the ground that the government installed the tracking devices in the

containers at a time when defendants did not have the containers in their

possession). Accordingly, as Henderson has not established that he has a

constitutionally protected interest with respect to either the driveway onto which

law enforcement entered to attach the tracker or the Impala itself when the tracker

was attached, it is **RECOMMENDED** that his motion to suppress any evidence

obtained as a result of the GPS monitoring of vehicles, [Doc. 193], be **DENIED** to the

extent Henderson asserts that the installation of the GPS tracking device violated his

Fourth Amendment rights.[24]

---

government did not challenge standing in the appeal, they did "not consider the Fourth Amendment significance of Jones's status," Jones, 132 S.Ct. at 949 n.2, rendering the Jones opinion *dicta* with respect to its statements on standing. Furthermore, this *dicta* clearly considers the rights of an individual who is the "exclusive" user of a vehicle, see id., and testimony here establishes only that Henderson drove the vehicle on "rare" occasions, (Tr. at 18). Accordingly, even under the *dicta* of Jones, Henderson has not shown that he has standing with respect to the installation of the GPS tracker on the Impala.

[24] Even if Henderson could establish a constitutionally protected interest with regard to the installation of the tracking device on the Impala, his motion would still fail for the reasons stated in the following section discussing Dooley's challenge against the installation.

### b.     <u>Dooley's Challenge Against the Installation</u>[25]

The government asserts that even if installation of the GPS tracker violates the Fourth Amendment, evidence derived from that action is not due to be suppressed since the good faith exception to the exclusionary rule applies. <u>See</u> [Doc. 543 at 27-41]. "Evidence seized as the result of an illegal search may not be used by the government in a subsequent criminal prosecution." <u>United States v. McClure</u>, 160 F. App'x 842, 844 (11th Cir. 2005) (per curiam) (unpublished) (citation and internal marks omitted). "The exclusionary rule, as it is known, is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect." <u>Id.</u> (citations and internal marks omitted). "One exception to the

---

[25] The government has conceded that Dooley has standing to challenge the installation of the GPS tracker as he has shown that he provided the money to purchase the Impala. <u>See</u> [Doc. 543 at 22]. Indeed, the government's arguments with respect to the merits of Dooley's suppression motion focus exclusively on the fact that his motion should be denied because he has not also shown that he had a reasonable expectation of privacy in the subsequent monitoring of the Impala. <u>See</u> [<u>id.</u> at 22-27]. However, as previously discussed, the holding in <u>Jones</u> does not add another necessary condition that must be satisfied in order for a defendant to establish a Fourth Amendment violation, but instead merely establishes an additional, independent way that a defendant may demonstrate his Fourth Amendment rights have been violated. <u>See</u> discussion, <u>supra</u> at 16 n.18. Accordingly, the Court will assume that Dooley has established a Fourth Amendment violation under <u>Jones</u> by presenting evidence that a GPS tracker was placed on a car in which he had a constitutionally protected possessory interest without a warrant, and will turn directly to the government's argument that this installation falls under the good faith exception to the exclusionary rule. <u>See</u> [Doc. 543 at 27-41].

exclusionary rule is the good faith exception set forth by the Supreme Court in

United States v. Leon, [468 U.S. 897 (1984)]." Id. (citation omitted).

Under Leon, "the good faith exception to the exclusionary rule 'stands for the

principle that courts generally should not render inadmissible evidence obtained by

police officers acting in reasonable reliance upon a search warrant that is ultimately

found to be unsupported by probable cause.'" United States v. Vanbrackle, 397 F.

App'x 557, 559 (11th Cir. 2010) (per curiam) (unpublished) (quoting United States

v. Martin, 297 F.3d 1308, 1313 (11th Cir. 2002)); see also United States v. Robinson,

336 F.3d 1293, 1295-96 (11th Cir. 2003).  The Leon good faith exception "has been

extended to situations where officers are called upon to interpret or rely upon an

external source of authority such as a statute, which later turns out to be invalid or

not to authorize the action taken, or where officers have based their conduct on

recognized exceptions to the warrant requirement itself, such as consent."  United

States v. Gonzalez, 969 F.2d 999, 1004 n.7 (11th Cir. 1992) (internal citations omitted);

see also Davis v. United States, 131 S.Ct. 2419, 2428-29 (2011) (holding that the good

faith exception to the exclusionary rule applies where police conduct a search in

objectively reasonable reliance on then-binding appellate judicial precedent).  "The

purpose of the exclusionary rule is to deter unlawful police misconduct; therefore,

when officers engage in objectively reasonable law enforcement activity and have

acted in good faith . . . , the *Leon* good faith exception applies." McClure, 160 F.

App'x at 845 (citation and internal marks omitted).[26]

To the extent the government can show law enforcement acted in reasonable

reliance on binding judicial precedent at the time Detective Duncan installed the

GPS tracker on the Impala, the good faith exception applies to render any evidence

obtained as a result of this action admissible. See Davis, 131 S.Ct. at 2428-29; United

States v. Lebowitz, 676 F.3d.1000, 1010 (11th Cir. 2012) (per curiam); United States

v. Pineda-Moreno, 688 F.3d 1087, 1091 (9th Cir. 2012) (applying the good faith

exception to the exclusionary rule to admit GPS tracker evidence after Jones). Prior

to Jones, the Eleventh Circuit had held that a warrant was not required to install an

electronic tracking device on the exterior of a vehicle parked in a public place, and

---

[26] Thus, although Dooley asserts that the good faith exception does not apply
because the government has failed to show that Detective Duncan, who installed the
tracker, had any knowledge of the then-binding appellate legal precedent, [Doc. 557
at 5-7], the "pertinent analysis" with respect to the good faith inquiry is "objective,
not an inquiry into the subjective awareness of [the installing] officer[.]" Herring v.
United States, 555 U.S. 135, 145 (2009) (internal marks omitted). In other words, the
"good faith inquiry is confined to the objectively ascertainable question whether a
reasonably well trained officer would have known that the search was illegal [in
light of] all of the circumstances." Leon, 468 U.S. at 922 n.23; see also id. at 919 n.20
("We emphasize that the standard of reasonableness we adopt is an objective one.");
United States v. Amaya, 853 F. Supp. 2d 818, 829 (N.D. Iowa 2012), opinion
withdrawn in part on reconsideration on other grounds by 853 F. Supp. 2d 835 (N.D.
Iowa 2012) (providing that courts "when applying *Davis* [in the context of Jones],
have looked to officers' compliance with, not knowledge of, binding appellate
precedent").

instead an officer need only have reasonable suspicion to support the installation of a beeper. United States v. Michael, 645 F.2d 252, 257-59 (5th Cir. May 11, 1981) (en banc);[27] cf. United States v. Smith, 387 F. App'x 918, 920-21 (11th Cir. 2010) (per curiam) (unpublished) (holding that the warrantless installation of a GPS device on the exterior of defendant's car did not violate the Fourth Amendment "because the car was parked in a place easily accessible to the public and was reachable from a public thoroughfare").[28]

However, Dooley asserts that the good faith exception does not apply because Michael is distinguishable from the current case since the Impala was parked on private property and not in a public place. See [Doc. 459 at 4-5; Doc. 557 at 5-7]; see also Michael, 645 F.2d at 256-57 (emphasis added) (applying the traditional

---

[27] Decisions of the Fifth Circuit rendered before October 1, 1981, are binding upon panels of the Eleventh Circuit. Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

[28] Dooley contends that law enforcement may not rely on the good faith exception to the exclusionary rule because legal precedent from other districts at the time the GPS tracker was installed suggested that installing the GPS tracker without a warrant may violate the Fourth Amendment. See [Doc. 459 at 4-5; Doc. 398 at 7]. However, Dooley does not cite any authority in support of his assertion that non-binding precedent deserves the same consideration as an appellate decision handed down by the Circuit Court in the district at issue, and given the specificity of the Supreme Court's holding in Davis, the good faith exception does not require an officer to consider precedent regarding the legal issue at hand from all judicial districts. See United States v. Lee, 862 F. Supp. 2d 560, 567-70 (E.D. Ky. 2012); United States v. Katzin, Criminal Action No. 11-226, 2012 WL 1646894, at *7-9 (E.D. Pa. May 9, 2012).

reasonable expectation of privacy test to determine "that the minimal intrusion involved in the attachment of a beeper to Michael's van, parked in a *public place* was sufficiently justified [by reasonable suspicion] so as to satisfy any of Michael's fourth amendment expectation of privacy concerns"). The Court agrees that the Eleventh Circuit's approval of warrantless tracker placement in <u>Michael</u> turns on the fact that "Michael's expectation of privacy in th[e] case was slight" since he parked his van "in plain view, in a public place" and "[w]hat a person knowingly exposes to the public, even in his own home . . . , is not a subject of Fourth Amendment protection."[29] <u>Michael</u>, 645 F.2d at 257-58 & n.14 (citations and internal marks omitted); <u>see also</u>, <u>cf.</u>, <u>Smith</u>, 387 F. App'x at 921. However, the undersigned does not find that the privacy interests at stake in the present situation are meaningfully distinguishable from those described in <u>Michael</u>, since, as previously discussed, the driveway of 5015 Michael Jay Street is "visible to the public" and not part of the curtilage of that residence, indicating that, like a public parking lot, it was not subject to any constitutional protection or reasonable expectation of privacy. <u>See</u> (Tr. at 51-52); <u>see also</u> <u>Cowart v. Enrique</u>, 311 F. App'x 210, 213-14 (11th Cir. 2009) (per

---

[29] Similarly, the 2006 Amendment notes to Federal Rule of Criminal Procedure 41(b)(4) specifically state that "if the officers intend to install or use the [tracking] device in a constitutionally protected area, they must obtain judicial approval to do so. If, on the other hand, the officers intend to install and use the device without implicating any Fourth Amendment rights, there is no need to obtain a warrant."

curiam) (unpublished) ( applying the <u>Dunn</u> factors and holding that a driveway and front yard which were clearly visible from the public street were not entitled to Fourth Amendment protection).  Accordingly, because appellate precedent in this Circuit both sanctioned warrantless installation of GPS trackers on vehicles in areas not entitled to Fourth Amendment protection, <u>see</u> <u>Michael,</u>645 F.2d at 256-57; <u>Smith</u>, 387 F. App'x at 920-21, and held that areas like the driveway of 5015 Michael Jay Street, which are not protected in some fashion from public view, are not subject to the protections of the Fourth Amendment, <u>see</u> <u>Cowart</u>, 311 F. App'x at 213-14, law enforcement's decision to install the GPS tracker on the Impala when it was parked in the driveway of 5015 Michael Jay Street without first securing a warrant falls under the protection of the good faith exception to the exclusionary rule, <u>see</u> <u>Davis</u>, 131 S.Ct. at 2428-29; <u>see also</u> <u>United States v. Nelson</u>, No. CR612-05, 2012 WL 3052914, at *2-3 (S.D. Ga. July 25, 2012) (relying on <u>Michael</u> to apply the good faith exception to the exclusionary rule after <u>Jones</u>).

Alternatively, Dooley asserts that the good faith exception does not apply because there was no reasonable suspicion supporting installation of the GPS tracker on the Impala and law enforcement therefore failed to comply with the binding appellate precedent of <u>Michael</u>.  [Doc. 557 at 8]; <u>see also</u> <u>Michael</u>, 645 F.2d at 257-59 (requiring reasonable suspicion for installation of a tracker).  Specifically, Dooley

asserts that reasonable suspicion did not exist because there was "no evidence at all connecting [the Impala] with anything, other than being parked at this particular residence." [Doc. 557 at 8]. He asserts that while witnesses had identified a red vehicle similar to a red Honda or a red Toyota, the police "knew very well" that the "American-made Red Chevy Impala" was a different vehicle. [Id.].

"Reasonable suspicion consists of a sufficiently high probability that criminal conduct is occurring to make the intrusion on the individual's privacy interest reasonable." United States v. Godsey, 224 F. App'x 896, 899 (11th Cir. 2007) (per curiam) (unpublished) (citation and internal marks omitted). "When making a determination of reasonable suspicion, courts must examine the totality of the circumstances of each case to see whether the [] officers have a particularized and objective basis for suspecting legal wrongdoing." United States v. Wilcher, Criminal Case No. 1:10-CR-25-TWT-LTW, 2010 WL 5678676, at *4 (N.D. Ga. Dec. 17, 2010), adopted by 2011 WL 336462, at *1 (N.D. Ga. Feb. 1, 2011) (citation omitted); see also United States v. Foskey, 455 F. App'x 884, 887 (11th Cir. 2012) (per curiam) (unpublished) (citation omitted). "[A]n inchoate and unparticularized suspicion or hunch of criminal activity is not enough to satisfy the minimum level of objectivity required." Wilcher, 2010 WL 5678676, at *4 (alteration in original) (citation and internal marks omitted); see also United States v. Brumfield, Criminal Action No.

1:10-CR-053-CAP-ECS-1, 2011 WL 5978082, at *3 (N.D. Ga. Feb. 18, 2011), adopted by 2011 WL 5976300, at *1 (N.D. Ga. Nov. 29, 2011) (citation omitted). There must be "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion." Wilcher, 2010 WL 5678676, at *4 (citations and internal marks omitted); see also United States v. Lewis, 674 F.3d 1298, 1311 (11th Cir. 2012). "To determine whether officers had reasonable suspicion, [the court] must take stock of everything they knew before [installing the tracker]." United States v. Gomes, 279 F. App'x 861, 870 (11th Cir. 2008) (per curiam) (unpublished) (citation and internal marks omitted); see also United States v. Henderson, 145 F. App'x 346, 351-52 (11th Cir. 2005) (per curiam) (unpublished).

Prior to installing the GPS tracker, law enforcement had identified Booker and an individual known by the nickname "Chicken," who had ties to North Carolina, as suspects in a series of bank robberies based on their association with Bennett, whose fingerprints had been recovered from a vehicle used in one of the robberies. (Tr. at 67-70, 84). Telephone records indicated that the individual suspected of being "Chicken" had obtained cellular service from cellular towers in the vicinity of several of the armored truck robberies at the times of those robberies, and that Booker had obtained cellular service from cellular towers in the vicinity of all of the armored truck robberies at the times of those robberies. (Tr. at 69-70). Further

analysis of telephone records associated with these individuals revealed three additional frequently called numbers which were often called right after the robberies had occurred. (Tr. at 82-83). Two of these phone numbers were registered to an individual named Donyale Dooley, living at 5015 Michael Jay Street, who also had ties to North Carolina, leading law enforcement to believe he was "Chicken." (Tr. at 82-84). The third phone was the land line at 5015 Michael Jay Street, registered in Jones' name. (Tr. at 83).

In addition, visual surveillance conducted in connection with the armed robbery investigation revealed that on March 7, 2012, a black Buick with a noticeably ajar hood was following a Loomis armored car. (Tr. at 72-77). On March 9, 2012, a witness reported seeing a similar black vehicle with a noticeably ajar hood watching a different armored truck as it serviced an ATM. (Tr. at 77-78). On March 15, 2012, following the robbery of an armored truck, witnesses observed the suspects trading their stolen getaway vehicle for a red, four-door sedan which one witness suggested may be a Toyota or a Honda. (Tr. at 80-81, 97-98). When law enforcement drove by the 5015 Michael Jay Street address, which had been identified by the phone records, they noticed a black Buick, with a noticeably ajar hood, parked in the driveway of that residence, and the Buick appeared to be the same vehicle surveillance agents had observed on March 7, 2011, following armored trucks in conjunction with

Booker.  (Tr. at 84-85); <u>see also</u> (Tr. at 49, 72-74).  Later, law enforcement observed a second vehicle, a red, four-door sedan, the Impala, parked in that same driveway. (Tr. at 88).

Based on this evidence, which shows that multiple sources had tied an individual living at 5015 Michael Jay Street, where the Impala and black Buick were parked, to the bank robberies, and that specific witness testimony had tied a red four-door sedan, like the Impala, to the March 15, 2011, robbery, reasonable suspicion supported law enforcement's decision to install a GPS tracker on the Impala.  As a result, evidence recovered from that tracker is admissible under the good faith exception since law enforcement "only did what the law allowed at that time."  <u>United States v. Rosas-Illescas</u>, Case No. 2:11-CR-492-RDP-HGD, 2012 WL 1946580, at *5 (N.D. Ala. May 30, 2012).  Although Dooley asserts that the police report identified the red sedan as a Honda or Toyota, and that law enforcement knew the Impala was not the same car, <u>see</u> [Doc. 557 at 8], he provides no evidentiary support for this broad assertion of bad faith.  Indeed, Agent Szabo specifically testified that, in his opinion, a 2008 Camry and a 2008 Chevy Impala looked similar, and in any event, the witness statements from the March 15, 2011, robbery indicate that while both witnesses agreed the car was a red, four-door sedan, a description clearly satisfied by the Impala, only one witness guessed it

33

might "possibly" be a Camry or a Nissan. (Tr. at 81, 97-98, 104-05). Accordingly, "reasonable suspicions of law enforcement agents in this case justified the minimal intrusion of affixing the . . . tracking device to the outside of the vehicle" and evidence derived from the warrantless installation of the GPS tracker is not due to be suppressed. United States v. Burton, 698 F. Supp. 2d 1303, 1308 (N.D. Fla. 2010) (finding reasonable suspicion where DEA agents received information from multiple sources that the regular driver of a vehicle was a distributor of cocaine and visual surveillance had revealed that the vehicle was parked at multiple locations of suspected drug activity). Therefore, it is **RECOMMENDED** that Dooley's motions to suppress evidence obtained as a result of the GPS monitoring of vehicles, [Docs. 201, 398], be **DENIED** to the extent Dooley asserts that the installation of the GPS tracking device violated his Fourth Amendment rights.

### 2. *Subsequent Monitoring of the GPS Tracking Device*

In order for the defendants to successfully mount a Fourth Amendment challenge based upon the subsequent monitoring of the GPS tracking device on the Impala, they must establish that the monitoring intruded upon their reasonable expectations of privacy. See Jones, 132 S.Ct. at 951. In order to allege a violation of this right, defendants "must demonstrate that [they] personally ha[ve] an expectation of privacy in the place searched, and that [their] expectation is

reasonable." <u>Minnesota v. Carter</u>, 525 U.S. 83, 88 (1998) (citation omitted). In other words, defendants must demonstrate both a subjective and an objective expectation of privacy to challenge a search. <u>United States v. Segura-Baltazar</u>, 448 F.3d 1281, 1286 (11th Cir. 2006); <u>see also</u> <u>California v. Ciraolo</u>, 476 U.S. 207, 211 (1986). "The individual[s] challenging the search bear[] the burdens of proof and persuasion." <u>United States v. Cooper</u>, 133 F.3d 1394, 1398 (11th Cir. 1998) (citation omitted); <u>see also</u> <u>Carter</u>, 525 U.S. at 88.

With respect to the subsequent tracking of the vehicle, Henderson asserts he had a reasonable expectation of privacy because he was "the other unidentified black male observed [in the Impala] on all but one of the dates in question," because he was "specifically monitored on March 30, 2011," and because he believes he was the "person exiting the . . . Impala and entering a CVS pharmacy on March 28, 2011." [Doc. 554 at 7]. Similarly, Dooley sets forth evidence that he drove the Impala "at least 99 percent of the time." <u>See</u> (Tr. at 15-16). Thus, defendants apparently contend that they had a reasonable expectation of privacy in their movements, and since they were occupants of the Impala, the monitoring of the Impala permitted law enforcement to track them, infringing upon their Fourth Amendment rights.

However, even assuming that defendants have set forth sufficient evidence to establish that they occupied the Impala during the time that it was being

monitored by law enforcement,[30] they have not established a sufficient reasonable expectation of privacy in the movements law enforcement captured to warrant suppression of the evidence from the GPS tracker. The Supreme Court has specifically held that a person has no reasonable expectation of privacy in his movements on a public highway, and thus the warrantless use of a tracking device to follow public movements, such as those of the Impala on the street or even while parked in the driveway of 5015 Michael Jay Street, does not implicate the Fourth Amendment. See Knotts, 460 U.S. at 281-83; see also id. at 282 ("Nothing in the Fourth Amendment prohibit[s] the police from augmenting the sensory faculties bestowed upon them at birth with such enhancement as science and technology afford[] them."). Although warrantless tracking of a defendant within a constitutionally protected space has been held to implicate the Fourth Amendment, see Karo, 468 U.S. at 714 (holding that the warrantless installation of a tracking device to follow defendant's movements within a private residence implicated the Fourth Amendment), there is no indication that the warrantless tracker on the

---

[30] The government points out that Henderson merely states that he "*believes* he was the other unidentified black male observed on all but one of the dates in question" and because he must direct the Court to evidence in the record, his own subjective beliefs are not sufficient evidence to establish standing. See [Doc. 559-1 at 6 n.1 (internal marks omitted) (citing [Doc. 554 at 7])]; see also United States v. Cardenas, 24 F. App'x 890, 893 (10th Cir. 2001) (unpublished) (citation omitted) (noting that a defendant's subjective belief of a fact, without evidence that the fact existed, does not meet the burden to establish standing necessary to mount a Fourth Amendment challenge).

vehicle was ever used to track the car in any such protected area; indeed, Detective Duncan specifically testified that while the signal could be tracked when a vehicle was out on the street, it could not be tracked when a vehicle was inside a garage, as it was not likely that the signal would transmit from inside a structure, (Tr. at 63). Accordingly, monitoring the Impala on public streets, to the extent it permitted law enforcement to also track the public movements of defendants, does not implicate the Fourth Amendment.

Moreover, to the extent Dooley asserts that the fact the Impala was monitored for eight days generated aggregate data in which he had a reasonable expectation of privacy, violating his Fourth Amendment rights, see, e.g., [Doc. 557 at 3-4]; see also United States v. Maynard, 615 F.3d 544, 560, 563 (D.C. Cir. 2010) (reasoning that long-term monitoring violated defendant's reasonable expectation of privacy because the defendant's aggregate movements were not actually exposed to public view since it was unlikely that a stranger would observe all the defendant's public movements over such a long period); see also Jones, 132 S.Ct. at 957 (Alito, J., concurring) (expressing agreement with the Maynard Court's reliance on reasonable expectations of privacy as they relate to long-term monitoring),[31] the undersigned

_____

[31] Because the majority found that a Fourth Amendment violation had occurred on the basis of trespass theory, they did not reach the question of whether prolonged monitoring, even on public streets, would violate a defendant's reasonable expectation of privacy. See Jones, 132 S.Ct. at 953-54. Moreover, the monitoring in Jones lasted 28 days, id. at 948, far longer than the 8 days at issue here,

finds that suppression of the evidence obtained from the GPS trackers is not warranted on this basis because the good faith exception to the exclusionary rule applies. At the time the trackers were being monitored, appellate precedent in the Eleventh Circuit had clearly established that no warrant was needed for electronic monitoring of vehicles on public streets, see Knotts, 470 U.S. at 281-83; Michael, 645 F.2d at 258 (approving of warrantless tracking of vehicle where "[t]he beeper only aided the agents in the performance of their lawful surveillance" and "[t]he van traveled public roads and was exposed to public view"), and had expressly approved of such monitoring where law enforcement had reasonable suspicion to believe the individuals being monitored had committed a crime, see Michael, 645 F.2d at 258. Accordingly, law enforcement acted in good faith reliance on existing appellate case law at the time it monitored the Impala without a warrant using a tracker that broadcast only from the open areas of the public streets, and even if the Fourth Amendment were violated, suppression of the evidence obtained by the tracker is not warranted due to the good faith exception to the exclusionary rule. As a result, it is **RECOMMENDED** that defendants' motions to suppress any evidence obtained as a result of the GPS monitoring of vehicles, [Docs. 193, 201, 398], be

---

and Justice Alito specifically stated that "relatively short-term monitoring of a person's movements on public streets accords with expectations of privacy that our society has recognized as reasonable," id. at 964 (citing Knotts, 460 U.S. at 281–82).

**DENIED** to the extent defendants assert that the subsequent monitoring of the GPS

tracking device violated their Fourth Amendment rights.

## B.     Real-time Location Evidence from Cell Phones

In addition to challenging GPS evidence obtained via the tracker installed on

the Impala, Dooley[32] asserts that the government illegally obtained real-time location

information by "pinging"[33] his cellular telephones.[34]   See [Doc. 398 at 9-16].   In

---

[32] Although Dooley filed an additional motion post-Jones challenging not only
GPS information from the tracker but also real-time location evidence from cell
phones, see [Doc. 398], Henderson has not raised any such challenge.

[33] When a telephone is "pinged," its position is identified through GPS data.
[Doc. 341-3 at 8].

[34] Dooley identifies instances of pinging occurring on March 22, March 23,
March 24, March 28, and March 30 of 2011.   [Doc. 460 at 3].   Specifically, he
challenges the pinging of 678-280-4793 ("Target Telephone # 3") on March 22, [Doc.
567-1 at 2], the pinging of Target Telephone #3 and 980-333-7216 ("Target Telephone
#4") on March 24, 2011, [id. at 10], the pinging of 678-895-3369 ("Target Telephone
#2"), Target Telephone #3, and Target Telephone #4 on March 28, 2011, [id. at 4], as
well as nonspecific "phone pings" on March 28, 2011, and March 30, 2011, [id at 6,
12].   Dooley also asserts that Target Telephones ##3-4 were pinged on March 23,
2011, but the evidence provided in support of this assertion consists only of a report
stating that an agent "asked Inv. Crosby to set up a ping on [Target Telephone #4]"
and acknowledging that "Agent Szabo had an active ping running on [Target
Telephone #3]."   [Id. at 8].   Dooley has not pointed to any log notes from the
investigation showing that either telephone was actually pinged on this date or
described any evidence arising from such a ping that the government intends to use
at trial against defendants.   Accordingly, this allegation will not be addressed
further herein, as Dooley has not made a "definite, specific, detailed, and
nonconjectural [assertion] to enable the court to conclude that a substantial claim is
presented" with respect to any pinging on this date.   See United States v. Cooper,
203 F.3d 1279, 1284 (11th Cir. 2000) (citation and internal marks omitted).

particular, Dooley contends that the state wiretap orders issued during the investigation did not permit the government to obtain real-time location information by accessing the GPS or cell tower location capabilities of his cellular telephones.[35] [Id. at 9-12]. In response, the government concedes that GPS data and real-time cell tower data fall outside the scope of Title III, see [Doc. 434 at 2-3], but it challenges Dooley's standing to contest the gathering of real-time location information through the wiretap orders, see [id. at 2], and asserts instead that in addition to providing a basis for interception of communications pursuant to Title III, the applications for the wiretap orders established probable cause for law enforcement to obtain the real-

---

[35] Dooley also asserts that the government cannot legally obtain GPS or real-time location information via the Pen Register Statute used to obtain cell site location information. See [Doc. 398 at 12-16]. However, as discussed at length in a previous Report and Recommendation, see [Doc. 486], the applications and orders issued pursuant to this statute neither requested nor authorized the government to recover GPS or real-time location information from the cellular telephones. See [Doc. 433-1 at 5 (application specifically stating that "[t]he Government is not requesting the Court to direct that the cellular phone provider activate the Target Telephones GPS functionality, or to direct the disclosure of information from multiple cellular antenna towers simultaneously to triangulate at the precise location of a cellular telephone"); Doc. 433-2 at 6 (same); Doc. 433-3 at 7 (same)]; see also [Doc. 433-1 at 16 (order pursuant to Pen Register Statute specifically stating that the government was "*not* authorized to obtain and shall not obtain from the provider pursuant to this Order: . . . (3) GPS information on the location of the user, even if that technology is built into the cellphone"); Doc. 433-2 at 17 (same); Doc. 433-3 at 18 (same)]. Accordingly, the government acknowledges that the Trap and Trace Orders did not authorize it to obtain GPS or real-time location information, see [Doc. 433], and Dooley's objections in this regard are thus moot and will not be addressed further herein. Instead, the Court will consider only whether the government could legally obtain real-time location information pursuant to the wiretap orders.

time location information,[36] conforming with the requirements of the Fourth Amendment, see [id. at 3-7 (citing United States v. Ortega-Estrada, Criminal File No. 1:07-CR-356-TWT, 2008 WL 4716949, at *14 (N.D. Ga. Oct. 22, 2008), adopted at *1 ("[T]here is no requirement . . . that a search warrant for [real-time] GPS information be independent from a wiretap order, and therefore, its inclusion with the subject wiretap orders does not render either defective.")]. Accordingly, since GPS data and real-time cell tower data fall outside the scope of Title III, the statutory suppression remedy from Title III does not apply, United States v. Forest, 355 F.3d 942, 950 (6th Cir. 2004), vacated on other grounds by Garner v. United States, 543 U.S. 1100 (2005); Ortega-Estrada, 2008 WL 4716949, at *14, and the GPS information and real-time cell tower data obtained pursuant to the wiretap orders "would be admissible unless such evidence was obtained contrary to the Fourth Amendment," Ortega-Estrada, 2008 WL 4716949, at *14; see also United States v. Flores, No. 1:05-cr-558-WSD-JFK, 2007 WL 2904109, at *4 (N.D. Ga. Sept. 27, 2007) (footnote omitted) ("Suppression is not an appropriate remedy for illegal interception of [evidence outside the scope of Title III] unless the violation rises to a constitutional level.").

_____

[36] Each wiretap order states: "[I]f requested by a law enforcement agency executing this investigation warrant, the TARGET TELEPHONE SERVICE PROVIDER shall provide cell phone positioning information through the use of GPS data and or through all cell data such as cell tower data which provides positioning information. This information is to be provided to the [GCPD] in real time, if possible and if requested." [Doc. 341-2 at 23-24; Doc. 341-3 at 18; Doc. 341-4 at 19-20].

1.    *Standing*

As previously discussed, "[t]he Fourth Amendment protects an individual in those places where he can demonstrate a reasonable expectation of privacy against government intrusion."[37] United States v. Suarez-Blanca, Criminal Indictment No. 1:07-CR-0023-MHS/AJB, 2008 WL 4200156, at *5 (N.D. Ga. Apr. 21, 2008) (citing Katz, 389 U.S. at 353); see also Ortega-Estrada, 2008 WL 4716949, at *14 ("The Fourth Amendment prohibits 'unreasonable searches and seizures,' and requires warrants to issue only upon a showing of probable cause and a particular description of the thing to be seized."). "Fourth Amendment rights, however, are personal, and only individuals who actually enjoy the reasonable expectation of privacy have standing to challenge the validity of a government search." Suarez-Blanca, 2008 WL 4200156,

---

[37] Generally, to challenge the interception of a communication under Title III, a defendant must show that he is an "aggrieved person," which courts have interpreted in accordance with existing standing rules to include those individuals who are the "victim[s] of . . . invasion[s] of privacy." Jones v. United States, 362 U.S. 257, 261 (1960), overruled on other grounds by United States v. Salvucci, 448 U.S. 83 (1980); see also Ortega-Estrada, 2008 WL 4716949, at *2 (quoting 18 U.S.C. § 2518(10)(a)); Flores, 2007 WL 2904109, at *2 (citation and internal marks omitted) ("To [challenge a wiretap] a defendant must show: (1) he was a party to the communication, (2) the wiretap efforts were directed at him, or (3) the interception took place on his premises."). However, since the GPS and real-time cell tower data was not authorized on a statutory basis under Title III, but the government contends that the applications for the wiretap orders established probable cause to obtain the real-time location information, see [Doc. 434 at 3-7], the Court will not address whether Dooley is an aggrieved person under the statute, and will instead only consider whether he has shown a reasonable expectation of privacy under the Fourth Amendment to challenge the obtaining of the real-time location data.

at *5 (citations omitted); see also Rakas v. Illinois, 439 U.S. 128, 133-34 (1978). "To have standing to challenge a search, one must manifest a subjective expectation of privacy in the invaded area that society is prepared to recognize as reasonable." Suarez-Blanca, 2008 WL 4200156, at *5 (citations and internal marks omitted); see also Ciraolo, 476 U.S. at 211 (standing to challenge search requires a subjective expectation of privacy that society would recognize as legitimate); United States v. Baron-Mantilla, 743 F.2d 868, 870 (11th Cir. 1984) (per curiam). Additionally, "'[l]egitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" Suarez-Blanca, 2008 WL 4200156, at *5 (alteration in original) (quoting Rakas, 439 U.S. at 143 n.12). "Thus, an individual asserting Fourth Amendment rights 'must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable[.]'" Id. at *6 (alteration in original) (quoting Carter, 525 U.S. at 88). "That is, a defendant must establish both a subjective and an objective expectation of privacy," and he "bears the burden of showing a legitimate expectation of privacy in the area searched." Id. (citations omitted).

Dooley asserts that he has standing to challenge the pinging of various cell phones because he was the owner of three phones that were subject to the wiretaps,

specifically, Target Telephones ## 2-4.[38] [Doc. 460 at 6].  The government, however, contends that because Dooley was using a false name with respect to those telephones, he cannot demonstrate the reasonable expectation of privacy required for standing to challenge evidence seized pursuant to the second and third wiretap orders.  See [Doc. 555 at 6-15 (citing Suarez-Blanca, 2008 WL 4200156, at *5) (footnote and citations omitted) ("Courts have determined that an individual does not have a legitimate expectation of privacy in items that are not in the individual's name or when an individual uses an alias or fictitious name and there is no other evidence linking the defendant to the item or property.")].

Dooley, however, relies on the Supreme Court's holding in Jones, 132 S.Ct. at 945, for the proposition that he can assert standing in an object not registered in his

_____

[38] Dooley asserts that he has standing with respect to 404-667-4900 ("Target Telephone #1"), the subject of the First Wiretap Order, because his "voice was intercepted on numerous calls with codefendant . . . Booker when Booker used [Target Telephone #1]."  [Doc. 460 at 6].  While such a showing may be sufficient to show Dooley was an aggrieved person with a reasonable expectation of privacy in the *communications* intercepted by the First Wiretap Order, see Jones, 362 U.S. at 261; Ortega-Estrada, 2008 WL 4716949, at *2; Flores, 2007 WL 2904109, at *2, the relevant question with respect to the pinging of the cell phone is whether Dooley has shown that activating the GPS capabilities of the phone or accessing cell tower data in real time to reveal the location of its user has violated his reasonable expectation of privacy.  See Forest, 355 F.3d at 950-52; Ortega-Estrada 2008 WL 4716949, at *12-13.  Because Dooley asserts that Booker, not Dooley, was using Target Telephone # 1, he has not shown that the pinging of that phone in any way violated any reasonable expectation of privacy he may have had with respect to his location, and has not established standing to challenge the government's acquisition of real-time location information with respect to that phone.  See United States v. Degaule, 797 F. Supp. 2d 1332, 1361-63 (N.D. Ga. 2011), adopted at 1344.

name. See [Doc. 544 at 8-9]. Dooley contends that in Jones the Supreme Court "clearly noted that an individual not registered with an item can still have standing to challenge an alleged Fourth Amendment violation where that individual is the 'exclusive' user and, as a result, assumes the property rights of a bailee." [Id. at 9 (citing Jones, 132 S.Ct. at 949 n.2)]. However, the Court stopped short of this holding, and instead merely recognized the status of Jones as a bailee, noting that because the government did not challenge standing in the appeal, they did "not consider the Fourth Amendment significance of Jones's status." Jones, 132 S.Ct. at 949 n.2. Accordingly, while the Court noted that Jones would have the property rights of a bailee, they made no determination as to whether such a status would satisfy Fourth Amendment standing.[39] See id.

Alternatively, Dooley contends that he has a reasonable expectation of privacy sufficient to challenge the wiretaps of Target Telephones ## 2-4 because, although he used a fake name on the telephone accounts, other evidence links him to the

_____

[39] Dooley also cites Jones for the proposition that he has standing under a possessory trespass theory because he was using the device "at the time the government trespassorily insert[ed] the information gathering device." [Doc. 544 at 9 (internal marks omitted) (quoting Jones, 132 S.Ct. at 952)]. However, pinging a cell phone through its GPS capabilities or calibrating cell tower data in real time is clearly distinguishable from the placement of an electronic tracking device on a person or his property to follow his movements, and since "pinging" does not involve the physical placement of a tracker or beeper onto Dooley's cell phone, the undersigned finds that the "beeper" line of Fourth Amendment cases focusing on physical trespass are not relevant to the standing analysis here. See Jones, 132 S.Ct. at 951-52.

telephones at issue. <u>See</u> [Doc. 544 at 7-13 (<u>citing</u> <u>Suarez-Blanca</u>, 2008 WL 4200156, at *5 (footnote and citations omitted) ("Courts have determined that an individual does not have a legitimate expectation of privacy in items that are not in the individual's name or when an individual uses an alias or fictitious name *and there is no other evidence linking the defendant to the item or property*.")].[40] Indeed, the <u>Suarez-Blanca</u> court specifically noted that "an individual may assert a reasonable expectation of privacy in packages addressed to them under fictitious names," 2008 WL 4200156, at *6 n.6 (<u>citing</u> <u>United States v. Pitts</u>, 322 F.3d 449, 457-59 (7th Cir. 2003); <u>United States v. Villarreal</u>, 963 F.2d 770, 774-75 (5th Cir. 1992); <u>United States v. Boyd</u>, No. CRIM. A. 05-10037-GA03, 2006 WL 314344, at *4 (D. Mass. Feb. 8, 2006)); <u>see also</u> <u>United States v. Pierce</u>, 959 F.2d 1297, 1303 n.11 (5th Cir. 1992) (drawing a distinction between packages addressed to the "alter ego" of a defendant and those addressed to individuals other than the defendant), that "an individual

---

[40] The other cases cited by Dooley where a person who was not the registered owner of a telephone was found to have standing to challenge a search are examples of situations where "other evidence" existed linking the individual to the phone in someone else's name. <u>See, e.g.</u>, <u>United States v. Garcia-Bercovich</u>, 582 F.3d 1234, 1236 (11th Cir. 2009) (finding a reasonable expectation of privacy where other evidence showed that defendant's full name matched the name on the intercepted package, and he had retrieved at least two other similarly addressed packages); <u>United States v. Finley</u>, 477 F.3d 250, 259 (5th Cir. 2007) (finding a reasonable expectation of privacy where other evidence showed the phone was registered in defendant's employer's name, and that the phone was issued to defendant, he was permitted to use the phone for personal purposes, and the defendant took "normal precautions to maintain his privacy in the telephone.").

has an expectation of privacy in a hotel room for which he uses an alias to register where he has exclusive control over the room and the keys," Suarez-Blanca, 2008 WL 4200156, at *6 n.6 (citing United States v. Newbern, 731 F.2d 744, 748 (11th Cir. 1984)), and that "an individual has an expectation of privacy in property that was purchased under an alias but where the evidence showed the defendant lived at the home and exercised control over it," Suarez-Blanca, 2008 WL 4200156, at *6 n.6 (citing United States v. Watson, 950 F.2d 505, 507 (8th Cir. 1991)), and specifically distinguished those situations from the one at hand, where a defendant sought to suppress cell phone records from a phone registered under a different subscriber name and "there [was] no evidence linking [that] subscriber to [the defendant]," id. at *6-7 (noting that the defendant "failed to tie himself in any way to the subscriber"). Accordingly, if Dooley can show other evidence linking him to the subscriber of the telephones at issue, "Donyale Dooley," he can establish Fourth Amendment standing despite the fact that the phone was not registered to his name.

As "other evidence" linking him to the target telephones, Dooley points to the fact that "the agents believed Mr. Dooley was either a speaker on or was using all five targeted phones," the fact that law enforcement "knew [Dooley] had access to [the phones] up to the point of his arrest," the fact that Donyale Dooley, who is in fact Dooley's brother, identified Dooley's voice on all five phones, the fact that Donyale Dooley testified that Dooley habitually established cell phone accounts and

applied for other services under Donyale's name because Dooley had poor credit, and the fact that Donyale Dooley also identified "domestic calls" made from those phones between Dooley and his girlfriend and Dooley and his mother. See [Doc. 544 at 9-10, 12]. However, as the government points out, see [Doc. 555 at 8], Dooley may not "rely[] solely on the government's theory of the case [to show] that [he] has standing to contest [a] search." United States v. Singleton, 987 F.2d 1444, 1449 (9th Cir. 1993); see also United States v. Thompson, 171 F. App'x 823, 838 (11th Cir. 2006) (per curiam) (unpublished);United States v. Lewis, Criminal No. 07-00266-CG, 2007 WL 2996347, at *1 (S.D. Ala. Oct. 12, 2007). Accordingly, neither law enforcement's belief that Dooley was the one who owned the phones, nor their knowledge and belief that he had the phones in his possession can serve as the "other evidence" necessary to establish Dooley's standing to assert a Fourth Amendment challenge to the pinging of phone not registered under his name. See Singleton, 987 F.2d at 1449; Thompson, 171 F. App'x at 828; Suarez-Blanca, 2008 WL 4200156, at *5; Lewis, 2007 WL 2996347, at *1.

However, Dooley also cites as "other evidence" Donyale Dooley's affidavit, where Donyale Dooley explains that he knew Dooley routinely used his name to establish cell phone accounts, apply for housing, or sign up for other services that would require a credit check because Donyale Dooley had better credit than Dooley did. See [Doc. 544-1 at 1 (specifically testifying that Donyale Dooley knew Dooley

had used his name to set up cell phone accounts in the past)]. Moreover, Donyale Dooley identified Dooley's voice in various calls made from the cell phones between Dooley and his girlfriend and Dooley and his mother. See [Doc. 544 at 9-10, 12; Doc. 541-1 at 2]. The Court finds that this "other evidence" is sufficient to establish a connection between Dooley and the subscriber name used to set up Target Telephones ##2-4, establishing his reasonable expectation of privacy in those phones. Therefore, in addition to the Fourth Wiretap Order,[41] Dooley has standing to challenge real-time location evidence seized pursuant to the Second and Third Wiretap Orders. See Suarez-Blanca, 2008 WL 4200156, at *6 n.6 (citations omitted); see also Garcia-Bercovich, 582 F.3d at 1236 (finding sufficient "other evidence" to establish a reasonable expectation of privacy in a package mailed to an alias where the defendant established previous use of the other name by showing he had retrieved two other similarly addressed packages).[42]

---

[41] The government concedes that Dooley has standing with respect to 951-313-7823 ("Target Telephone #5"), the subject of the Fourth Wiretap Order, which was registered in his name. See [Doc. 341 at 20; Doc. 341-4 at 2].

[42] In support of his motion, Dooley also cites United States v. Moncur, No. 10-20801-CR, 2011 WL 3844096, at *1 (S.D. Fla. July 28, 2011), asserting that the case shows that a reasonable expectation of privacy can exist despite the use of an alias where the alias was not used merely in furtherance of the criminal scheme. See [Doc. 544 at 12-13]. The government contends that considering whether or not the alias was used in furtherance of criminal ends "adds to the standing threshold question, and in doing so, seemingly shifts the burden of proof to the Government to disprove standing . . . by requiring the government . . . to show evidence that [the defendant] used the alias to frustrate law enforcement." [Doc. 555 at 12-13].

## 2. *Probable Cause to Seize Real-Time Location Data*

The government maintains that the state wiretap orders for Dooley's cell phones obtained during the investigation lawfully authorized the seizure of real-time location data from his phones because the applications submitted to obtain the orders established probable cause for the pinging. See [Doc. 434]. Rule 41 of the Federal Rules of Criminal Procedure provides for issuance of a warrant to permit the use of a tracking device if an application establishes probable cause to use such a device. Fed. R. Crim. P. 41(d)(1). Probable cause exists if the totality of the circumstances indicate that there is a fair probability that obtaining real-time

_____

However, since standing is assessed on a case-by-case basis, see Oliver v. United States, 466 U.S. 170, 191 n.3 (1984), and both a defendant's subjective expectations of privacy and society's reasonable expectations of privacy are relevant to the inquiry, see Carter, 525 U.S. at 88, defendant's motivations in using an alias are relevant to his Fourth Amendment standing, and considering them does not place any inappropriate burden on the government. Indeed, in determining that use of an alias defeats any reasonable expectation of privacy, courts have pointed to the defendant's underlying motivation as a justification for their decision. See, e.g., Suarez-Blanca, 2008 WL 4200156, at *7 (citing United States v. Wood, 6 F. Supp. 2d 1213, 1214 (D. Kan. 1998)) (noting that no reasonable expectation of privacy existed because the use of another name indicated that the defendant was either "trying to distance himself from the cell phone or had no interest in the cell phone"); United States v. Walker, 20 F. Supp. 2d 971, 973-74 (S.D.W. Va. 1998) (holding that a package recipient's use of an alias in furtherance of a criminal scheme defeated the reasonableness of his expectation of privacy). Here, the fact that Donyale's affidavit establishes that Dooley used the "Donyale Dooley" alias habitually to set up any service requiring a credit check, including his living arrangements, and that the alias was not strictly associated with the charged criminal activities, weighs in favor of finding he had an expectation of privacy in the services or property held under the alias. See Moncur, 2011 WL 3844096, at *1; Walker, 20 F. Supp. 2d at 973-74.

location information will reveal a crime or evidence of a crime.  <u>Degaule</u>, 797 F. Supp. 2d at 1363 n.24 (citation omitted); <u>see also</u> <u>United States v. Peterson</u>, 627 F. Supp. 2d 1359, 1363 (M.D. Ga. 2008) (<u>citing</u> <u>Illinois v. Gates</u>, 462 U.S. 213, 239 (1983)). "An issuing judge's probable cause determination should be paid great deference by reviewing courts, and it will be upheld if there exists a substantial basis for concluding that probable cause existed." <u>United States v. Sutton</u>, Criminal Action No. 5:08-CR-40(HL), 2009 WL 481411, at *5 (M.D. Ga. Feb. 25, 2009) (citations and internal marks omitted).

"While Rule 41 provides procedures by which warrants may be issued, it is not the exclusive determinate as to whether a particular search violates the Fourth Amendment." <u>Ortega-Estrada</u> 2008 WL 4716949, at *14.  In fact, this Court has held that GPS information may be obtained pursuant to a wiretap order if the application establishes probable cause for obtaining the GPS data.  <u>Id.</u>; <u>Degaule</u>, 797 F. Supp. 2d at 1363 n.24.  Thus, the Court will consider whether the applications for the wiretap orders for Dooley's phones established probable cause to authorize pinging of the phones under the Fourth Amendment.

### a.    Evaluation of Probable Cause for the Wiretap Orders

### i.    Target Telephone #2

Beginning with the affidavit in support of the First Wiretap Order,[43] Detective

Andrew Whaley ("Detective Whaley") of the GCPD explains in great detail how law

enforcement had linked Dooley to several armed robberies, believed to have been

carried out by the same group of individuals due to the similar nature of the crimes.

[Doc. 341-1 at 25-28, 33].  Detective Whaley describes law enforcement's discovery

of Bennett's fingerprints on a getaway vehicle, and following his disappearance and

murder, the subsequent investigation of his death.  [Id. at 33-39, 44-45].  During this

investigation, law enforcement interviewed Bennett's family and friends, learned

that Bennett had admitted involvement in at least one of the robberies, and were

able to identify Booker and an individual known as "Chicken," as other individuals

involved in the crimes.  [Id. at 35-39]. Through Bennett's subpoenaed phone records

and information provided during the interviews, investigators obtained phone

numbers associated with both "Chicken" and Booker, and after subpoenaing the

subscriber information for those numbers were able to determine that "Chicken"

---

[43] The application for the Second Wiretap Order incorporates and attaches the affidavit submitted with the application for the First Wiretap Order.  See [Doc. 341-2 at 3].

was most likely Dooley,[44] who lived at 5015 Michael Jay Street.   [Id. at 33, 37, 39;

Doc. 341-2 at 10-12, 14 (linking "Chicken" to North Carolina and describing Donyale

Dooley's North Carolina criminal history)].  Obtaining phone records and cell site

location information for these numbers revealed that the phones had been used in

the vicinity of the robberies at the time that the robberies occurred and that they

were often in contact with each other.[45]  [Doc. 341-1 at 33-35, 44-45; Doc. 341-2 at 12-

14].

Detective Whaley describes how, after making these connections, law

enforcement surveilled Booker's vehicles, observing his movements as he appeared

to be "casing" a Loomis armored truck in Stone Mountain, and discovered that a

black Buick with a front hood that was noticeably ajar appeared to be casing the

truck in conjunction with Booker.   [Doc. 341-1 at 40-42]; see also [id. at 26-32

(describing investigation leading to identification of vehicles through surveillance

---

[44] The affidavit refers to Dooley as Donyale Dooley, the alias he used.  See generally [Doc. 341-1].

[45] Specifically, the wiretap affidavit notes (1) 2.77 hours of contact over 104 calls between one of Dooley's phones and one of Booker's phones; (2) 1.04 hours of contact and over 15 calls between one of Dooley's phones and one of Booker's phones; (3) 18.15 hours of contact over 319 calls between one of Booker's phones and one of Dooley's phone, including 3 calls on November 11, 2010, the same date of the Bank of America Robbery; 1 call on November 29, 2010, the same date of the Wells Fargo Robbery; and 13 calls on December 7, 2010, the same date of the Mall of Georgia robbery.  [Doc. 341-2 at 6].

video and public records)]. The affidavit states that the Buick with the hood ajar observed casing the ATM of a Wells Fargo on March 7, 2011, was later observed by law enforcement parked in the driveway at 5015 Michael Jay Street, the address associated with Dooley and his telephones. [Doc. 341-2 at 13-14].

In addition to the information provided in the original affidavit, Detective Whaley's affidavit in support of the application for the Second Wiretap Order describes a conversation between Booker and Dooley, who was using Target Telephone #2, on March 20, 2011, five days after the armed robbery at the Toco Hills Shopping Center, during which the courier was shot and killed. [Id. at 10-11]. Detective Whaley then provides his interpretation of the coded conversation, relating it to events at earlier robberies and the planning of future robberies.[46] [Id.

---

[46] Specifically, Detective Whaley stated that Dooley told Booker "that shit was ugly and unreal" and Booker acknowledged him. [Doc. 341-2 at 10]. Dooley then stated that "they were just giving that pussy away" and talked about how they "didn't do their 'homework,'" but that he had already "put the homework in." [Id.]. Booker asked him when he "wants to do that" and Dooley replied "whenever you're ready." [Id.]. Dooley also made a reference to the fact that "the mother fucker only go down there only to get a small change that was it." [Id. at 11]. Detective Whaley interpreted this conversation as a reference to the murder in the DeKalb County armored truck robbery which had taken place on March 15, 2011. [Id. at 10-11]. He believed that Dooley was telling Booker that it was easy to rob guards, but that the last robbery had not been preceded by sufficient surveillance and intelligence, referencing the fact that the amount of money taken in the robbery was significantly smaller than the previous ones, a detail that had not been released to the public. [Id. at 11]. Detective Whaley interpreted the rest of the conversation to indicate that Dooley had already done some surveillance on a new target, and so he was ready for another armed robbery whenever Booker was. [Id]

at 11-12]; see also Flores, 2007 WL 2904109, at *39 (explaining that the issuing judge "may consider an agent's training and experience to offer opinions as to methods utilized by [suspects] and, based on the same, consider an agent's interpretation of code words and language in determining whether [] probable cause exists to authorize a search warrant"). Detective Whaley concluded that the investigation indicated that Dooley was using Target Telephone #2 "to plan, coordinate and conduct armed robberies in Gwinnett County and surrounding metropolitan-Atlanta counties." [Id. at 15].

The Court finds that the affidavit submitted in support of the Second Wiretap Order provided a substantial basis for concluding that probable cause existed to believe that obtaining real-time location information with respect to Target Telephone #2 would reveal a crime or evidence of a crime as the conversation intercepted on March 20, 2011, five days after the armed robbery at the Toco Hills Shopping Center, indicated that Dooley was using Target Telephone #2 to discuss the prior robbery with Booker and to plan another robbery, and phone records indicated that the two had been in communication on cell phones around the time of other robberies. [Doc. 341-2 at 10-14]. Accordingly, the Second Wiretap Order, issued on March 21, 2011, did not violate the Fourth Amendment when it authorized law enforcement to ping Target Telephone #2, and it is **RECOMMENDED** that

Dooley's motion to suppress evidence, [Doc. 398], be **DENIED** to the extent he objects to law enforcement's pinging of Target Telephone #2 after the order was issued on March 21, 2011.  See [Doc. 567-1].

## ii.    Target Telephones ##3-4

The affidavit in support of the application for the Third Wiretap Order likewise establishes the requisite probable cause with respect to Target Telephones ##3-4.   After incorporating by reference the evidence described in the earlier applications, see [Doc. 341-3 at 6], Detective Whaley describes the most recent developments in the investigation, noting that Dooley had left Target Telephone #2 with Jones and that Dooley had called Target Telephone #2 multiple times from Target Telephone #3, which was activated on March 8, 2011.[47]  [Id. at 7].  Similarly, conversations between Booker on Target Telephone #1 and a female on Target Telephone #2 indicated that Dooley would call Booker from "the Lo-Key shop," a

---

[47] The affidavit in support of the third wiretap application also mentions that Target Telephone #3 was "pinged" on March 22, 2011, while law enforcement had the red Impala under surveillance as it traveled from the 5015 Michael Jay Street residence to a Bank of America in Lithonia, Georgia.  See [Doc. 341-3 at 8; Doc. 567-1 at 2].   However, because this instance of pinging of Target Telephone #3 occurred before the Third Wiretap Order was issued authorizing pinging of Target Telephone #3, the Court will evaluate the existence of probable cause in the third wiretap application without considering this instance of pinging of Target Telephone #3. See United States v. Sereme, No. 2:11-CR-97-FtM-29SPC, 2012 WL 1757702, at *15-16 (M.D. Fla. Mar. 27, 2012), adopted by 2012 WL 1757271, at *1 (M.D. Fla. May 16, 2012).

term Detective Whaley understood to be slang for a phone not yet intercepted or compromised by law enforcement, and Dooley then called Booker using Target Telephone #4. [Id. at 8-9]. During this conversation, Dooley and Booker continued to speak in code or slang, and Dooley indicated that they needed to get together and the two discussed whether the police had been watching them. [Id.]. Dooley also made a reference to "chopper spitting" which Detective Whaley said "is a commonly used street slang reference for shooting a gun." [Id. at 9]. Detective Whaley concluded that the investigation indicated that Dooley was currently using three cell phones, Target Telephones ## 2-4, "to plan, coordinate and conduct armed robberies in Gwinnett County and surrounding metropolitan-Atlanta counties." [Id.].

The Court finds that the affidavit submitted in support of the Third Wiretap Order provided a substantial basis for concluding that probable cause existed to believe that obtaining real-time location information with respect to Target Telephones ##3-4 would reveal a crime or evidence of a crime as the investigation indicated that Dooley continued to communicate with Booker and wanted to get together with him, but they were concerned about law enforcement surveillance, and Dooley had obtained these new cell phones to continue to communicate with Booker and Jones while avoiding detection by law enforcement. [Doc. 341-3 at 7-9].

Accordingly, the Third Wiretap Order, issued on March 24, 2011, did not violate the Fourth Amendment when it authorized law enforcement to ping Target Telephones ##3-4, and it is **RECOMMENDED** that Dooley's motion to suppress evidence, [Doc. 398], be **DENIED** to the extent he objects to law enforcement's pinging of Target Telephones ## 3-4 after the order was issued on March 24, 2011.[48] See [Doc. 567-1 at 4, 6, 10, 12].

### iii. Target Telephone #5

The affidavit in support of the fourth wiretap application also establishes the requisite probable cause with respect to Target Telephone # 5. After incorporating by reference the evidence described in the earlier applications, see [Doc. 341-4 at 6], Detective Whaley describes the most recent developments in the investigation, noting that on March 27, 2011, Dooley had received a call on Target Telephone #2 from his home phone number in which a female, believed to be Jones, discussed purchasing a new Tracphone from the store, [id. at 8]. Several hours later, Dooley called Target Telephone #1 from a new Tracfone, Target Telephone #5, and told

---

[48] Two of the pings Dooley challenges are of Target Telephones ##3 and 4 on March 24, 2011. [Doc. 567-1 at 10]. However, it is clear from the log of the investigation that these pings occurred after Detective Whaley had obtained the Third Wiretap Order, which was signed at noon on March 24, 2011, [Doc. 341-3 at 20], as the pings occurred after "1627 hrs," when calls to Target Telephone #3 began to be recorded. See [Doc. 567-1 at 10 (noting that Target Telephones ##3 and 4 were pinged after "1814 hrs")].

Booker that the new number was his new "joint," a slang term for a new cell phone. [Id.]. Dooley said that he had four "joints," which Detective Whaley understood to be a reference to the four cell phones, Target Telephones ##2-5, that Dooley was currently using. [Id.].

The affidavit describes the content of two conversations between Booker and Dooley using these phones, which Detective Whaley believed indicated that Dooley was considering meeting with Booker, and the two were discussing the disposition of money from robberies or other illegal activity, and Booker expressed displeasure with Dooley's actions in light of earlier agreements. [Id. at 8-9]. During this conversation, Dooley told Booker that he was "Charlotte bound" and needed "4 lab packs" to make the trip, which Detective Whaley understood to mean that Dooley needed or planned to obtain money for a trip to North Carolina, as the investigation had revealed that Dooley had ties to Mecklenburg County, North Carolina. [Id. at 9].

The affidavit also describes how surveillance and GPS tracking had revealed that at approximately 7:30 p.m. on March 27, 2011, Dooley drove the Impala around the vicinity of a Wells Fargo bank in DeKalb County, which was serviced by the same armored truck company that had previously been robbed and which was on the same route as other bank locations previously cased by Booker, [id. at 9-10], and

the driving pattern suggested that Dooley was checking for routes of escape, dead-end streets, and a place to possibly abandon a vehicle, [id.]. Detective Whaley concluded that the investigation indicated that Dooley was using Target Telephone #5 "to plan, coordinate and conduct armed robberies in Gwinnett County and surrounding metropolitan-Atlanta counties." [Id. at 10].

The Court finds that the affidavit submitted in support of the Fourth Wiretap Order provided a substantial basis for concluding that probable cause existed to believe that obtaining real-time location information with respect to Target Telephone #5 would reveal a crime or evidence of a crime as the investigation indicated that Dooley continued to communicate with Booker using Target Telephone #5, which was one of four cell phones Dooley had at that time, the two were discussing disposition of the proceeds of their criminal conduct, Dooley indicated he needed money to travel to North Carolina, and Dooley was engaged in conduct consistent with casing a bank for another robbery. [Doc. 341-4 at 8-10]. Accordingly, the Fourth Wiretap Order, issued on March 28, 2011, did not violate the Fourth Amendment when it authorized law enforcement to ping Target Telephone # 5, and it is **RECOMMENDED** that Dooley's motion to suppress evidence, [Doc. 398], be **DENIED** to the extent he objects to law enforcement's

pinging of Target Telephone #5 after the order was issued on March 28, 2011.
See [Doc. 567-1 at 6].

## b. Good faith exception

The government argues that even if the wiretap orders that authorized pinging of Dooley's cell phones were found not to have been supported by probable cause, the law enforcement agents reasonably relied in good faith on the orders in pinging the phones and suppression of the GPS evidence is not warranted. [Doc. 434 at 6]. As previously discussed, "the good faith exception to the exclusionary rule 'stands for the principle that courts generally should not render inadmissible evidence obtained by police officers acting in reasonable reliance upon a search warrant that is ultimately found to be unsupported by probable cause.'" Vanbrackle, 397 F. App'x at 559 (quoting Martin, 297 F.3d at 1313). The Eleventh Circuit has recognized that the good faith exception to the exclusionary rule applies to wiretap applications and orders. United States v. Malekzadeh, 855 F.2d 1492, 1497 (11th Cir. 1988); United States v. Acosta, 807 F. Supp. 2d 1154, 1248-49 (N.D. Ga. 2011), adopted at 1168; Flores, 2007 WL 2904109, at *7; United States v. Russell, Cr. No. 2:08CR121-WHA, 2008 WL 4649051, at *5 (M.D. Ala. Oct. 20, 2008); United States v. Royster, No. 5:07-CR-16 (WDO), 2007 WL 4336321, at *10 (M.D. Ga. Dec. 7, 2007).[49]

_____

[49] Although the Sixth Circuit has held that there is no good faith exception for a warrant obtained pursuant to Title III, see United States v. Rice, 478 F.3d 704 (6th

Recognizing that the good faith exception to the exclusionary rule would permit introduction of almost all evidence seized pursuant to judicial authorization, the Supreme Court also identified four specific situations in which the good faith exception would not apply: (1) where the warrant [or court order] is so facially deficient that the executing officers cannot reasonably presume it to be valid; (2) where the issuing judge was misled by information in the affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (3) where the issuing judge wholly abandoned his judicial role; and (4) where the supporting affidavit is so lacking in indicia of probable cause [or specific and articulable facts relevant and material to an ongoing criminal investigation] as to render official belief in its existence entirely unreasonable. Leon, 468 U.S. at 923; see also United States v. Accardo, 749 F.2d 1477 (11th Cir. 1985).

Dooley asserts that the good faith exception is not available because "the wiretap applications simply say nothing whatsoever about why agents needed Phone Location Data," and "[n]either the factual predicate for seeking such information nor any judicial determination that such information was needed can be found when scouring the wiretap applications or subsequent orders." [Doc. 460 at 5]. However, each wiretap application, which incorporated by reference the

Cir. 2007), the Eleventh Circuit's precedent in Malekzadeh is controlling, see Acosta, 807 F. Supp. 2d at 1248-49; Royster, 2007 WL 4336321, at *10 & n.5.

original application and affidavit, as amended by subsequent applications, specifically requested that the issuing court order the Target Telephone Service Providers to provide to the GCPD real time cell phone positioning information through use of GPS data. [Doc. 341-1 at 11]. In the supporting affidavit, Detective Whaley explained the shortcomings of traditional physical surveillance to monitor the activities of the subjects engaged in the armed robberies and even noted that the use of GPS tracking devices on vehicles fails to pinpoint a subject's location at all times. [Id. at 47-48]. Detective Whaley concluded that "the only remaining investigative method available to detect and prosecute all conspirators and locate all contraband involved in the aforementioned armed robberies is the use of electronic surveillance of the telephone being used by [Booker] and those persons yet to be identified as persons involved in his criminal organization." [Id. at 55]. Detective Whaley added that the activity to be electronically monitored was believed to represent a continuing criminal conspiracy, and the affidavit presented "probable cause that the telephones are used by the conspirators to commit the [armed robberies] and that the precision locating data will yield evidence pertinent to the investigation and will be instrumental in meeting the [goals of the investigation]." [Id. at 57-58].

Thus, contrary to Dooley's contention, the applications and affidavits provided the factual predicate for requesting real time GPS data from the cell phones, and each wiretap order entered granted the request to obtain real time cell phone positioning information through use of GPS data. See [Doc. 341-2 at 23-24; Doc. 341-3 at 18; Doc. 341-4 at 19-20]. Dooley has not advanced any other argument as to why the good faith exception should not apply, and there is no evidence here that the issuing judge was misled, that the issuing judge abandoned his role as a neutral and detached judge, or that the wiretaps so lacked probable cause or were so deficient as to bar the application of the good faith exception here. See Acosta, 807 F. Supp. 2d at 1249 (finding that the good faith exception would apply where "[d]efendant set forth no grounds supporting a finding that Leon's good faith exception does not apply to this case"); Royster, 2007 WL 4336321, at *10 (footnote omitted) ("Defendant [] pointed to no evidence that the law enforcement officers in this case had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment, and therefore the good faith exception would apply even if the Court had not found the surveillance otherwise valid."). Accordingly, it was objectively reasonable for the agents to conclude that probable cause for the warrants existed and for them to rely in good

faith on the wiretaps orders issued by the judges to ping Dooley's cell phones.

Degaule, 797 F. Supp. 2d at 1363 n.24.

c.      **Pinging Prior to Wiretap Order**

While the Court finds that the various wiretap orders were supported by

probable cause to lawfully authorize pinging of the Target Telephones after the

respective orders were issued, Dooley has identified one instance of pinging that

occurred before the wiretap order associated with the pinged phone had been

issued.[50]  As noted earlier, the affidavit in support of the third wiretap application

mentions that Target Telephone #3 was "pinged" on March 22, 2011, while law

enforcement had the red Impala under surveillance as it traveled from the 5015

Michael Jay Street residence to a Bank of America in Lithonia, Georgia.  See [Doc.

---

[50] Dooley also identifies two instances of pinging of unspecified phones that occurred on March 28, 2011, and March 30, 2011. [Doc. 567-1 at 6, 12].  However, the information submitted by Dooley fails to show that the pinging on those dates was not authorized by one or more of the wiretap orders.  The investigative report cited with respect to the March 28, 2011, pinging indicates that Dooley was using Target Telephone #3 around the time of the pinging, [id. at 12], and the wiretap order authorizing pinging of that phone had been issued on March 24, 2011, see [Doc. 341-3].  Indeed, wiretap orders authorizing the pinging of Target Telephones #2 and #4 had also been issued prior to that date, and the wiretap order for the only remaining cell phone, Target Telephone #5, was issued at 2:50 p.m. on March 28, 2011.  See [Docs. 341-2 to 341-4].  However, Dooley has not shown that any pinging of Target Telephone #5 occurred before the wiretap order was issued.  As for the March 30, 2011, pinging of an unspecified phone, all the wiretap orders obtained during the investigation had been issued prior to that date, so any pinging on March 30, 2011, was authorized by one or more of the wiretap orders.  See generally [id.].

65

341-3 at 8; Doc. 567-1 at 2].[51]  This pinging obviously occurred before the Third Wiretap Order was issued on March 24, 2011, authorizing pinging of Target Telephone #3.  Although the pinging of Target Telephone #3 on March 22, 2011, was not authorized by a wiretap order, the GPS data obtained on this date while law enforcement had Dooley under surveillance as he traveled in the red Impala from the 5015 Michael Jay Street residence to a Bank of America in Lithonia, Georgia, is not subject to suppression unless Dooley shows that the pinging of his cell phone in this instance while he was under surveillance in public violated the Fourth Amendment.  See United States v. Skinner, 690 F.3d 772, 777 (6th Cir. 2012) (obtaining GPS location information emitted from a cell phone without a warrant was not a violation of the Fourth Amendment because there is no reasonable expectation of privacy in the data given off by a voluntarily procured cell phone).

As discussed already in connection with the defendants' challenge to the use of the GPS tracker affixed to the Impala, the Supreme Court has specifically held that a person has no reasonable expectation of privacy in his movements on a public highway, and thus the use of a tracking device to follow movements in public does

---

[51] A GCPD investigative report dated April 8, 2011, describing events in the investigation on March 23, 2011, states that "Agent Szabo had an active ping running on the 678-280-4793 number (Target Telephone #3)." [Doc. 567-1 at 8]. However, the only instance of pinging preceding the wiretap order for Target Telephone #3 that Dooley has identified occurred on March 22, 2011.  [Id. at 2].

not implicate the Fourth Amendment.  See Knotts, 460 U.S. at 282 ("Nothing in the Fourth Amendment prohibit[s] the police from augmenting the sensory faculties bestowed upon them at birth with such enhancement as science and technology afford[] them."); see also Skinner, 690 F.3d at 777-81 (holding that defendant "did not have a reasonable expectation of privacy in the data emanating from his cell phone that showed its location").  According to the affidavit submitted in support of the third wiretap application, Target Telephone #3 was pinged on March 22, 2011, while law enforcement had the red Impala under surveillance as it traveled from the 5015 Michael Jay Street residence to a Bank of America in Lithonia, Georgia.  See [Doc. 341-3 at 8; Doc. 567-1 at 2].  Thus, the warrantless pinging of Dooley's cell phone on March 22, 2011, occurred while he was traveling in public under physical surveillance of law enforcement.  Since Dooley does not have a reasonable expectation of privacy in his movements on a public highway, the fact that law enforcement augmented its visual surveillance of him on March 22, 2011, through pinging of his cell phone while he was in public did not violate the Fourth Amendment.  See Knotts, 470 U.S. at 281-83; Skinner, 690 F.3d at 781 ("Because authorities tracked a known number that was voluntarily used while traveling on public thoroughfares, [defendant] did not have a reasonable expectation of privacy in the GPS data and location of his cell phone."); Michael, 645 F.2d at 258 (approving

of warrantless tracking of vehicle where "[t]he beeper only aided the agents in the performance of their lawful surveillance" and "[t]he van traveled public roads and was exposed to public view"); see also Ortega-Estrada, 2008 WL 4716949, at *13 (finding, in part, that the GPS data collected "did not invade a place where he might have an expectation of privacy or constitute a 'search' of any such place . . . [so] the use of the device does not require a warrant"). Accordingly, it is **RECOMMENDED** that Dooley's motion to suppress evidence, [Doc. 398], be **DENIED**.

### III. CONCLUSION

Accordingly, the government's motion for leave to file a surreply, [Doc. 559], is **GRANTED**, and it is **RECOMMENDED** that Henderson's motion to suppress any evidence obtained as a result of the GPS monitoring of vehicles, [Doc. 193], Dooley's motion to suppress evidence and fruits obtained from warrantless GPS tracking, [Doc. 201], and Dooley's motion to suppress all evidence derived from illegally installed GPS trackers and from all real time location data derived from his telephones, [Doc. 398], be **DENIED**.

**IT IS SO ORDERED** and **RECOMMENDED**, this 29th day of January, 2013.

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE