# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

CRIMINAL CASE NO.

1:11-cr-00255-TWT-RGV

STACEY DOOLEY and ASHLEY HENDERSON

## ORDER FOR SERVICE OF MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Attached is the Report and Recommendation of the United States Magistrate Judge made in accordance with 28 U.S.C. § 636(b)(1) and N.D. Ga. Cr. R. 58.1(A)(3)(a) and (b). Let the same be filed and a copy, with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the Report and Recommendation within fourteen (14) days of receipt of this Order. Should objections be filed, they shall specify with particularity the alleged error(s) made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party. The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for

review by the District Court. Failure to object to this Report and Recommendation waives a party's right to review. Fed. R. Crim. P. 59(b)(2).

Pursuant to Title 18, U.S.C. § 3161(h)(1)(D) and (H), **the above-referenced fourteen (14) days allowed for filing objections is EXCLUDED from the computation of time under the Speedy Trial Act, whether or not objections are actually filed.** The Clerk is **DIRECTED** to submit the Report and Recommendation with objections, if any, to the District Court after expiration of the above time period.

**IT IS SO ORDERED** and **DIRECTED**, this 30th day of January, 2013.

_____
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL CASE NO. 1:11-cr-00255-TWT-RGV |
| STACEY DOOLEY and ASHLEY HENDERSON | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Defendants Stacey Dooley ("Dooley") and Ashley Henderson ("Henderson"), collectively referred to herein as "defendants," are charged along with seven other co-defendants in a fifteen count indictment. [Doc. 312].[1] Dooley and Henderson are charged with (1) unlawfully obstructing, delaying, and interfering with interstate commerce by taking personal property in the custody and control of armored car couriers by means of actual and threatened force, violence, and fear of injury, and conspiring to do so, in violation of 18 U.S.C. §§ 1951 and 2; (2) carrying and using a firearm in relation to a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii)

---

[1] The cited document and page numbers in this Report and Recommendation refer to the document and page numbers shown on the Adobe file reader linked to this Court's electronic filing database (CM/ECF).

and 2; and (3) causing the death of a person through using a firearm in relation to a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A), 924(j)(1), and 2. See [Id.].

Defendants have filed motions to suppress intercepted communications, [Doc. 247 (Henderson's motion); Doc. 252 (Dooley's motion)], and the government has filed a consolidated response to these motions, see [Doc. 341]. For the following reasons, it is hereby **RECOMMENDED** that the motions to suppress intercepted communications, [Docs. 247, 252], be **DENIED.**

## I. FACTUAL BACKGROUND

### A. Wiretap for Target Telephone #1 (404-667-4900) ("First Wiretap")

On March 18, 2011, the Acting District Attorney for the Gwinnett Judicial Circuit submitted an "Application for an Order Authorizing the Interception of Wire Communications" to a Gwinnett County Superior Court Judge. See [Doc. 341-1 at 2-15]. An affidavit signed by Detective Andrew Whaley ("Detective Whaley") of the Gwinnett County Police Department ("GCPD"), was submitted in support of the application.[2] [Id. at 6, 16]. The application sought to intercept communications from

_____

[2] Detective Whaley stated that he had been employed by the GCPD since June of 2007 and had been a police officer since January of 2000. [Doc. 341-1 at 17]. He stated that he had worked for four years on narcotics investigations, prostitution investigation, burglary investigations, and robbery investigations. [Id.]. Detective Whaley averred that he had attended "Basic Investigations courses," received 2325 hours of Peace Officer Standards and Training ("POST") instruction, and that he had been the lead investigator in "numerous drug investigations and prostitution investigations" when he worked for a different police department, that he had been

2

"Target Telephone #1" (404-667-4900) used by co-defendant Quentin Booker

("Booker"), and the application specified that an investigation had produced

probable cause to believe that Target Telephone #1 was being used to facilitate

criminal offenses, specifically robbery and armed robbery, and that "Booker, an

unidentified black male referred to as 'Chicken,' and others known and as yet

unknown" were involved in the offenses.  [Id. at 2-3].

###   1.     *Probable Cause in the First Wiretap Affidavit*

In the affidavit submitted in support of the first wiretap application, Detective

Whaley described in great detail the background investigation leading to the request

for the wiretap order.  See [id. at 24-30].  Specifically, the affidavit described the

investigation of three armored truck robberies in Gwinnett County, taking place at

a Bank of America on November 11, 2010 ("Bank of America robbery"); a Wells

---

the lead investigator in "numerous burglary and robbery investigations while
working for [GCPD]," and that he had been associated with more than two hundred
felony charges as a result of those investigations.  [Id.].  He further affirmed that his
investigations had resulted in "arrests, search warrants and seizure of [illegal drugs],
money, guns, and personal property of victims" and that he was "familiar with how
[] drug organizations operate as well as burglary and robbery organizations."  [Id.].
He stated that he was "familiar with the ways in which armed robbers conduct their
business, including the various means and method by which armed robbers and
their criminal organizations use cellular telephone, text messaging, digital display
paging devices and calling cards to facilitate armed robberies; and their use of
numerical codes and code words to conduct their transactions."  [Id. at 17-18].  He
testified that in his experience "armed robbers often obtain cellular telephones in
fictitious names, and/or the names of third parties in an effort to conceal their drug
trafficking [sic] activities from law enforcement."  [Id. at 18].

Fargo on November 29, 2010 ("Wells Fargo robbery"); and at the Mall of Georgia on December 7, 2010 ("Mall of Georgia robbery"). [Id. at 24-29]. The affidavit noted how similarities in the Bank of America robbery and the Wells Fargo robbery led officers to believe that the two may be related, [id. at 25-28],[3] and how a string of armored truck robberies eventually led law enforcement agents from the Federal Bureau of Investigation, DeKalb County, Marietta, and the City of Atlanta to pool their resources with the GCPD to share information regarding their investigations, [id. at 33].

The affidavit described how the investigators were able to identify vehicles that were involved in these robberies, and how this search eventually led them to identify individuals suspected of being involved in the crimes. See generally [id. at 26-32]. Specifically, witnesses at the Bank of America robbery were able to get the tag number for the getaway vehicle, a blue Chevy Tahoe ("the Tahoe"), which had been stolen from the Atlanta Medical Center ("AMC") in Fulton County earlier on the morning of that robbery. [Id. at 26]. Surveillance video from the AMC parking

---

[3] In each robbery, the courier or "hopper" from the armored truck company was mid-way through loading the cassettes of money into the ATM when a black male wearing a hoodie and carrying a gun came up behind the courier and told him or her to "open" the ATM. Compare [Doc. 341-1 at 25], with [id. at 27]. In each case, the suspect or suspects then grabbed the unloaded cassettes from the ATM, but were unable to pull the previously loaded cassettes out, breaking off the handles. Compare [id. at 25], with [id. at 27]. The robber then fled to a neighboring parking lot where a car was waiting for him. Compare [id. at 25-26], with [id. at 27-28].

4

lot showed that a dark-colored passenger car, which appeared to be a late model Buick LaCrosse ("the LaCrosse"), and a maroon SUV were in the AMC parking lot near where the Tahoe was parked. [Id. at 28]. After a meeting between the driver of the LaCrosse and an occupant of the maroon SUV, someone from the maroon SUV broke into the Tahoe, and all three cars then drove off in the same direction. [Id.]. Video surveillance from the Mall of Georgia parking lot showed that the same type of LaCrosse was used as a getaway vehicle by the armed robber. [Id. at 30]. Based on the body style and features of the LaCrosse, officers determined the vehicle was a brown 2008-2009 Buick LaCrosse Super, and further investigation revealed that only one vehicle, owned by Anita Booker, wife of co-defendant Booker, was a potential match.[4] [Id. at 31-32].

The affidavit also described how fingerprints recovered following an armored car robbery in Marietta provided law enforcement with evidence supporting Booker's involvement in the robberies. [Id. at 33-35, 44-45]. Specifically, the affidavit stated that one fingerprint recovered from the getaway vehicle used in the Marietta armed robbery was identified as belonging to Christopher Bennett ("Bennett"), who

_____

[4] The affidavit also explained that the LaCrosse was later found in the driveway of Anita Booker's cousin in Hiram, Georgia, in March of 2011. [Doc. 341-1 at 46]. Detective Whaley stated that he believed Booker had taken the vehicle there and "draped it with a vehicle cover in order to conceal its identify and avoid its detective by law enforcement officers investigating the recent armored truck robberies." [Id.].

had been reported missing on December 29, 2010.[5]  [Id. at 33].  During the

investigation of Bennett's disappearance, officers subpoenaed his phone records and

the phone records for the last numbers he had contacted, believing it would belong

to "Chicken," who had been identified as an individual connected to the robberies.[6]

[Id.].  Records for that phone number showed that it was actually registered to

Henderson from November 12, 2010, until December 29, 2010, and that it had been

used in the vicinity of the armored car robberies, and had moved away from those

locations immediately after each robbery took place.  [Id. at 33-34].  Additionally,

one of the numbers called from that phone around the times of the robberies was

registered to Booker at the same address listed on the registration for the LaCrosse.

---

[5] According to interviews with Bennett's brother, Tramel Bennett ("Tramel"), Bennett's girlfriend, Aeriel Taylor ("Taylor"), and Warren Pope ("Pope") Bennett had admitted to them before his disappearance that he was involved in the armored car robberies.  See [Doc. 341-1 at 35, 37-39].  Bennett also told them that "Big Quint" was responsible for planning the robberies, and both Pope and Donavan Thomas, Bennett's cousin who denied any knowledge of the robberies, identified a picture of Booker as "Big Quint" or "Big Q."  [Id. at 35, 37-39].  Pope, Tramel, and Taylor also told police that Bennett had informed him that "Chicken" and "Teddy" were involved in the robberies.  [Id. at 37, 39].  According to Tramel, Bennett also told him that the robbery was supposed to be an inside job.  [Id. at 39].  Further police investigation revealed that Veronica Bullard, who was employed by Dunbar Armored Truck Company and had worked on three of the routes that had been robbed, was Booker's sister.  [Id. at 34, 36].

[6] Taylor told law enforcement that Bennett was supposed to be meeting "Chicken" when he disappeared, leading investigators to believe that "Chicken" was the last person Bennett may have contacted with his phone.  [Doc. 341-1 at 33].

[Id. at 34].  Finally, subpoenaed phone records for a number associated with Booker[7]

showed that the phone was in the vicinity of each robbery when it took place and

left the area immediately after the robberies were over.  See [id. at 44-45].

The affidavit also described how information gleaned from visual surveillance

and GPS trackers attached to Booker's vehicles connected Booker to Target

Telephone #1.  See [id. at 40-42].[8]  The GPS tracker revealed that Booker's vehicle

traveled to a Spring Hill Suites in Lithia Springs, Georgia, on March 14, 2011, and

when the manager of the hotel was interviewed the following day, he confirmed that

Booker entered the lobby and requested a room key for a room registered to Stanley

Johnson ("Johnson").  [Id. at 41-42].  After the manager refused to give him a key

because Booker was not the registered guest, Booker stepped into the lobby and

made a phone call on his cell phone, and Johnson arrived in the hotel lobby shortly

thereafter to obtain a key for Booker.[9]  [Id.].  Based on this interaction, law

---

[7] Tramel provided law enforcement with phone numbers for Booker and "Chicken."  [Doc. 341-1 at 39].

[8] During the surveillance of Booker, agents also observed him watching a Loomis truck as it made deliveries and "engaging in evasive driving techniques, referred to by law enforcement officials as heat checks."  [Doc. 341-1 at 40-41]. Detective Whaley explained that "[h]eat checks are commonly used by individuals involved in criminal activity to determine if law enforcement officers are conducting surveillance on them."  [Id. at 41].

[9] Video surveillance confirmed the manager's version of events.  [Doc. 341-1 at 42].  Agent Paul Szabo ("Agent Szabo"), who had observed Booker several times

enforcement officials subpoenaed Johnson's telephone records in order to obtain Booker's telephone number. [Id.]. The records revealed that Johnson received a call from Target Telephone #1 (404-667-4900) at approximately the same time that the hotel manager observed Booker in the lobby making a phone call. [Id. at 43-44].

### 2. *Necessity in the First Wiretap Affidavit*

Detective Whaley explained that a wiretap was necessary because "routine investigative techniques" had been tried and had failed, appeared reasonably unlikely to succeed if tried, or were too dangerous to employ. [Id. at 47]. With respect to physical surveillance, he noted that agents efforts had been "consistently thwarted by Booker's evasive driving techniques . . . and Booker's sporadic schedule," and he noted that physical surveillance was not likely to accomplish the investigation's goals because it is impossible to conduct 24/7 surveillance and excessive surveillance of mobile targets was likely to drive the organization further underground. [Id. at 47-48].

With respect to grand jury subpoenas, Detective Whaley noted that the subjects involved in Booker's organization would likely be uncooperative or invoke their Fifth Amendment privileges, that subpoenas would likely lead to the destruction of evidence or cause the organization to move "further

_____

while surveilling him, confirmed that the individual on the tape who had spoken with the manager was Booker. [Id.].

underground,"and that it would be unwise to grant immunity at that stage in the investigation when the most culpable individuals had not yet been identified. [Id. at 49]. He also noted that subpoenas to custodians of records would not likely be helpful because, in his experience, "individuals involved in criminal activity often obtain cellular telephones in fictitious names or the names of third parties, or they obtain prepaid calling cards without any corresponding subscriber information in an effort to conceal their illegal activities." [Id.].

With respect to using confidential informants, Detective Whaley noted that no informants were known or available within the organization at that time, and none of the individuals who had been interviewed had "firsthand knowledge about the day-to-day operations of the organization." [Id. at 50]. Consequently, based on his experience, Detective Whaley opined that it was unlikely that someone would be able to infiltrate the organization and gain access to useful information within a reasonable amount of time. [Id.]. For this same reason, Detective Whaley did not believe that an undercover agent would be useful to the investigation, and he noted that the organization's "propensity for violence" made such a tactic overly dangerous, and "investigators presently lack[ed] an intermediary source or person to introduce an undercover agent."[10] [Id. at 50-51]. Similarly, with respect to

---

[10] Detective Whaley added that since neither confidential informants nor undercover agents were viable investigative techniques, consensual monitoring was

9

interviews of witnesses or targets, Detective Whaley noted that cooperation was unlikely "because of the family relationships and/or friendships and loyalties that often exist in these types of criminal organizations" and alternatively because any person aligning themselves with law enforcement may fear retaliation against themselves or their families by other members of the organization.  [Id. at 53].

Detective Whaley further averred that search warrants would not be useful at that point in the investigation.  [Id. at 51-52].  Although law enforcement had an address for Booker, they are unsure of the logistics of his operation and whether any guns, money, or other evidence would be located in his home, and feared that executing a search warrant prematurely would therefore not reveal much evidence and may push the organization further underground.  [Id.].

Finally, although toll records had been used successfully in the investigation, Detective Whaley pointed out that such records were of "limited use" as an investigative tool because they, like pen register and trap and trace devices, provide no content or "real-time" information about contacts between suspects, and do not even provide information as to who is actually using the telephone associated with the number.  [Id. at 52].  He further noted that, particularly in light of the fact that subscriber information associated with telephone numbers of known criminals is

---

not a viable option for investigators.  [Doc. 341-1 at 54].

often false, "[o]nly the interception of wire communications . . . will provide 'real-time' information on the content of communications and the identity of the person making the communications" permitting investigators to identify and develop prosecutable cases against the suspects. [Id.].[11] A Gwinnett County Superior Court Judge issued an order authorizing interception of wire communications on Target Telephone #1 on March 18, 2011. [Doc. 341-2 at 2, 6].[12]

**B.    Wiretap for Target Telephone #2 (678-895-3369) ("Second Wiretap")**

On March 21, 2011, the Acting District Attorney for the Gwinnett Judicial Circuit submitted a "First Motion to Amend Order Authorizing the Interception of Wire Communications" to a Gwinnett County Superior Court Judge. See [Doc. 341-2]. An affidavit signed by Detective Whaley was attached to the motion seeking a second wiretap, see [id. at 3, 8-18], to intercept communications on "Target

---

[11] Detective Whaley also noted that there were no prior authorized wiretaps in place at that time during the investigation which could serve as a substitute for the wiretap being sought. [Doc. 341-1 at 53]. Although the affidavit also addressed the types of communications to be intercepted, the time period for interceptions, minimization, the basis for continuing monitoring beyond the first call, and whether notice of the investigation to the conspirators was warranted, see [id. at 53-38], no defendant has raised challenges to these aspects of the wiretap application and these topics will therefore not be summarized herein.

[12] The parties have not provided a copy of the original wiretap order, see [Doc. 341-1], but it is undisputed that the order was issued on March 18, 2011.

Telephone #2" (678-895-3369), subscribed to and used by "Donyale Dooley."[13]  [Id. at 2].

### 1.    *Probable Cause in the Second Wiretap Affidavit*

In support of the motion for a second wiretap, Detective Whaley's affidavit, which incorporated his original affidavit for the first wiretap, stated that an individual identified as Dooley had called Booker on Target Telephone #1 from Target Telephone #2 (678-895-3369)[14] on March 20, 2011, and the two then engaged in a conversation, speaking in "code" allegedly about an earlier armored car robbery and preparation for another robbery.[15]  [Doc. 341-2 at 10].   Target Telephone #2 also

---

[13] The affidavit refers to Dooley as "Donyale Dooley" because he used his brother's name as an alias when he established cell phone service.   See generally [Doc. 341-2; Doc. 341-4 at 8 n.1; Doc. 544-1].

[14] During this conversation, the individual speaking with Booker mentioned a red vehicle he owned that had been stolen, but which he had recovered.  [Doc. 341-2 at 11].  A red Chevrolet Impala (the "Impala"), which was registered to Dooley's girlfriend, co-defendant Desiree Jones ("Jones"), had been observed parked outside Dooley's home.  [Id. at n.2].  Moreover, Dooley's water account at his residence listed the number for Target Telephone #2 as a contact number.  [Id. at 12].

[15] Detective Whaley stated that "based upon [his] training and experience, [speaking in code] is a common tactic used by individuals engaged in criminal activity in an attempt to conceal their illegal endeavors."  [Doc. 341-2 at 10]. Specifically, during their conversation, Dooley told Booker "that shit was ugly and unreal and Booker acknowledged him."  [Id.].  Dooley then stated that "they were just giving that pussy away" and talked about how they "didn't do their 'homework,'" but that he had already "put the homework in."  [Id.].  Booker asked him when he "wants to do that" and Dooley replied "whenever you're ready."  [Id.]. Dooley also made a reference to the fact that "the mother fucker only go down there

had numerous contacts with Booker's telephone and a telephone believed to have been used by an individual known as "Chicken," who was reportedly connected to some of the robberies. [Id. at 14]. Furthermore, other phone numbers known to be associated with Dooley[16] were in contact with Booker on the days of each of the three robberies in Gwinnett County and numerous other times in the months surrounding the robberies. [Id. at 12-14].

Detective Whaley also described how investigators further connected Dooley to Booker through surveillance. On March 7, 2011, law enforcement followed Booker in his vehicle as he appeared to be "casing" a Loomis armored truck in Stone Mountain, and they observed that a black Buick Park Avenue (the "Buick") with a front hood that was noticeably ajar seemed to be casing the truck in conjunction with

---

only to get a small change and that was it." [Id. at 11]. Detective Whaley believed that this conversation referenced the DeKalb County armored truck robbery on March 15, 2011, during which the courier was shot and killed. [Id. at 10-11]. He believed that Dooley was telling Booker that it was easy to rob armored truck guards, but that the last robbery had not been preceded by sufficient surveillance and intelligence, referencing the fact that the amount of money taken in the robbery was significantly smaller than in previous robberies, a detail that had not been released to the public. [Id. at 11]. Detective Whaley interpreted the rest of the conversation to indicate that Dooley had already done some surveillance on a new target, and so he was ready for another armed robbery whenever Booker was. [Id.].

[16] Dooley had placed phone calls to Gwinnett County 911 from one of the numbers in 2009 because he wanted to surrender his pit bull puppy to Gwinnett County Animal Control. [Doc. 341-2 at 11-12]. Dooley listed another number as the contact information for his water account, and he was the registered subscriber for two other phones. [Id. at 12, 14].

Booker.  [Doc. 341-1 at 40-42]; see also [id. at 26-32 (describing investigation leading to identification of vehicles through surveillance video and public records)]. Detective Whaley stated that the Buick with the hood ajar observed on March 7, 2011, was later observed by law enforcement parked in the driveway at 5015 Michael Jay Street, the address associated with Dooley and his telephones.  [Doc. 341-2 at 13-14].

### 2.     *Necessity in the Second Wiretap Affidavit*

In the affidavit accompanying the motion for the second wiretap, Detective Whaley outlined the "normal investigative techniques" that had been tried and failed or reasonably appeared unlikely to succeed if tried.  [Id. at 15].  The explanations he provided were essentially the same as those detailed with respect to the first wiretap.  See [id. at 15-18].  However, Detective Whaley also noted that surveillance was becoming increasingly difficult given the fact that the intercepted phone calls indicated that the suspects were aware they were being followed.  [Id. at 15].  A Gwinnett County Superior Court Judge issued an order granting the motion to intercept wire communications on Target Telephone #2 on March 21, 2011. [Id. at 19-26].

**C.    Wiretap for Target Telephone #3 (678-280-4793) and Target Telephone #4 (980-333-7216) ("Third Wiretap")**

On March 24, 2011, the Acting District Attorney for the Gwinnett Judicial Circuit submitted a "Second Motion to Amend Order Authorizing the Interception of Wire Communications" to a Gwinnett County Superior Court Judge. See [Doc. 341-3]. Another affidavit signed by Detective Whaley was submitted in support of this motion for a third wiretap, see [id. at 6-13], which sought to intercept communications on "Target Telephone #3" (678-280-4793) and "Target Telephone #4" (980-333-7216). [Id. at 2-3]. Target Telephone #3 was registered to "Donyale Dooley" living at 5015 Michael Jay Street, but the subscriber information for Target Telephone #4 was unknown. [Id. at 2-3, 9-10].

**1.    *Probable Cause in the Third Wiretap Affidavit***

Detective Whaley's affidavit, which incorporated his prior affidavits for the earlier wiretaps, noted that on March 22, 2011, Target Telephone #2 had been left with Dooley's girlfriend, co-defendant Jones, and that Dooley had contacted her multiple times from Target Telephone #3 (678-280-4793), a phone which subscriber information indicated was registered to Dooley and activated on March 8, 2011. [Doc. 341-3 at 7-8]. Surveillance on March 22, 2011, also revealed that two males got into the Impala at Dooley's residence and then traveled to two different Bank of

America branches.  [Id. at 8].  During this time, Target Telephone #3 was "pinged"[17] several times and its location corresponded exactly with the location of the Impala, providing evidence that the phone was inside the car.  [Id.].

Surveillance agents at the Bank of America located at 3141 Turner Hill Road, Lithonia, Georgia, on March 22, 2011, observed one black male get out of the Impala.  [Id.].  Video surveillance from inside the Bank of America and bank statements subsequently obtained revealed that Dooley was the individual who entered the bank on March 22, 2011, and that he withdrew $1100.00 on that date.  [Id.].  Later that night, Booker, using Target Telephone #1, called Dooley on Target Telephone #2.  [Id.].  A female answered and when Booker asked for Dooley, she responded that he would call Booker from the "Lo-Key shop,"[18] and she waited on the phone until Dooley called Booker from Target Telephone #4 (980-333-7216).  [Id.].  The conversation between Booker and Dooley lasted about ten minutes, during which

---

[17] When a telephone is "pinged," its position is identified through GPS data. [Doc. 341-3 at 8].  Dooley's challenge to the pinging of his cell phones was addressed in a separate Report and Recommendation.  See [Doc. 574].

[18] Detective Whaley stated that "[b]ased upon [his] training and experience and [his] review of the previously intercepted telephone conversations conducted over TARGET TELEPHONE #1 and TARGET TELEPHONE #2, [he] believe[d] that the term 'Lo-Key shop' is slang or code for a telephone that has not been compromised or intercepted by law enforcement."  [Doc. 341-3 at 9].

time they spoke in "code or slang."[19] [Id. at 9]. Detective Whaley concluded that the investigation indicated that Dooley was currently using three cell phones, Target Telephones ## 2-4, "to plan, coordinate and conduct armed robberies in Gwinnett County and surrounding metropolitan-Atlanta counties." [Id.].

## 2. *Necessity in the Third Wiretap Affidavit*

In the affidavit accompanying the motion for the third wiretap, Detective Whaley outlined the "normal investigative techniques" that had been tried and had failed or reasonably appeared unlikely to succeed if tried by incorporating the statements he made in the previous wiretap applications. [Id. at 10]. A Gwinnett County Superior Court Judge issued an order granting the motion to intercept wire communications on Target Telephones ## 3 and 4 on March 24, 2011. [Id. at 13-20].

---

[19] Specifically, Dooley stated that he and Booker needed to get together, and that he had been checking the block to see if it was "hot." [Doc. 341-3 at 9]. Dooley also made a reference to "chopper spitting" and stated that his area was like a "blizzard" and that there had been nothing out his way. [Id.]. He also stated that "folks would be checking temperatures." [Id.]. Based upon Detective Whaley's training and experience, he believed that Dooley told Booker he had been checking to see if the police were watching him but that he had not seen any police in his area. [Id.]. Detective Whaley also stated that "chopper spitting" is a commonly used slang street reference for shooting a gun, "folks" is commonly used to refer to police or law enforcement and "temperature" is a reference to the presence of police in the area. [Id.].

**D.     Wiretap for Target Telephone #5 (951-313-7823) ("Fourth Wiretap")**

On March 28, 2011, the Acting District Attorney for the Gwinnett Judicial Circuit submitted a "Third Motion to Amend Order Authorizing the Interception of Wire Communications" to a Gwinnett County Superior Court Judge. See [Doc. 341-4]. Another affidavit signed by Detective Whaley was submitted in support of this motion for a fourth wiretap, see [id. at 6-13], which sought to intercept communications on "Target Telephone #5" (951-313-7823), used by "Stacey Dooley, a/k/a/ 'Chicken,' a/k/a/ 'Poor Chicken.'" [Id. at 2].

**1.     *Probable Cause in the Fourth Wiretap Affidavit***

Detective Whaley's affidavit, which incorporated his prior affidavits for the earlier wiretaps, noted that on March 27, 2011, Dooley had received a call on Target Telephone #2 from his home phone number in which a female, believed to be Jones, discussed purchasing a new Tracphone from the store. [Id. at 8]. Several hours later, around 7:30 p.m., Dooley called Target Telephone #1 from Target Telephone #5 (951-313-7823). [Doc. 341-4 at 8]. In this conversation, Dooley referred to Target Telephone #5 as his new "joint," which Detective Whaley explained is a slang term for a new phone, and Dooley said that he had "four joints" that he was also currently using, which Detective Whaley believed to be a reference to Target Telephones ## 2-5. [Id.]. Dooley also said that he was thinking of "coming out his (Booker's) way

and giving him a call." [Id.]. Booker then accused Dooley of not playing fair and indicated that he had been thinking about "how y'all rob partners." [Id. at 8-9]. Dooley told Booker he was "thinking wrong" and the call ended. [Id. at 9].

Dooley called Booker back almost immediately and the two had a coded conversation about a money dispute. [Id.]. According to Detective Whaley, "[i]t appear[ed] from the content and tone of the phone conversations that Booker and Dooley could be discussing the disposition of money from robberies or other illegal activity and that Booker [was] displeased with Dooley's actions in view of their agreement." [Id.]. Dooley ended the second conversation by telling Booker that he was going to Charlotte and that he needed "4 lab packs" to make the trip,[20] a reference which Detective Whaley believed "may indicate Dooley's need or plan to obtain additional money before leaving on his trip." [Id.].

GPS tracking devices installed on several vehicles involved in the investigation revealed that earlier in the day on March 27, 2011, the Impala, which Dooley had previously been seen driving, traveled to a parking lot near a Wells Fargo bank in Decatur, Georgia[21] and parked there for about thirteen minutes. [Id.

_____

[20] The investigation had revealed that Dooley had ties to Mecklenburg County, North Carolina. [Doc. 341-4 at 9].

[21] This bank, like those which served as the scene of other robberies, was serviced by Loomis Armored Truck Company and was on the same armored vehicle route with the two bank locations that Booker was believed to have previously

at 10]. The vehicle also "made several circles around the bank and up and down the streets in the area of the bank, but did not stop anywhere other tha[n] the location at the Wells Fargo bank." [Id.]. Detective Whaley stated that it appeared from the driving pattern that the vehicle was checking for routes of escape, as distinguished from a dead-end street, and for a place to possibly abandon a vehicle. [Id.]. Detective Whaley concluded that the investigation indicated that Dooley was using Target Telephone #5 "to plan, coordinate and conduct armed robberies in Gwinnett County and surrounding metropolitan-Atlanta counties." [Id. at 10].

**2.** *Necessity in the Fourth Wiretap Affidavit*

In the affidavit accompanying the motion for the fourth wiretap, Detective Whaley outlined the "normal investigative techniques" that had been tried and had failed or reasonably appeared unlikely to succeed if tried by incorporating the statements he made in the original application for the first wiretap and in the affidavits supporting the second and third wiretaps. [Id. at 11]. A Gwinnett County Superior Court Judge issued an order granting the motion to intercept wire communications on Target Telephone #5 on March 28, 2011. [Id. at 15-22].

surveilled. See [Doc. 341-4 at 10].

## II. DISCUSSION

**A.     Statutory Framework for Intercepted Communications**

"Title III of The Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520, sets forth numerous requirements the government must meet before electronic surveillance (wiretaps) may be authorized."  United States v. Flores, No. 1:05-cr-558-WSD-JFK, 2007 WL 2904109, at *21 (N.D. Ga. Sept. 27, 2007), adopted at *15.  For example, pursuant to 18 U.S.C. § 2518, a wiretap application must include:

> a full and complete statement of the facts and circumstances relied upon by the applicant . . . including details as to the particular offense . . ., a particular description of . . . the type of communications sought to be intercepted, the identity of the person . . . whose communications are to be intercepted, and a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.

United States v. Gonzalez Perez, 283 F. App'x 716, 720 (11th Cir. 2008) (per curiam) (unpublished) (alterations in original) (internal marks omitted) (quoting 18 U.S.C. § 2518(1)(b), (c)); see also United States v. Woodley, No. CR408-315, 2009 WL 3415214, at *1 (S.D. Ga. Oct. 22, 2009), adopted at *1.

Upon a proper application, a district judge may issue an *ex parte* order authorizing the interception of wire communications if:

> the judge finds probable cause to believe that an individual is committing or has committed a qualifying offense; that particular communications concerning that offense will be obtained through such

interception; and that the facilities from which, or the place where, the communications are to be intercepted are being used in connection with the offense, or are leased to, listed in the name of, or commonly used by such person.

United States v. Duarte-Rosales, Criminal File No. 1:05-CR-197-6-TWT, 2008 WL 140665, at *2 (N.D. Ga. Jan. 11, 2008), adopted at *1 (citing 18 U.S.C. § 2518(3)(a), (b) and (d)); see also United States v. Robles, 283 F. App'x 726, 734-35 (11th Cir. 2008) (per curiam) (unpublished). "Probable cause for a wiretap is the same probable cause required for a search warrant," Duarte-Rosales, 2008 WL 140665, at *2 (citations omitted), and "[l]ike other types of warrants, probable cause must exist at the time surveillance is authorized," Flores, 2007 WL 2904109, at *21 (citing United States v. Domme, 753 F.2d 950, 953 (11th Cir. 1985)). "[A] wiretap order is presumed to be valid, and a defendant has the burden of overcoming the presumption and of proving that the wiretap order was unlawfully obtained." Id. at *22 (citations omitted). "This Court need merely determine whether the judge who signed the [order] had a substantial basis for concluding that probable cause existed." Duarte-Rosales, 2008 WL 140665, at *2 (citations omitted).

**B.     Analysis**

Defendants seek to suppress evidence obtained as a result of various wiretaps obtained by the government. Specifically, Henderson seeks to suppress evidence arising from the first wiretap, asserting that the supporting affidavit "fail[ed] to

establish the reliability and special expertise of the affiant" because it contained boilerplate language "infect[ing] probable cause." [Doc. 247 at 8-11]. He also asserts that none of the affidavits established that the wiretaps were necessary under 18 U.S.C. § 2518, citing the fact that the description of the investigation in the affidavits shows that other investigatory techniques had proven successful. See [id. at 11-17].[22]

Similarly, Dooley also contends that none of the affidavits established that the wiretaps were necessary under 18 U.S.C. § 2518, citing the success of other investigative techniques and asserting that "agents failed to explain why these other techniques would not continue to provide useful information." [Doc. 252 at 6]. Moreover, he asserts that the second wiretap application was unsupported by probable cause, rendering all evidence obtained as a result of it, including subsequent wiretaps, inadmissible. See [id. at 7-9]. Like Henderson, he cites the fact that other investigatory techniques had proven successful in support of his contention that the wiretaps were not shown to be necessary, and contends that the

---

[22] Henderson also asserts that because "Booker, the target of the initial application ha[d] clearly already been identified and tied to the Gwinnett County robberies . . . one of the statutory conditions precedent for the authorization for a wiretap was not satisfied and the application therefore should have been denied." [Doc. 247 at 17]. However, Henderson does not identify any precedent for the proposition that wiretaps are unnecessary if their target has been identified, and the Court is aware of no such authority. Accordingly, the Court construes this argument as one that the wiretap was not necessary because law enforcement had achieved sufficient success through other investigatory techniques to discover Booker's identity and tie him to the robberies.

use of boilerplate language renders the application invalid.  [Id. at 5-7].  With respect to probable cause, Dooley asserts that he was tied to Booker and the investigation based on mere connections between their phones and "innocuous comments" made in conversations overheard as a result of the first wiretap, and that these comments did not create probable cause to intercept all communications to his telephone.  [Id. at 7-8].  Defendants request an evidentiary hearing on their motions; in particular, Henderson requests a Franks[23] hearing "[b]ecause substantial questions still exist as to the need for wiretaps in light of the success of conventional investigative techniques."  [Doc. 427 at 17]; see also [Doc. 252 at 8 (Dooley requesting an "evidentiary hearing")].  The Court will address each of these arguments in turn.

**1.**    *Standing*[24]

"In order to contest an order permitting the interception of communications, a defendant must establish that he was an 'aggrieved person.'"[25]  United States v.

---

[23] See Franks v. Delaware, 438 U.S. 154 (1978).

[24] In addition to the argument raised in their motions to suppress, defendants submitted supplemental briefs concerning standing at the request of this Court, see [Docs. 544 (Dooley's brief), 548 (Henderson's brief)], to which the government has responded, [Doc. 555]; see also [Doc. 341 at 7-27 (arguments regarding standing in government's initial response to the motions to suppress)].

[25] Such a showing must also be made before defendant is entitled to an evidentiary hearing regarding any such challenge.  See United States v. Cooper, 203 F.3d 1279, 1285 (11th Cir. 2000) ("Defendants are not entitled to an evidentiary hearing based on a 'promise' to prove at the hearing that which they did not

Ortega-Estrada, Criminal File No. 1:07-CR-356-TWT, 2008 WL 4716949, at *2 (N.D. Ga. Oct. 22, 2008), adopted at *1 (quoting 18 U.S.C. § 2518(10)(a)). "Such a person is defined in the relevant statute as a 'person who was a party to an intercepted . . . communication or a person against whom the interception was directed.'" Id. (alteration in original) (quoting 18 U.S.C. § 2510(11)); see also Flores, 2007 WL 2904109, at *2 (citation and internal marks omitted) ("To [challenge a wiretap] a defendant must show: (1) he was a party to the communication, (2) the wiretap efforts were directed at him, or (3) the interception took place on his premises."). The Supreme Court has explained that the statutory definition of "aggrieved person" "should be construed in accordance with existing standing rules," Alderman v. United States, 394 U.S. 165, 176 n.9 (1969) (citation omitted), so that one seeking to suppress intercepted communications must "allege, and if the allegation be disputed [must] establish, that he himself was the victim of an invasion of privacy," Jones v. United States, 362 U.S. 257, 261 (1960), overruled on other grounds by United States v. Salvucci, 448 U.S. 83 (1980).

Under existing standing rules, "[t]he Fourth Amendment protects an individual in those places where he can demonstrate a reasonable expectation of privacy against government intrusion." United States v. Suarez-Blanca, Criminal

_____

specifically allege in their motion to suppress [i.e. standing].").

Indictment No. 1:07-CR-0023-MHS/AJB, 2008 WL 4200156, at *5 (N.D. Ga. Apr. 21, 2008) (citing Katz v. United States, 389 U.S. 347, 353 (1967)). "Fourth Amendment rights, however, are personal, and only individuals who actually enjoy the reasonable expectation of privacy have standing to challenge the validity of a government search." Id. (citations omitted); see also Rakas v. Illinois, 439 U.S. 128, 133-34 (1978). "To have standing to challenge a search, one must manifest a subjective expectation of privacy in the invaded area that society is prepared to recognize as reasonable." Suarez-Blanca, 2008 WL 4200156, at *5 (citations and internal marks omitted); see also California v. Ciraolo, 476 U.S. 207, 211 (1986) (standing to challenge search requires a subjective expectation of privacy that society would recognize as legitimate); United States v. Baron-Mantilla, 743 F.2d 868, 870 (11th Cir. 1984) (per curiam). Additionally, "'[l]egitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" Suarez-Blanca, 2008 WL 4200156, at *5 (alteration in original) (quoting Rakas, 439 U.S. at 143 n.12). "Thus, an individual asserting Fourth Amendment rights 'must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable[.]'" Id. at *6 (alteration in original) (quoting Minnesota v. Carter, 525 U.S.

83, 88 (1998)). That is, defendants "must establish both a subjective and an objective expectation of privacy," and they "bear the burden of showing a legitimate expectation of privacy in the area searched." Id. (citations omitted).

### a. Henderson's standing to challenge the wiretaps

Henderson asserts that he is an "aggrieved person" with respect to the second and third wiretap orders and has standing to challenge these wiretap orders because he was the "subject of, an alleged participant in or a party to the intercepted communications." [Doc. 247 at 4 (citations and internal marks omitted)]; see also [Doc. 548].[26] In support of this assertion, Henderson offers the affidavit of his

---

[26] It is undisputed that Henderson was not specifically identified on any wiretap order as a subscriber or user of any of the target telephones, see [Docs. 341-1 to 341-4], and he has made no showing that the communications were intercepted on property that he owns, see Flores, 2007 WL 2904109, at *2 (citation and internal marks omitted). Although Henderson also asserts in his original motion to suppress that he has standing because the wiretap was "directed at him" in that he "is alleged to be a member of the target organization[] he is sufficiently connected with that group to challenge the wiretaps used in the prosecution against him," [Doc. 247 at 4-5], he does not renew this argument in his supplemental brief, and in any event, the Supreme Court has specifically rejected standing on the basis of membership in a group or conspiracy, see Alderman, 394 U.S. at 171-72, 174 (noting that "coconspirators and codefendants have been accorded no special standing" and that Fourth Amendment rights "may not be vicariously asserted"); United States v. Fredericks, 586 F.2d 470, 480 (5th Cir. 1978); Flores, 2007 WL 2904109, at *17 (citation omitted) ("Standing is not conferred on co-conspirators or co-defendants who are not parties to or targets of the intercepted communications, merely because they are implicated by th evidence obtained during the surveillance."). Decisions of the Fifth Circuit rendered before October 1, 1981, are binding upon panels of the Eleventh Circuit. Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

27

mother, Audrey Henderson, who listened to the recorded telephone calls and indicated that she heard Henderson's voice in nine of the recorded calls.[27] See [Doc. 548 at 3-4; Doc. 548-1]. Accordingly, the Court finds, and the government concedes, see [Doc. 555 at 5-6], that Henderson qualifies as an "aggrieved person" under the statute and has established the requisite standing to challenge the second and third wiretap orders, which authorized the interception of communications on Target Telephones ## 2-4.

### b.   Dooley's standing to challenge the wiretaps

Dooley asserts that he is an "aggrieved person" with respect to all four wiretap orders and has standing to challenge each of them.[28]   [Doc. 252 at 8; Doc. 544]. In support of his contention that he is an "aggrieved person" under the statute, Dooley offers the affidavit of his brother, Donyale Dooley ("Donyale"), stating that he identified Dooley as a participant in several conversations on each of the Target

---

[27] Specifically, she testified that she heard Henderson's voice in Call # 1453 from Target Telephone #2, Calls ## 26-28, 63, 97, 122, and 1156 from Target Telephone #3, and Call # 127 from Target Telephone #4.  [Doc. 548-1].

[28] The government concedes that Dooley is an aggrieved person and had a reasonable expectation of privacy with respect to the fourth wiretap order, which was for Target Telephone #5, registered under Dooley's name.  See [Doc. 341 at 20; Doc. 341-4 at 2].

Telephones.[29]  See [Doc. 544 at 5-7; Doc. 544-1].  Accordingly, the Court finds, and the government concedes, see [Doc. 555 at 6], that Dooley qualifies as an "aggrieved person" under 18 U.S.C. § 2518(10)(a) with respect to all wiretap orders and Target Telephones.

However, Dooley must also establish that he has a reasonable expectation of privacy in the communications intercepted from the Target Telephones, and the government contends that because Dooley was using a false name with respect to Target Telephones ##2-4, he cannot demonstrate the reasonable expectation of privacy required for standing to challenge the second and third wiretaps. See [Doc. 555 at 6-15 (citing Suarez-Blanca, 2008 WL 4200156, at *5) (footnote and citations omitted) ("Courts have determined that an individual does not have a legitimate expectation of privacy in items that are not in the individual's name or when an individual uses an alias or fictitious name and there is no other evidence linking the defendant to the item or property.")].  For the reasons stated in the Report and

---

[29] Specifically, Donyale testified that he identified Dooley's voice on Calls ##404, 682, 965, 1073, 1130, 1191, and 1357 from Target Telephone #1; Calls ##16, 36, 1449, 1450, and 1451 from Target Telephone #2; Calls ##99, 113, 167, 310, 330, 341, 378, 431, 704, 899, 1057, 1137, 1142, 1156, and 1166 from Target Telephone #3; Calls ##54 and 127 from Target Telephone #4; and Call #29 on Target Telephone #5. [Doc. 544 at 5-7; Doc. 544-1].  Donyale also testified that he heard part of other calls indicating that his brother was using Target Telephone #2, and that, in the interest of time, he did not listen to all the calls intercepted from Target Telephones ##3-5. [Doc. 544 at 6-7; Doc. 544-1].

Recommendation on Dooley's motion to suppress evidence obtained from real time location data derived from his cell phones, the Court finds that Dooley has presented "other evidence" that sufficiently shows a connection between Dooley and the subscriber name used to set up Target Telephones ## 2-4, establishing his reasonable expectation of privacy in those phones and his standing to challenge the second and third wiretap orders.[30] <u>See</u> [Doc. 574 at 42-49]; <u>see also</u> <u>Suarez-Blanca</u>, 2008 WL 4200156, at *6 n.6 (citations omitted); <u>see also</u> <u>United States v. Garcia-Bercovich</u>, 582 F.3d 1234, 1236 (11th Cir. 2009) (finding sufficient "other evidence" to establish a reasonable expectation of privacy in a package mailed to an alias where the defendant established that he had retrieved two other similarly addressed packages in the past).

## 2. *Requests for Hearings*

Henderson "requests a <u>Franks</u> hearing to determine the extent and potential of the information and evidence that law enforcement had when they sought the wiretaps," apparently contending that the affidavits in support of the wiretap applications contained misrepresentations with respect to the necessity and probable

---

[30] Accordingly, for purposes of discussion in the remainder of this Report and Recommendation, Dooley will be considered as the actual subscriber to the phones registered to "Donyale Dooley."

cause requirements. [Doc. 247 at 17 (citations omitted)].[31] However, in order to merit such a hearing, a defendant must make "a substantial preliminary showing that a false statement [or omission] knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." Franks, 438 U.S. at 155-56; see also United States v. Wilson, 314 F. App'x 239, 243 (11th Cir. 2009) (per curiam) (unpublished); Flores, 2007 WL 2904109, at *31. A defendant's attack "must be more than conclusory and must be supported by more than a mere

---

[31] Dooley also requests an evidentiary hearing regarding his motion, [Doc. 252 at 8-9], but not a Franks hearing. Rather, Dooley contends that the second wiretap order was not supported by probable cause, and since the government relied on information gathered from the second wiretap in its subsequent wiretap applications, an evidentiary hearing is necessary to determine "the effect this illegal seizure had on evidence derived from later interceptions." [Id. at 2]. However, since the Court finds, for the reasons discussed hereinafter, that the second wiretap was supported by probable cause, Dooley's request for a hearing is **DENIED**. Moreover, to the extent Dooley requests a more general evidentiary hearing regarding the issues raised in his motion, the district court has broad discretion in determining whether to conduct an evidentiary hearing, see United States v. Cantu, 625 F. Supp. 656, 665 n.16 (N.D. Fla. 1985) (citation omitted), and one is only required where "the allegations of the moving papers, including affidavits if any are filed, are sufficiently definite, specific, detailed, and nonconjectural, to enable the court to conclude that a substantial claim is presented. If the allegations are sufficient *and factual issues are raised*, a hearing is required," id. at 664 (emphasis omitted) (quoting United States v. Poe, 462 F.2d 195, 197 (5th Cir. 1972) (citation omitted)). However, Dooley's general challenges with respect to necessity and probable cause do not identify any specific unresolved issues of fact, and instead merely address whether the affidavits in support of the wiretaps, which are already before the Court, meet the statutory requirements to demonstrate necessity and probable cause, and therefore the issues he has raised may be addressed without further factual development. Accordingly, to the extent Dooley has made a general request for an evidentiary hearing, it is due to be **DENIED**.

desire to cross-examine." <u>Flores</u>, 2007 WL 2904109, at *32 (<u>quoting</u> <u>Franks</u>, 438 U.S. at 171-72). "'There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof.'" <u>Id.</u> (<u>quoting</u> <u>Franks</u>, 438 U.S. at 171-72). Henderson has made no such allegations or offer of proof here, as he merely makes the bald, general assertion that Detective Whaley somehow misrepresented the success of conventional investigative techniques with respect to the necessity requirement, <u>see</u> [Doc. 247 at 17], and that Detective Whaley's credibility is somehow maligned by two errant references to investigating drug activity in the introduction and summary portions of an affidavit that totals over forty pages, <u>see</u> [<u>id.</u> at 8-11]. Because Henderson has failed to meet the minimum requirements for a <u>Franks</u> hearing, his request for an evidentiary hearing is **DENIED**. <u>See</u> <u>Flores</u>, 2007 WL 2904109, at *32-33; <u>see also</u> <u>United States v. Arbolaez</u>, 450 F.3d 1283, 1294 (11th Cir. 2006) (per curiam) (denying a request for a <u>Franks</u> hearing because there was "no affidavit or otherwise sworn statement alleging that [the affiant] knowingly or recklessly included false statements in the search warrant affidavit"); <u>United States v. Thompson</u>, No. 10-cr-20140, 2011 WL 4455244, at *7-9 (S.D. Fla. Mar. 31, 2011).

### 3. *Necessity*

"Pursuant to 18 U.S.C. § 2518, court-ordered electronic surveillance is prohibited unless the government demonstrates the necessity of such techniques." Wilson, 314 F. App'x at 243 (citation omitted). "This statute requires that wiretap applications include a 'full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous . . . .'" United States v. Collins, 300 F. App'x 663, 666 (11th Cir. 2008) (unpublished) (alteration in original) (quoting 18 U.S.C. § 2518(1)(c)); see also Wilson, 314 F. App'x at 243. "The purpose of this statute is to ensure that wiretapping is not resorted to in situations in which traditional investigative techniques[32] would suffice to expose the crime." Collins, 300 F. App'x at 666 (footnote added). "'The affidavit need not show a comprehensive exhaustion of all possible techniques, but must simply explain the retroactive or prospective failure of several investigative techniques that reasonably suggest themselves.'" Id. (quoting United States v. Van Horn, 789 F.2d 1492, 1496 (11th Cir. 1986)). "The district court is entitled to broad discretion in analyzing the necessity issue, and the government's showing on necessity must be read in a

---

[32] "Traditional investigative techniques include: physical surveillance, cooperating witnesses, informants, controlled drug purchases, pen registers and trap and trace devices." Collins, 300 F. App'x at 666 n.2.

practical and commonsense fashion." United States v. Newsome, No. CR 108-062, 2008 WL 4820257, at *3 (S.D. Ga. Nov. 4, 2008), adopted at *1 (citation and internal marks omitted); see also United States v. Ashley, 876 F.2d 1069, 1073 (1st Cir. 1989) (citation omitted) ("The government affidavit is adequate if it satisfies the burden that it indicate a 'reasonable likelihood' that alternative techniques would fail to expose the crime."); Flores, 2007 WL 2904109, at *27 (citation omitted).

"Congress' purpose in conditioning wiretaps upon a showing of necessity was narrow." United States v. Hammond, No. 2:10-cr-0007-JMS-CMM, 2011 WL 201497, at *5 (S.D. Ind. Jan. 18, 2011). "Congress wanted to ensure not that wiretaps are used only as a last resort in an investigation, but that they were not to be routinely employed as the initial step in criminal investigation." Id. (citation and internal marks omitted); see also United States v. Giordano, 416 U.S. 505, 515 (1974). Therefore, "the necessity hurdle is not great." Hammond, 2011 WL 201497, at *5 (citations and internal marks omitted).

Defendants assert that none of the wiretap affidavits fulfilled the "necessity" requirement for a wiretap order because the recitation of evidence in the affidavit showed that conventional investigatory techniques had been successful. See [Doc. 247 at 11-17; Doc. 252 at 5-9]. Dooley also asserts that the affidavits merely recite boiler-plate rationales and that the government has therefore failed to carry its

burden of showing a necessity for the wiretaps. [Doc. 252 at 7-9]. The Court disagrees.

In his affidavits, Detective Whaley described at length the investigation undertaken by law enforcement agents from several jurisdictions and explained that the wiretaps were necessary to accomplish specific objectives of that investigation, including fully revealing the nature and extent and all methods of committing the armed robberies; the identities of all participants in the armed robberies; how the money from the armed robberies was distributed; all locations of contraband and other items used in furtherance of the armed robberies; the existence and location of all records used in the conspiracy; the location and source of all resources used to finance the illegal activities; the location and disposition of all proceeds from the activities; and the collection of evidence useful in the prosecution of the target subjects for the armed robberies. [Doc. 341-1 at 21-22]. Detective Whaley then provided a detailed explanation of the techniques already employed by law enforcement and the reasons why these techniques had failed to achieve the investigation's objectives or why he believed such techniques would fail in this particular investigation. [Id. at 47-54; Doc. 341-2 at 15-18; Doc. 341-3 at 10; Doc. 341-4 at 11]. These techniques included physical surveillance, grand jury subpoenas, subpoenas to custodians of records, use of confidential informants or undercover

agents, consensual monitoring, interviews with witnesses or targets, search warrants, toll records, pen registers, and trap and trace devices.  [Doc. 341-1 at 47-54; Doc. 341-2 at 15-18; Doc. 341-3 at 10; Doc. 341-4 at 11].

Detective Whaley also explained, with reference to the investigation undertaken in this specific case, why these other investigatory techniques would not serve the investigation's goals.  For example, he noted that Booker's evasive driving techniques and sporadic schedule made physical surveillance difficult in light of the investigation's goals of uncovering the full details regarding the conspiracy and crimes committed.  [Doc. 341-1 at 47-48]; see also [Doc. 341-2 at 15 (noting that physical surveillance was becoming increasingly difficult since the subjects were aware that they were being followed)].  He noted that subpoenas and search warrants were not likely to yield productive information at that point in the investigation, and that interviews, use of confidential informants, consensual searches, consensual monitoring, or grand jury subpoenas were unlikely to be effective because he did not believe any of the suspects would cooperate given the familial relationships or close friendships involved, and he stated that he did not want to compromise the investigation by offering immunity at that point in the investigation because law enforcement was not yet sure which suspects were most culpable.  [Doc. 341-1 at 49-50, 52-54 (also noting that officials were unaware of any person willing to speak with them who had "firsthand knowledge about the day-

today operations of the organization")]. Furthermore, he noted that it was unlikely an undercover agent or other informant could infiltrate the organization in a timely manner, and that such an undertaking would be highly dangerous given the suspects' propensity for violence. [Id. at 50-51]. Finally, with respect to pen registers, toll records, or trap and trace devices, Detective Whaley observed that those measures had already been as helpful as their "limited use" would allow given that they do not provide content or real-time information about communications between suspects, nor do they even affirmatively identify which individual is actually using the phone to participate in the call, and subpoenaing the documents related to the telephones would not likely provide accurate information as individuals routinely use false subscriber information.[33] [Id. at 49, 52].

This recitation meets the necessity requirement for a wiretap affidavit, and "[t]he fact that the traditional methods in use were producing evidence does not alter [the Court's] conclusion." United States v. Allen, 274 F. App'x 811, 816 (11th Cir. 2008) (per curiam) (unpublished). "Nothing in the law requires that the traditional methods be entirely useless or that the district court force the government to redefine its objectives." Id.; see also United States v. Bennett, 219 F.3d 1117, 1122 (9th Cir. 2000) (providing that "the mere attainment of some degree of success

---

[33] The recitation of necessity in the first affidavit was incorporated into each subsequent wiretap affidavit. See [Doc. 341-2 at 3; Doc. 341-3 at 10; Doc. 341-4 at 11].

during law enforcement's use of traditional investigative methods does not alone serve to extinguish the need for a wiretap"). Here, Detective Whaley described the success the investigation had experienced with traditional techniques by outlining the evidence law enforcement had thus far amassed against the suspects, but he also described in detail how those techniques have limitations which made them subsequently less useful in light of the investigation's goal to identify all participants and determine the full extent and scope of the conspiracy, demonstrating the requisite necessity for the wiretaps. See United States v. Kelley, Criminal No. 08-00327-CG, 2009 WL 2589086, at *2 (S.D. Ala. Aug. 17, 2009) (citations and internal marks omitted) ("This circuit has repeatedly held that, where conventional techniques will not show the entire scope of the conspiracy, a wiretap is permissible, even in those situations where conventional techniques will allow for the arrest and conviction of some members."). [34]

Moreover, although Dooley is correct that an affidavit supporting a wiretap application must "show with specificity why in *this particular investigation* ordinary means of investigation will fail," United States v. Carrazana, 921 F.2d 1557, 1565 (11th Cir. 1991) (citations omitted), and he is correct that some of the conclusions in

---

[34] Thus, Henderson's conclusory assertion that the wiretap affidavit fails to meet statutory conditions precedent simply because Booker had already been identified, see [Doc. 247 at 17], is without merit.

Detective Whaley's affidavits, such as the ineffectiveness of pen registers and tracking devices, or the fear that a grand jury investigation or interviews with witnesses would alert the conspirators, see, e.g., [Doc. 341-1 at 47-54], could certainly apply to other investigations, an affidavit meets the necessity requirement despite the presence of commonly-employed language as long as it is "sufficiently specific and do[es] not constitute 'boiler-plate' rationales," United States v. Degaule, 797 F. Supp. 2d 1332, 1359 (N.D. Ga. 2011), adopted at 1344. Here, Detective Whaley's affidavit "[i]nclud[es] more than mere general declarations and conclusory statements, [and] instead incorporates detailed facts and supporting conclusions that satisfy the predicates of 18 U.S.C. § 2518(c)." See United States v. Murdock, No. CR410-160, 2011 WL 43503, at *1 (S.D. Ga. Jan. 6, 2011). Indeed, Detective Whaley provided detailed information specific to this investigation, including a description of Booker's evasive driving techniques and sporadic schedule; how individuals interviewed by Agent Szabo did not have firsthand knowledge of day-to-day operations rendering use of a confidential informant unhelpful; how investigators were as yet unaware of relative culpability levels and did not want to offer immunity at that point in the investigation; the "propensity for violence" of the conspiracy members, as illustrated by the "unprovoked shooting of the Loomis guard in DeKalb County;" the fact that only Booker's residence had been identified and specific reasons as to why searching his residence at that time was untenable;

and with respect to the Second Wiretap Order, how individuals involved in the conspiracy had picked up on the fact that they were being monitored, indicating that traditional investigative techniques were unlikely to serve the specific goals of the pending investigation.  See [Doc. 341-1 at 47-54; Doc. 341-2 at 15-18].  Given these specific statements, the fact that some of the reasons that traditional investigative techniques would not work may apply to other investigations, "will not negate a finding of necessity [because] the affidavit, as a whole, alleges sufficient facts demonstrating necessity." United States v. Torres, 908 F.2d 1417, 1423 (9th Cir. 1990) (citations omitted).  Accordingly, the Court rejects defendants' arguments, and "finds that the government met the necessity requirements of 18 U.S.C. § 2518 in its application[s] for a wiretap." Kelley, 2009 WL 2589086, at *3.

**4.      *Probable Cause***

"To support an order of electronic surveillance, an affidavit must establish, among other things, probable cause to believe that an individual is committing, has committed, or is about to commit certain offenses enumerated in 18 U.S.C. § 2516, and probable cause to believe that communications concerning that offense will be obtained through electronic surveillance." United States v. Peterson, 627 F. Supp. 2d 1359, 1363 (M.D. Ga. 2008) (citation omitted).  "The probable cause necessary to support a wiretap authorization is the same probable cause necessary for a search warrant." Id. (citing United States v. Nixon, 918 F.2d 895, 900 (11th Cir. 1990)); see

also <u>Gonzalez Perez</u>, 283 F. App'x at 721. "Thus, probable [cause] exists if the totality of the circumstances indicate that there is a fair probability that the sought for evidence will be obtained." <u>Peterson</u>, 627 F. Supp. at 1363 (<u>citing</u> <u>Illinois v. Gates</u>, 462 U.S. 213, 239 (1983)). "The probable cause determination of the judge who issued the wiretap order will be upheld if the judge had a 'substantial basis' for concluding that probable cause existed." <u>Id.</u> (<u>citing</u> <u>Nixon</u>, 918 F.2d at 900).

Henderson asserts that the affidavit supporting the initial wiretap application[35] contained boilerplate language demonstrating the affiant's "lack of reliability" and "infect[ing] probable cause." [Doc. 247 at 8-11]. Dooley also specifically challenges the probable cause finding regarding the Second Wiretap Order, asserting that tying him to Booker and the investigation based on mere connections between their phones and "innocuous comments" made in conversations overheard as a result of the first wiretap did not create probable cause to intercept all communications to Target Telephone #2. <u>See</u> [Doc. 252 at 7-9].

─────────────────────

[35] As previously discussed, Henderson only has standing to challenge the Second and Third Wiretap Orders, authorizing interception of communications from Target Telephones ## 2-4. <u>See</u> discussion, <u>supra</u>. Because these wiretap orders incorporated by reference the recitation of facts supporting probable cause in the affidavit supporting the First Wiretap Order, <u>see</u> [Doc. 341-2 at 3 ; Doc. 341-3 at 10], Detective Whaley's testimony in the initial wiretap application is relevant to Henderson's challenge.

### a. Detective Whaley's Reliability as Affiant

Henderson asserts that references in the affidavit to "drug activity" show that the affidavit contains boilerplate language and indicate that Detective Whaley's statement is unreliable.[36] See generally [Doc. 247 at 8-11]. He asserts that due to these inaccuracies, the affidavit does not effectively demonstrate probable cause. See

_____

[36] To the extent Henderson also contends that the affidavit does not establish Detective Whaley's expertise, see [Doc. 247 at 8-9 (making two brief references to affiant's expertise by stating the affidavit "fail[ed] to establish. . . special expertise of the affiant" and that his "lack of experience would infect probable cause")], his contention has no merit. Detective Whaley summarized his expertise at length, noting that he had been employed by the GCPD since June of 2007 and had been a police officer since January of 2000. [Doc. 341-1 at 17]. He stated that he had worked for four years working on narcotics investigations, prostitution investigations, burglary investigations, and robbery investigations. [Id.]. Detective Whaley averred that he had attended "Basic Investigations courses," received 2325 hours of POST instruction, and that he had been the lead investigator in "numerous drug investigations and prostitution investigations" when he worked for a different police department, that he had been the lead investigator in "numerous burglary and robbery investigations while working for [GCPD]" and that he had been associated with more than two hundred felony charges as a result of those investigations. [Id.]. He further affirmed that his investigations had resulted in "arrests, search warrants and seizure of [illegal drugs], money, guns, and personal property of victims" and that he as "familiar with how [] drug organizations operate as well as burglary and robbery organizations." [Id.]. He stated that he was "familiar with the ways in which armed robbers conduct their business, including the various means and method by which armed robbers and their criminal organizations use cellular telephone, text messaging, digital display paging devices and calling cards to facilitate armed robberies; and their use of numerical codes and code words to conduct their transactions." [Id. at 17-18]. He testified that in his experience "armed robbers often obtain cellular telephones in fictitious names, and/or the names of third parties in an effort to conceal their drug trafficking [sic] activities from law enforcement." [Id. at 18]. This information is sufficient to establish his expertise as an investigator in general and with respect to robbery investigations in particular.

[id.].  However, where a defendant challenges the accuracy and reliability of an affidavit, the challenge is more properly analyzed under Franks, which requires that a defendant show officers intentionally or recklessly included false information or omitted necessary true information in the affidavit.[37]  See United States v. Wuagneux, 683 F.2d 1343, 1354 (11th Cir. 1982) (analyzing appellant's argument regarding inaccuracies and mistakes in an affidavit under Franks); United States v. Richardson, 268 F. App'x 868, 868-69 (11th Cir. 2008) (per curiam) (unpublished) (addressing an appellant's argument against an affiant's reliability as a Franks challenge).  However, negligent or innocent mistakes do not violate the Fourth Amendment, Franks, 438 U.S. at 171; Wuagneux, 683 F.2d at 1355, and, as previously discussed, Henderson has not even made a sufficient showing to meet the initial burden for a Franks hearing, much less presented a meritorious Franks claim.[38]

---

[37] Instead of applying this standard, Henderson includes a discussion of the relevant standards for determining if probable cause has been established where an informant is mentioned in an affidavit.  See [Doc. 247 at 10-11].  However, the affidavit at issue here does not mention any information provided by a confidential informant, see generally [Doc. 341-1], and to the extent Henderson seeks to apply this standard of reliability to Detective Whaley as an affiant, his reliance on these cases is misplaced.

[38] Even if Henderson's challenge were considered as attacking probable cause, he has not in any way even argued how two errant references to drug activity in a 45-page affidavit, see [Doc. 341-1 at 3, 39], diminish the recitation of probable cause which otherwise makes clear that the instant investigation centered on a series of armed robberies, describing in detail the government's investigation of the robberies, identification of suspects, and how law enforcement connected those suspects to the respective Target Telephones, see generally [Doc. 247].

Accordingly, as this court finds that the wiretap affidavits effectively demonstrated both necessity and probable cause, it is **RECOMMENDED** that Henderson's motion to suppress evidence of illegally intercepted communications, [Doc. 247], be **DENIED**.

### b.    Probable Cause for the Second Wiretap Order

Contrary to Dooley's contentions, <u>see</u> [Doc. 252 at 7-9], Detective Whaley's affidavit provided sufficient facts to establish probable cause to support the Second Wiretap Order.  Beginning with the affidavit in support of the first wiretap application, incorporated by reference into the application for the second wiretap, Detective Whaley explained how law enforcement had identified Booker and Dooley as suspects in several armed robberies, believed to have been carried out by the same group of individuals due to similarities in the crimes.  [Doc. 341-1 at 25-28, 33]. Detective Whaley detailed the discovery of Bennett's fingerprints on a getaway vehicle, and following his disappearance and murder, the subsequent investigation of his death.  [<u>Id.</u> at 33-39, 44-45].  During this investigation, law enforcement interviewed Bennett's friends and family, learned that Bennett had admitted involvement in at least one of the robberies, and were able to identify Booker and "Chicken," as other individuals involved in the crimes.  [<u>Id.</u> at 35-39]. Through Bennett's subpoenaed phone records and information provided during the interviews, investigators obtained phone numbers associated with both "Chicken,"

and Booker, and after subpoenaing the subscriber information for those numbers were able to determine that "Chicken" was most likely Dooley, who lived at 5015 Michael Jay Street.  [Id. at 33, 37, 39]; [Doc. 341-2 at 10-12, 14 (linking "Chicken" to North Carolina)].  Obtaining phone records and cell site location information for these numbers revealed that the phones had been used in the vicinity of the robberies at the time that the robberies occurred and that they were often in contact with each other.[39]  [Doc. 341-1 at 33-35, 44-45].

Detective Whaley described how, after making these connections, law enforcement installed and monitored GPS trackers on Booker's vehicles, observing his movements as he appeared to be "casing" a Loomis armored truck in Stone Mountain, and discovered that a black Buick with a front hood that was noticeably ajar appeared to be casing the truck in conjunction with Booker.  [Doc. 341-1 at 40-42]; see also [id. at 26-32 (describing investigation leading to identification of vehicles through surveillance video and public records)].  The affidavit stated that the Buick with the hood ajar observed casing the ATM of a Wells Fargo on March

---

[39] Specifically, the wiretap affidavit notes (1) 2.77 hours of contact over 104 calls between one of Dooley's phones and one of Booker's phones; (2) 1.04 hours of contact and over 15 calls between one of Dooley's phones and one of Booker's phones; (3) 18.15 hours of contact over 319 calls between one of Booker's phones and one of Dooley's phone, including 3 calls on November 11, 2010, the same date of the Bank of America Robbery; 1 call on November 29, 2010, the same date of the Wells Fargo Robbery; and 13 calls on December 7, 2010, the same date of the Mall of Georgia robbery.  [Doc. 341-2 at 6].

7, 2011, was later observed by law enforcement parked in the driveway at 5015 Michael Jay Street, the address associated with Dooley and his telephones. [Doc. 341-2 at 13-14].

Against this backdrop, Detective Whaley's affidavit continued to describe conversations between Booker and Dooley on March 20, 2011, five days after the armed robbery at the Toco Hills Shopping Center, during which the courier was shot and killed. [Id. at 10-11]. Detective Whaley then provided his interpretation of the coded conversation held over the cell phones. [Id. at 11-12]. Specifically, he stated that Dooley told Booker "that shit was ugly and unreal" and Booker acknowledged him. [Id. at 10]. Dooley then stated that "they were just giving that pussy away" and talked about how they "didn't do their 'homework,'" but that he had already "put the homework in." [Id.]. Booker asked him when he "wants to do that" and Dooley replied "whenever you're ready." [Id.]. Dooley also made a reference to the fact that "the mother fucker only go down there only to get a small change and that was it." [Id. at 11].

Detective Whaley interpreted this "coded" conversation as a reference to the DeKalb County armored truck robbery which had taken place on March 15, 2011, during which the courier was shot and killed. [Id. at 10-11]. He believed that Dooley was telling Booker that it was easy to rob guards, but that the last robbery had not been preceded by sufficient surveillance and intelligence, referencing the

fact that the amount of money taken in the robbery was significantly smaller than the previous ones, a detail that had not been released to the public. [Id. at 11]. Detective Whaley interpreted the rest of the conversation to indicate that Dooley had already done some surveillance on a new target, and he was ready for another armed robbery whenever Booker was. [Id].

"Courts considering wiretap applications are allowed to rely upon the reasonable interpretations given by experienced law enforcement affiant-agents as to the code, slang or obtuse language used by those persons engaged in allegedly conspiratorial communications." Flores, 2007 WL 2904109, at *24 n.16 (citations omitted); see also United States v. Garcia, 447 F.3d 1327, 1335 (11th Cir. 2006); Ortega-Estrada, 2008 WL 4716949, at *15 n.13; Flores, 2007 WL 2904109, at *39 (explaining that the issuing judge "may consider an agent's training and experience to offer opinions as to the methods utilized by [suspects] and, based on the same, consider an agent's interpretation of code words and language in determining whether probable cause exists to authorize a [wiretap order]"). The Court finds, contrary to Dooley's conclusory assertions that Detective Whaley's interpretation of the conversation amounts to a "fantastic claim," see [Doc. 252 at 7], that Detective Whaley used his training and experience, see [Doc. 341-1 at 2 (summarizing Detective Whaley's experience and training as an investigator)], to draw reasonable inferences regarding the meaning of the coded conversation in light of the context

47

of the entire investigation. Moreover, contrary to Dooley's contention, Detective Whaley's affidavit relied on more than "innocuous comments" in a "single call" to support probable cause, [Doc. 252 at 3-4, 7-8], as the phone records, witness interviews, and surveillance described in the affidavit connected Dooley to Booker and both of them to a string of armored truck robberies, with indications that another robbery was being contemplated. Therefore, based on the totality of the facts contained in the affidavit, the undersigned finds that the judge authorizing the wiretap reasonably concluded that there was probable cause to believe that information and evidence concerning the armed robberies would be obtained through the interception of wire communications over Target Telephone #2, and it is **RECOMMENDED** that Dooley's motion to suppress illegally intercepted communications, [Doc. 252], be **DENIED**.

## C.    Good Faith Exception

The government contends that even if the affidavits in support of the wiretaps did not establish probable cause or necessity, suppression of the evidence obtained pursuant to those wiretaps would not be warranted. [Doc. 341 at 66-71]. Under United States v. Leon, 468 U.S. 897 (1984), "the good faith exception to the exclusionary rule 'stands for the principle that courts generally should not render inadmissible evidence obtained by police officers acting in reasonable reliance upon a search warrant that is ultimately found to be unsupported by probable cause.'"

United States v. Vanbrackle, 397 F. App'x 557, 559 (11th Cir. 2010) (per curiam) (unpublished) (quoting United States v. Martin, 297 F.3d 1308, 1313 (11th Cir. 2002)); see also United States v. Robinson, 336 F.3d 1293, 1295-96 (11th Cir. 2003). The exception is founded on the principle that the exclusionary rule "is designed to deter police misconduct rather than to punish the errors of judges and magistrates," Leon, 468 U.S. at 914; see also Herring v. United States, 555 U.S. 135, 137 (2009) ("The question [of suppression] turns on the culpability of the police and the potential of exclusion to deter wrongful police conduct."); Arizona v. Evans, 514 U.S. 1, 14 (1995) (citation omitted) ("[T]he exclusionary rule was historically designed as a means of deterring police misconduct, not mistakes by court employees."), and "[p]enalizing an officer for the magistrate's error, rather than his own, [therefore] cannot logically contribute to the deterrence of Fourth Amendment violations," Leon, 468 U.S. at 921. The Eleventh Circuit has recognized that the good faith exception to the exclusionary rule applies to wiretap applications and order. United States v. Malekzadeh, 855 F.2d 1492, 1497 (11th Cir. 1988); United States v. Acosta, 807 F. Supp. 2d 1154, 1248-49 (N.D. Ga. 2011); Flores, 2007 WL 2904109, at *7; United States v. Russell, Cr. No. 2:08CR121-WHA, 2008 WL 4649051, at *5 (M.D. Ala. Oct. 20, 2008); United States v. Royster, No. 5:07-CR-16 (WDO), 2007 WL 4336321, at *10 (M.D. Ga. Dec. 7, 2007).[40]

---

[40] Although the Sixth Circuit has held that there is no good faith exception for a warrant obtained pursuant to Title III, see United States v. Rice, 478 F.3d 704 (6th Cir. 2007), the Eleventh Circuit's precedent in Malekzadeh is controlling, see Acosta,

Recognizing that the good faith exception to the exclusionary rule would permit introduction of almost all evidence seized pursuant to judicial authorization, the Supreme Court also identified four specific situations in which the exception would not apply: (1) where the warrant [or court order] is so facially deficient that the executing officers cannot reasonably presume it to be valid; (2) where the issuing judge was misled by information in the affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (3) where the issuing judge wholly abandoned his judicial role; and (4) where the supporting affidavit is so lacking in indicia of probable cause [or specific and articulable facts relevant and material to an ongoing criminal investigation] as to render official belief in its existence entirely unreasonable. Leon, 468 U.S. at 923; see also United States v. Accardo, 749 F.2d 1477, 1480 & n.4 (11th Cir. 1985). However, neither defendant has advanced any argument as to why the good faith exception would not apply, and there is no evidence here that the issuing judge was misled or abandoned his role as a neutral and detached judge, or that the wiretaps so lacked probable cause or were so deficient as to bar the application of the good faith exception. See Acosta, 807 F. Supp. 2d at 1249 (finding that the good faith exception would apply where "[d]efendant set forth no grounds supporting a finding that Leon's good faith

_____

807 F. Supp. 2d at 1248-49; Royster, 2007 WL 4336321, at *10 & n.5.

exception does not apply to this case"); <u>Royster</u>, 2007 WL 4336321, at *10 ("Defendant . . . pointed to no evidence that the law enforcement officers in this case had knowledge or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment, and therefore the good faith exception would apply even if the Court had not found the surveillance otherwise valid."). Accordingly, even if the wiretap orders were found to be deficient, law enforcement reasonably relied in good faith on the wiretap orders, and defendants' motions to suppress are due to be denied on this alternative basis. <u>See</u> <u>Acosta</u>, 807 F. Supp. 2d at 1248-49.

### III. CONCLUSION

For the foregoing reasons, it is hereby **RECOMMENDED** that Henderson's motion to suppress intercepted communications, [Doc. 247], and Dooley's motion to suppress evidence derived from illegally intercepted communications, [Doc. 252], be **DENIED.**

**IT IS SO RECOMMENDED**, this 30th day of January, 2013.

_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE